**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------- x

MAXCIMO SCOTT and JAY ENSOR on behalf of
themselves and all others similarly situated,

                        Plaintiffs,

           -against-

CHIPOTLE MEXICAN GRILL, INC.,

                    Defendant.

------------------------------------------------------------- x

Case No. 12-CIV-8333(ALC)(SN)

**DECLARATION OF LISA LEWIS**

I, LISA LEWIS, declare as follows:

1.      I am an attorney in the law firm of Sheppard, Mullin, Richter & Hampton, LLP, attorneys for Defendant Chipotle Mexican Grille, Inc., ("Chipotle").  I submit this Declaration in support of Chipotle's Opposition to Plaintiffs Maxcimo Scott and Jay Ensor's ("Plaintiffs") Motion for Court-Authorized Notice seeking conditional certification and to place before the Court true and correct copies of certain documents.

2.      Attached hereto as Exhibit 1 is a true and correct copy of the Declaration of Matthew Scheiman, executed on April 16, 2013.

3.      Attached hereto as Exhibit 2 is a true and correct copy of the Declaration of Jessenia Aragon, executed on April 9, 2013.

4.      Attached hereto as Exhibit 3 is a true and correct copy of the Declaration of Tomas Espejel, executed on April 5, 2013.

5.      Attached hereto as Exhibit 4 is a true and correct copy of the Declaration of Mynor Mendizabal, executed on April 12, 2013.

6.     Attached hereto as Exhibit 5 is a true and correct copy of the Declaration of Alejandra Garcia, executed on April 11, 2013.

7.     Attached hereto as Exhibit 6 is a true and correct copy of the Declaration of Ruperto Uribe, executed on April 11, 2013.

8.     Attached hereto as Exhibit 7 is a true and correct copy of the Declaration of Kristin Dominguez, executed on April 15, 2013.

9.     Attached hereto as Exhibit 8 is a true and correct copy of the complaint filed by opt-in plaintiff Leah Turner, captioned Leah Turner v. Chipotle Mexican Grill of Colorado, LLC, Civil Action No. 13-CV-00794-WYD (D. Colo. 2013).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 16, 2013 at New York, New York

/s/ Lisa Lewis
LISA LEWIS

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **MAXCIMO SCOTT and JAY ENSOR on behalf of themselves and all others similarly situated,** | Case No.: 12 CV 8333 (ALC)(SN) |
| | **ECF Case** |
| Plaintiffs, | **DECLARATION OF MATTHEW SCHEIMAN** |
| -against- | |
| **CHIPOTLE MEXICAN GRILL, INC.,** | |
| Defendant. | |

I, Matthew Scheiman, declare as follows:

1.      I am currently employed as a Regional Executive Director at Chipotle.  I have personal knowledge of the following facts and, if called as a witness, can competently testify thereto.

2.      I have been employed by Chipotle since May of 1999 when I was hired as a General Manager in Denver, Colorado.

3.      In or around November of 1999, I was promoted to the position of Denver Area Manager.  As the Denver Area Manager, I had overall operational responsibility for 10 restaurants located in the Denver market.

4.      In April of 2002, I was promoted to the position of Operations Director for the Rocky Mountain Region.   As the Operations Director for the Rocky Mountain Region, I had overall responsibility for the operations of all restaurants located in Colorado, Iowa, Kansas, Missouri, Nebraska and Oklahoma and some restaurants located in Texas and Wyoming.

5.      In June of 2010, after an organizational restructuring, I became the Team Director for the Rocky Mountain Region.  As the Team Director for the Rocky Mountain Region I had overall responsibility for the operations of all restaurants located in Colorado.

6.      Finally, in June of 2011 I was promoted to my current position as Regional Executive Director of the Northeast Region.  As the Regional Executive Director for the Northeast Region, I have overall responsibility for the operations of all restaurants located in Connecticut, Maine, Massachusetts, New Hampshire, New York, Rhode Island and Vermont and some restaurants located in New Jersey.

**Chipotle's Vision**

7.      Chipotle operates restaurants which serve a focused menu of burritos, tacos, burrito bowls and salads, made using fresh ingredients.  Chipotle's vision is to change the way people think about and eat fast food.  Chipotle does this by avoiding a formulaic approach when creating the restaurant experience and looking to fine-dining restaurants for inspiration.

8.      Chipotle's approach is also guided by an idea called "Food With Integrity" which involves finding the highest quality ingredients – ingredients that are grown or raised with respect for the environment, animals and people who grow or raise the food.

9.      In addition to a focus on Food With Integrity, Chipotle also has a similarly focused people culture with an emphasis on identifying, hiring and empowering top performing people.  In particular, Chipotle makes an effort to hire employees who will operate restaurants in a way that is consistent with its high standards, yet allows each of their unique personalities, management styles, skills and strengths to contribute to Chipotle's success.

**Chipotle's Operational Framework**

10.     Chipotle operates more than 1,400 restaurants, including restaurants located throughout the United States in 43 states and the District of Columbia, as well as 5 restaurants in Canada and 7 in Europe.

11.     Chipotle's operations and restaurants are divided into the following six regions based upon geographic location:  Central, Mid Atlantic, Northeast, Pacific, Rocky Mountain, and South.

12.     Regional Directors or Executive Team Directors have overall responsibility for the operations of all restaurants located in their regions.

13.     Regional Directors or Executive Team Directors have differing styles, approaches and priorities that cause differing approaches to the ways in which their regions operate, including personnel and management decisions.  There is no uniform manner in which personnel decisions are made or in which management duties are carried out throughout all regions or even all restaurants within a region.

14.     Working under each Regional Director or Executive Team Director is a team of field support leaders who are responsible for assisting the Regional Directors in overseeing the operations of the restaurants within each region.   The leadership structure of the field support team varies from region to region, but generally includes several positions such as Team Directors, Area Managers, Team Leaders and Apprentice Team Leaders.

15.     At the restaurant level, a typical restaurant is staffed with a General Manager, an Apprentice Manager, one or more Service Managers, one or more Kitchen Managers and a range of 15 to 35 full and part-time employees who are supervised by the General Manager and

Apprentice and are responsible for preparing and serving food, as well as other activities, and who are referred to as Crew Members.

16.    General Managers who have been recognized for their excellent performance are given the title of Restaurateur.  A Restaurateur performs all of the same duties as a General Manager.  Restaurateurs who continue to excel may take on the additional responsibility of overseeing or mentoring up to four nearby restaurants.

**Variations in Restaurant Staffing**

17.    There are many dissimilarities in the operations of Chipotle's more than 1,400 restaurants,  including dissimilarities in sales volume, number of hiring decisions, staffing, location and physical layout, to name only a few.  As a result of these dissimilarities, there are significant variations from restaurant to restaurant and even shift to shift in the manner in which managers, including Apprentices, perform their duties and the amount of time devoted to such duties.

18.    For example, restaurants with a higher sales volume may have as many as 35 Crew Members, whereas a restaurant with a lower sales volume may have as few as 15 Crew Members.  The staffing levels in other restaurants may fall somewhere within this range. Likewise, new restaurants and restaurants with higher turnover must participate in much greater interviewing, selection, hiring and new-hire training activities than restaurants with lower turnover and a stable work force.

19.    Furthermore, not all positions are staffed in each of the restaurants.  For example, approximately one-quarter of Chipotle's restaurants do not have an Apprentice.  In general, restaurants with average daily sales below a certain threshold will not be staffed with an Apprentice.   Other restaurants may not staff an Apprentice for a variety of reasons, including but

-4-

not limited to promotions within the restaurant or lack of a qualified candidate.  Some restaurants, on the other hand, have either one or two Apprentices.

20.      In addition, some restaurants do not have a General Manager.  For example, there is often no General Manager in a restaurant where the General Manager has been promoted to the position of Restaurateur.  In those restaurants, the next highest level of manager after the Restaurateur is the Apprentice.  Some restaurants, on the other hand, have a General Manager and are not assigned to a Restaurateur.

**Role of Apprentices**

21.      In the restaurants that staff the Apprentice position, the Apprentices are primarily responsible for managing the day-to-day operations of the restaurants and supervising the lower level managers and Crew Members.

22.      The number of employees that an Apprentice may supervise during any given shift may range from 5 to 14 employees, depending on the restaurant's staffing, sales volume, location and other factors.

23.      Chipotle considers the Apprentice position to be a stepping stone to the General Manager position.  More specifically, Apprentices are typically promoted to the position of General Manager once they have demonstrated that they have mastered the skills of and regularly performed the duties of a General Manager.

24.      Before becoming an Apprentice, an employee must develop management skills and knowledge and demonstrate his or her ability to manage and lead.  To do so, an employee who is promoted from within typically must work first as an hourly Service Manager and Kitchen Manager.  As a Service Manager, employees learn how to supervise and train Crew Members.

25.     Once an employee is promoted to Apprentice, he or she is expected to work with the General Manager or Restaurateur of the restaurant to run the day-to-day operations of the restaurant and prepare for the General Manager role.  Apprentices must first train, coach and develop Crew Members and hourly managers such as Service Managers to qualify for advancement and to take over the Apprentice's position in order to qualify for advancement to the General Manager position.  Thus, Apprentices spend varying amounts of time working shoulder-to-shoulder to oversee, direct, supervise, train, coach and provide regular feedback to Crew Members, Kitchen Managers and Service Managers in order to train and develop them for advancement and prioritize their work.  While working shoulder-to-shoulder, Apprentices are engaged in work directly related to the management of the restaurant and its employees, even when they choose to help out while supervising.

**Job Duties and Responsibilities of Apprentices**

26.     The actual activities performed by Apprentices and the amount of time spent on each duty varies from region to region, restaurant to restaurant and even shift to shift based on numerous factors, such sales volume, staffing levels at the time, unanticipated absences of employees, the number of new employees who require close supervision and extra training and the managerial style, skills and preferences of Regional Directors, Restaurateurs (if they exist over a restaurant), General Managers and Apprentices.

27.     Nonetheless, Apprentices are expected to lead the successful day-to-day operations of the restaurant by accomplishing the following essential job duties and responsibilities, among others:  recruiting, interviewing and hiring Crew Members; supervising and training restaurant employees; participating in personnel decisions regarding restaurant employees, including transferring, disciplining and terminating employees; approving leaves of

absence for employees; building sales and managing the restaurant budget; preparing schedules that meet the needs of the business so that an excellent customer experience is delivered while maintaining financial responsibility; supervising employees, allocating work, assigning work, directing employees and prioritizing work; ensuring proper performance of administrative duties including payroll, inventory, food ordering and cash handling; acting as the highest level manager when the General Manager or Restaurateur is not present; ensuring safety and security standards are emphasized and adhered to and that employees are trained in appropriate responses to unsafe situations; and ensuring employees are paid properly, receive appropriate benefits and are prepared for additional career opportunities; overseeing employees to maintain a clean restaurant with excellent food quality and customer service; and directing employees to maintain cleaning and sanitation standards within the restaurant.

28.    Apprentices are responsible for and expected to manage, supervise, direct, train, evaluate and discipline all Crew Members and lower level managers at all times they are on duty.

29.    In addition, Apprentices are expected to use their discretion and independent judgment when interviewing, selecting, hiring, scheduling, directing, developing, coaching, training, disciplining and firing employees and when determining what activities to delegate to Crew Members and lower level managers and how they should prioritize assignments.

30.    Apprentices also perform and are trained to perform all of the duties that a General Manager is authorized to perform, with the exception of conducting document review for worker eligibility determinations.  An Apprentice is, however, authorized to conduct document review if he or she has attended the necessary I-9 document training.

31.    An Apprentice is required to act as the highest level manager on duty whenever the General Manager or Restaurateur of the restaurant is not present in the restaurant.

32.     Moreover, Apprentices are authorized to perform a number of managerial duties that lower level managers, including Kitchen Managers and Service Managers, are not authorized to perform, including:  performing cash handling audits and video audits relating to loss prevention, authorizing leaves of absence for employees, making recommendations for employee pay increases, terminating employees, sending employees home early and approving weekly schedules.

**Variations in Job Activities and Time Spent on Activities**

33.     Although all Apprentices are accountable for completing the essential job duties and responsibilities of the position, Chipotle requires Apprentices, as managers, to use their discretion and independent judgment at all times to determine which activities to perform and the amount of time they need to spend on each activity in order to accomplish their management responsibilities. At all times they are responsible to manage and supervise the employees on duty and to prioritize, assign, supervise and direct their work.

34.     Based upon my experience and observations in my various roles at Chipotle, there are a vast number of dissimilarities in the ways that Apprentices approach their job duties and responsibilities.  In particular, there are significant variations from employee to employee, shift to shift, restaurant to restaurant, location to location and region to region in the activities performed by Apprentices and the time that Apprentices spend on each activity.

35.     Some of the variations in approach among Apprentices are a result of Chipotle's shoulder-to-shoulder training technique.  Chipotle does not require Apprentices to participate in centralized training.  Instead, each Apprentice is expected to work shoulder-to-shoulder with the General Manager of his or her restaurant to receive on-the-job training.  During the on-the-job training, Apprentices receive individualized instruction which can vary greatly from Apprentice

-8-

to Apprentice and restaurant to restaurant based upon the style and preferences of the General Manager conducting the training. As a result of this lack of centralized training, individual Apprentices are exposed to various different methods for performing their job duties and responsibilities.

36.     Chipotle's on-the-job training method also requires Apprentices to train, supervise, direct and coach lower level managers and Crew Members by working shoulder-to-should with them. As a result, the amount of time that individual Apprentices spend on such training and other activities may differ substantially from restaurant to restaurant based upon a myriad of factors, including the number of new or inexperienced Crew Members or managers, the turnover rate and the sales volume.

37.     In addition to the differences created by the individualized shoulder-to-shoulder training method, the activities Apprentices perform and the amount of time spent on each activity also vary significantly based upon variables in the restaurants such as the sales volume, staffing needs, location and layout, among other variables.

38.     For example, an Apprentice working at a restaurant with a higher volume of sales that employs 35 Crew Members will inevitably spend more of his or her time performing duties relating to interviewing, hiring, training, evaluating and scheduling employees, among other managerial duties, than an Apprentice working at a restaurant with a lower volume of sales with only 15 Crew Members, simply based on the fact that there are more employees to manage.

39.     Likewise, an Apprentice working at a newly opened restaurant or a restaurant with high employee turnover will spend considerably more time recruiting, interviewing and hiring employees than an Apprentice at an established restaurant or a restaurant with low employee turnover.

40.     Based upon my experience and observations, other factors which significantly impact the way in which an Apprentice spends his or her time are the experience level, skills and preferences of the General Manager or Restaurateur of the restaurant.  For example, while some General Managers or Restaurateurs delegate responsibility to the Apprentice for scheduling the restaurant's entire staff, other General Managers or Restaurateurs prefer to maintain control over scheduling for managers.   In addition, while some General Managers or Restaurateurs prefer to delegate the majority of training, hiring, interviewing and evaluating responsibilities to Apprentices, others prefer to retain more control over these activities and still others divide the responsibilities evenly.  Thus, in some cases, the preferences and style of the General Manager or Restaurateurs may dictate whether certain activities are performed by the Apprentice and/or the amount of time spent on those activities.  Furthermore, restaurants with two Apprentices generally have higher sales volumes and staffing levels and may use a different approach for dividing responsibilities.

41.     Likewise, the experiences and preferences of the individual Apprentices also influence how they spend their time.  Because Chipotle encourages its Apprentices to use their unique personalities and strengths to manage their restaurants, decisions regarding the activities performed and the proportion of time required on each activity in order to accomplish the job duties of the position vary substantially from Apprentice to Apprentice.

42.     For example, some Apprentices prefer to spend a substantial amount of their time working shoulder-to-shoulder with Crew Members, Kitchen Managers or Service Managers so that they can be involved with training and evaluating their performance as often as possible.  On the other hand, other Apprentices prefer to spend more time performing administrative duties, such as creating schedules, handling inventory or ordering food, and would rather

delegate the training responsibilities to Crew Members and lower level managers as much as possible.

43.     By way of another example, some Apprentices prefer to position themselves in different places in the restaurant in order to supervise and direct the work of other employees. For example, some Apprentices prefer to work in a position that is next to the cashier and at the end of the line of Crew Members preparing the food.   In this position, the Apprentice can direct the work and evaluate the performance of Crew Members, while at the same time directing customer traffic.  Other Apprentices prefer to work in a position between the line of Crew Members preparing the food for customers and the employees cooking the food in the kitchen. In this position, the Apprentice can similarly direct the work and evaluate the performance of Crew Members, while at the same time can also ensuring that food is properly moving from the kitchen to the Crew Members preparing the food.

44.     These are just a few examples of the numerous ways in which an Apprentice's style and personal preferences can impact the approach that an Apprentice uses to accomplish his or her management responsibilities.

45.     In short, based upon my observations and experiences at Chipotle, the activities performed by Apprentices and the proportion of time spent on each activity vary significantly from Apprentice to Apprentice and from restaurant to restaurant and even shift to shift based upon differences in training, restaurant staffing, restaurant sales volume, the experiences or preferences of General Managers or Restaurateurs with whom the Apprentices work and the management styles and preferences of the individual Apprentices, among other factors.

**Variations in Hours Worked**

46.     In addition to the variations in activities performed and time spent on those activities, the number of hours worked by Apprentices also varies substantially based upon several factors, including a restaurant's sales volume, staffing levels, the Apprentice's job performance and the existence of a Restaurateur versus a General Manager, among other factors.

47.     As explained above, restaurant staffing can vary significantly from restaurant to restaurant and shift to shift.  For example, some restaurants have as many as 35 Crew Members, some as few as 15 Crew Members.  Some restaurants have two or more Kitchen Managers and two or more Service Managers, while others have one of each.  In addition, some restaurants have a General Manager, while others have a Restaurateur.

48.     These differences in staffing from restaurant to restaurant result in variations in the number of hours worked by Crew Members and managers alike from restaurant to restaurant. For example, an Apprentice working in a restaurant that has a General Manager will likely work fewer hours than an Apprentice working in a restaurant with a Restaurateur who has responsibility to mentor other restaurants.

**Variations in Compensation Methodologies**

49.     Different regions, areas and locations use different compensation methods and pay rates for Apprentices.  For example, some Apprentices and managers are paid salaries while others are subject to different pay systems and are paid by the hour.   Some are classified as exempt and are not eligible for overtime pay while others are paid overtime.

**Time Spent As Acting The Highest Restaurant Manager**

50.     As explained above, an Apprentice is required to act as the highest level manager whenever the General Managers is not present in the restaurant.

51.     Apprentices typically work some of their shifts while a General Manager or Restaurateur is also on duty in the restaurant and other shifts as the highest level manager on duty.

52.     The amount of time that an Apprentice spends as the highest level manger varies from restaurant to restaurant and from Apprentice to Apprentice.  However, based upon my experience and observations, Apprentices generally spend over 50% of the hours that they work as the highest level manager on duty.

53.     In restaurants which have a Restaurateur, rather than a General Manager, the Apprentice often spends even more time as the highest manager on duty.  This is especially true when a Restaurateur is assigned to mentor more than one restaurant.  In those cases, the Restaurateur spends a substantial amount of his or her time visiting and mentoring the managers at other restaurants.  As a result, the Apprentice at the Restaurateur's home restaurant is required to act as the highest level manager on a more frequent basis while the Restaurateur is absent.

54.     Furthermore, in some restaurants where the General Manager position has not been filled, an Apprentice may be the highest level manager 100% of the time.

**Apprentice Performance**

55.     While the number of hours worked, the activities performed and the proportion of time spent on each activity may vary from Apprentice to Apprentice, all Apprentices are ultimately responsible for managing the day-to-day operations of their restaurants.  Indeed, Apprentices are evaluated based upon how effectively they perform their management job duties and responsibilities.

56.     In particular, Apprentices are evaluated using a Restaurant Management Performance Review ("Performance Review") which requires their direct manager to assess

-13-

them on their individual management performance.  The key performance measures contained in the Performance Review include creating a team of top performers, setting high standards, leading through empowerment and accomplishing financial goals.  As a result, Apprentices are evaluated based on the manner in which they perform their management duties.

57.     Apprentices are also eligible to receive a bonus which is tied to their Performance Review and determined based upon the rating received on the Performance Review.  The purpose of the bonus program is to reward Apprentices who successfully perform their management job duties and responsibilities.  Because bonuses recognize and reward the performance of management duties, Crew Members are not eligible for bonuses based upon performance.

58.     On the other hand, Apprentices who fail to effectively perform the required managerial job duties and responsibilities will receive low ratings on their performance evaluations.   Apprentices who receive low ratings on their Performance Evaluations are subject to disciplinary action, including demotion and termination.

**Interaction Among Apprentices**

59.     As explained in detail above, there are many dissimilarities among the Apprentices employed by Chipotle, including differences in the hours worked, the activities performed, the time spent on individual activities and the time spent as the highest level manager on duty.

60.     While Apprentices are exposed to other Apprentices who worked with them at the restaurants where they are or were employed during their career at Chipotle, for a number of reasons, it is unlikely that Apprentices would spend any significant amount of time observing Apprentices from other restaurants where they were never employed.

61.    First, Chipotle does not send Apprentices to any form of centralized training where they would work with or train with other Apprentices.

62.    Second, Chipotle does not offer or require Apprentices to attend conferences together.

63.    Finally, while some Apprentices may on rare occasions be asked to cover shifts at nearby restaurants, the Apprentices do not spend enough time working in other restaurants to fully observe the amount of hours worked, activities performed and time spent on individual activities by other Apprentices.

64.    In summary, in light of the significant variations in approaches from Apprentice to Apprentice and from restaurant to restaurant and shift to shift, there would be very little opportunity for Apprentices to observe and fully understand the amount of time worked, the activities performed and the proportion of time spent on each activity by Apprentices working in other restaurants.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 16, 2013 at 1:08 pm , New York.

MATTHEW SCHEIMAN

# EXHIBIT 2

<u>DECLARATION OF JESSENIA ARAGON</u>

I, JESSENIA ARAGON, declare as follows:

1.      I am currently employed by Chipotle Mexican Grill, Inc. ("Chipotle") as a Restaurateur 3 or "R3" in New York City.

2.      I have personal knowledge of the following facts and, if called as a witness, can competently testify thereto.

3.      In February of 2008, I was hired by Chipotle as a Service Manager at the restaurant located at 19 St. Marks Place, New York, New York (the "St. Marks Restaurant"). In or about August of 2008, I was promoted to the position of Apprentice at the St. Marks Restaurant. In or about October of 2009, I was promoted to the position of General Manager at the St. Marks Restaurant.

4.      In or about February of 2011, I was promoted to the position of Restaurateur at the St. Marks Restaurant. In or about May of 2011, I was promoted to the position of Restaurateur 2 or "R2". As an R2, I retained responsibility for the St. Marks Restaurant, but also gained responsibility for mentoring a second restaurant. In particular, I became responsible for mentoring the General Manager and overseeing the restaurant located at 200 Varick Street, New York, New York (the "Varick Street Restaurant"). As a result, I divided my time between the two restaurants.

5.      In or about May of 2012, I was promoted to the position of Restaurateur 3 or "R3" that I hold now. As an R3, I retained responsibility for the St. Marks Restaurant and for overseeing the Varick Street Restaurant, but I also gained responsibility for overseeing a third restaurant, namely the restaurant located at 405 6th Avenue, New York, New York (the

-1-

"Greenwich Village Restaurant").   As a result, I now divide my time among the three restaurants.

6.      An Apprentice at Chipotle is responsible for ensuring the excellence of his or her restaurant and for the supervision, development and retention of staff in the restaurant.  As a result, an Apprentice is required to effectively manage the day to day operations of the restaurant and properly supervise, direct and train the staff in his or her restaurant at all times.

7.      During the time that I was the Apprentice, the St. Marks Restaurant employed approximately 16 employees, including me, a Kitchen Manager, a Service Manager and the full and part-time employees, known as Crew Members.

8.      As the Apprentice at the St. Marks Restaurant, I was responsible for managing the operations of the restaurant and the staff at all times I was on duty.   In connection with my management and supervisory role in the restaurant, I performed all of the same duties and responsibilities as the General Manager of the restaurant.  My management duties and responsibilities continued 100% of the time I worked as the Apprentice and never ended.

9.      More specifically, I was responsible for building a team of employees to successfully operate the restaurant.   As a result, I screened out, interviewed, selected and hired job candidates for employment at the restaurant.   As an Apprentice, I was able to make hiring decisions on my own.

10.      Once I hired a new employee, I was responsible for reviewing and completing the necessary new hire paperwork, including I-9 documentation.

11.      As an Apprentice, I was also responsible for coaching, instructing and developing employees and for ensuring that new employees were properly trained.   I sometimes delegated the training of new Crew Members to one of the lower level managers at my discretion.

However, I would also work shoulder to shoulder with new employees while supervising, instructing, directing and prioritizing their work and offering feedback and advice so they could perform their duties satisfactorily and learn what is needed to advance at Chipotle. Even while working alongside other employees, I continued to supervise them and evaluate their productivity and efficiency.

12.     In addition to being responsible for training, as the Apprentice I was also responsible for evaluating the performance of employees.   As a result, I kept development journals for the employees in which I tracked their progress and noted any development problems or goals that I discussed with the employees.

13.     While supervising as the Apprentice, I constantly provided employees with feedback, constructive criticism and suggestions and evaluated their productivity and efficiency. If I determined it was necessary, I could discipline employees for violations of company policies or underperformance.   For example, if I determined that an employee was failing to perform up to expectations, I would discuss the performance problems with the employee and make a note of our discussions in his or her development journal.   If initial efforts to correct the performance problems through counseling and the development journal process were not successful, I also had the authority to issue a more formal written warning called a Performance Discussion.   In addition, I had the authority to terminate employees as the Apprentice.

14.     As the Apprentice, I was responsible for creating a work plan for the day and then overseeing the completion of that plan.   It was within my discretion and independent judgment to delegate, assign tasks and prioritize work in order to execute the plan.

15.     I was constantly supervising the work of the other employees while I was an Apprentice by walking around the restaurant and ensuring that everyone was completing their

assigned tasks.  If I saw someone who was not completing their work, I would speak to the employee and get him or her to refocus on the assigned tasks.  If I identified new tasks that needed to be completed, I would assign someone to complete the tasks.

16.     As the Apprentice, I was also responsible for preparing work schedules for the Crew Members and lower level managers.   I did this by reviewing financial reports and other relevant information to anticipate and determine the staffing needs.

17.     In addition, I was also responsible for ensuring compliance with health and safety laws and ensuring that the restaurant was complying with cleanliness standards.

18.     Furthermore, as the Apprentice I was responsible for addressing employee complaints and grievances, approving employee leaves of absence, addressing customer complaints, reviewing financial reports and data, maintaining the budget, controlling costs of the restaurant and ensuring safety of employees.

19.     When I was an Apprentice at the St. Marks Restaurant, the Restaurant did not employ a General Manager.  As a result, I was the highest level manager of the restaurant 100% of the time I was on duty.  During my shifts, I was responsible to direct, supervise and oversee all of the other employees on duty, which typically ranged between 4 to 8 employees per shift.

20.     Now that I am a Restaurateur, it is my responsibility to mentor and develop other managers for promotion within Chipotle.  As a result, I spend the majority of my time working with the managers in my restaurants training them on how to properly manage their restaurants. I divide my time between three restaurants and rely on the General Managers and Apprentice at each restaurant to manage the restaurants and to supervise, direct, coach and develop the employees.

21.     I train the managers who work for me to understand that they are responsible for overseeing the day to day operations of the restaurant and supervising the employees working at the restaurant. I also make it clear that they are expected manage their restaurants and the employees in their restaurant 100% of the time.

22.     The current Apprentice at the St. Marks Restaurant is Marvins Georges. As the Restaurateur for the restaurant, I am his direct supervisor and I am responsible for mentoring Mr. Georges on the management duties and responsibilities of an Apprentice. Mr. Georges typically spends over half his work time each week as the highest level manager in the restaurant with management authority over all its hourly employees.

23.     Before Mr. Georges worked as an Apprentice at the St. Marks restaurant, he worked for me as a General Manager at the Varick Street Restaurant. Mr. Georges assumed the role of General Manager at the Varick Street Restaurant after the prior General Manager left the company. Before being promoted to the position of General Manager, he had worked as the Apprentice at the Varick Street Restaurant for several months.

24.     Although Mr. Georges had learned the skills and knowledge to be a General Manager during the time he worked as an Apprentice, Mr. Georges did not perform up to standard as a General Manager. The Varick Street Restaurant was not meeting its development goals and it was regularly understaffed under his management. As a result, approximately 10 months after he became the General Manager, in August of 2012, I terminated his employment for underperformance. It was not because he lacked the authority or responsibility to manage the entire restaurant, but due to his failure to consistently carry out his responsibilities and authority in a satisfactory manner.

25.    After terminating Mr. Georges' employment, I decided to give him a second chance to prove that he could effectively perform the management duties and responsibilities that he had been trained to perform.  As a result, in November 2012, I re-hired Mr. Georges to work with me as an Apprentice in the St. Marks Restaurant.

26.    Now that I am directly responsible for supervising and mentoring Mr. Georges as an Apprentice, I have trained him to understand that his primary duty as the Apprentice is to manage the day to day operations of the restaurant and supervise the other employees.

27.    As the Apprentice at the St. Marks Restaurant, Mr. Georges has been trained on how to perform and is expected to perform all of the same management duties and responsibilities that I performed as an Apprentice.  In particular, Mr. Scott is expected to perform each of the management duties and responsibilities set forth in paragraphs 8 to 19 above.

28.    As the Apprentice at the St. Marks Restaurant, Mr. Georges is the next highest level employee after me because the Restaurant does not have a General Manager.  Because I have responsibility over three restaurants, Mr. Georges spends even more time as the highest level manager on duty than Apprentices who work in a restaurant with a General Manager, rather than a Restaurateur.  This is because I am often away from the St. Marks Restaurant in order to visit the other restaurants I am responsible for mentoring.

29.    Although Mr. Georges has been given a second opportunity to prove himself as an Apprentice, he has not consistently lived up to my performance expectations.  Mr. Georges has the knowledge, skills and authority necessary to manage the restaurant and supervise the employees, but he does not always seem to have the motivation or desire to use those skills.  For example, one of his main responsibilities is to train and develop employees in the restaurant.

However, instead of motivating and encouraging the staff, I have learned that he has often complained to the staff.

30.     I am continuing to work with Mr. Georges to improve his performance as an Apprentice.

31.     As the General Manager, and later the Restaurateur at the St. Marks Restaurant, an Apprentice who worked with me at the restaurant was Maxcimo Scott.

32.     As the General Manager and later the Restaurateur, I was Mr. Scott's direct supervisor and I was responsible for training Mr. Scott on the management duties and responsibilities of an Apprentice.   As a result, I know that Mr. Scott was trained to understand that his primary duty as the Apprentice was to manage the day to day operations of the restaurant and supervise the other employees.   I entrusted him with that authority and expected him to carry it out each day.

33.     As an Apprentice, Mr. Scott performed all of the same management duties and responsibilities that I performed as an Apprentice.   In particular, Mr. Scott performed each of the management duties and responsibilities set forth in paragraphs 8 to 19 above.

34.     My method of training Mr. Scott was to teach Mr. Scott how to perform the required management duties and then allow him to learn the required skills by performing the duties himself.   For example, I showed Mr. Scott how to prepare the weekly schedules, then I delegated the responsibility for creating the schedules to him.   When Mr. Scott needed to prepare schedules, I would take over supervising the employees while he worked on the schedules in the office.   He performed management responsibilities throughout his shifts, even when he exercised his discretion to work shoulder to shoulder with other employees.   During those periods, he

continued to have authority to direct, supervise, coach and train those employees and to maximize their productivity and efficiency.

35.    I ultimately recommended Mr. Scott for a promotion to the position of General Manager.  I would not have recommended him for a promotion if he had not proven to me that he could regularly and successfully perform all of the management duties and responsibilities set forth in paragraphs 8 to 19 above.

36.    During the time that Mr. Scott worked for me as both an Apprentice and a General Manager, Mr. Scott regularly left early and worked less than the 50 hours per week that he was scheduled to work.  On most days that he was scheduled, he would leave work 1 or 2 hours before the end of the scheduled shift.  I was fine with this arrangement as long as he was properly completing his job duties and responsibilities and the restaurants were performing as expected.   Because he was paid a salary, his compensation was not adjusted when he left early. In October of 2012, I noticed that Mr. Scott was not completing all of his management duties and responsibilities as a General Manager of the Greenwich Village Restaurant.  For example, I discovered that he was not updating and completing the development journals for all of his employees on a regular basis. As a result, I told Mr. Scott that he could no longer leave work early on a regular basis and that he had to make sure that all of his management duties and responsibilities were being performed.

37.    After I informed Mr. Scott that he had to work all of his scheduled hours, he started to complain about his schedule and question the number of hours that he worked.  Prior to this time, Mr. Scott had never complained about the number of hours that he worked.

38.    I understand that there is a proposed class action lawsuit against Chipotle that has been filed by Mr. Scott and another individual who previously worked as an Apprentice alleging

-8-

wage and hour violations, including allegations that they and others were not properly paid overtime in violation of federal and state laws. I understand that Mr. Scott and the other former Apprentice want to include me and other individuals in the lawsuit. In fact, Mr. Scott specifically asked me if I wanted to join the lawsuit and then told me to contact his attorneys. I declined to join in the lawsuit and I told Mr. Scott that I did not want to contact his attorneys or be involved in the lawsuit. I also informed Mr. Scott that I did not think that the lawsuit had any basis since I believe that Apprentices at Chipotle primarily perform high level management duties and are properly classified as exempt employees.

39.     Since the lawsuit was filed by Mr. Scott, I regularly receive telephone calls from him attempting to discuss the lawsuit. Through these telephone conversations, it has become clear to me that he has been monitoring the activities of other employees to determine who is assisting Chipotle in defending the lawsuit so that he can attempt to influence those employees. In particular, on Friday, April 8, 2013, Mr. Scott informed me that he had learned that the General Manager from the Varick Street Restaurant, Tomas Espejel, had met with Chipotle's representatives and given them a declaration. During that conversation, Mr. Scott exhibited anger and hostility towards Mr. Espejel and referred to him as "disgusting" and also called him a "snake." Mr. Scott made it clear to me that he was angry at Mr. Espejel simply because Mr. Espejel had agreed to meet with Chipotle's representatives and tell the truth. I am personally concerned that Mr. Scott may attempt to retaliate against anyone he believes is providing Chipotle with information in connection with the lawsuit.

40.     I understand that this declaration may be used in the lawsuit. I have completed this declaration voluntarily of my own free will and am choosing to do so because it is true and correct. I have not been pressured, coerced, threatened or promised anything in connection with

this declaration.  I understand that I will not be retaliated against as a result of my choice to either sign or not sign this declaration by Chipotle.  Chipotle informed me that it is entirely my choice whether to sign this declaration and that my choice would not affect my job in any way.

I declare to the best of my knowledge that the foregoing is true and correct under penalty of perjury.

Executed on April 9, 2013 at New York, New York.

JESSENIA ARAGON

# EXHIBIT 3

DECLARATION OF TOMAS ESPEJEL

I, Tomas Espejel, declare as follows:

1.        I am currently employed by Chipotle Mexican Grill, Inc. ("Chipotle") as a General Manager in the restaurant located at 200 Varick Street in New York, New York (the "Varick Street Restaurant").

2.        I have personal knowledge of the following facts and, if called as a witness, can competently testify thereto.

3.        I have worked for Chipotle since approximately May of 2010.  I started at Chipotle as a Kitchen Manager working at the restaurant located at 9 St. Marks Place, New York, New York (the "St. Marks Restaurant").  I worked in that position until December 2010 when I was promoted to the position of Service Manager at the St. Marks Restaurant.  In October 2011, I was promoted to the position of Apprentice at the St. Mark's Restaurant. Finally, I was transferred to the Varick Street Restaurant and promoted to the position of General Manager in August of 2012.  I have worked as the General Manager of the Varick Street Restaurant since that time.

4.        When I worked as an Apprentice at the St. Marks Restaurant, the restaurant employed a total of 20 employees, including me as the Apprentice, a Restaurateur, a Kitchen Manager, a Service Manager and 16 full and part-time employees known as Crew Members.

5.        As an Apprentice at the St. Marks Restaurant, I was responsible for maintaining and running the operations of the restaurant.  I was also responsible for supervising, directing and overseeing the other employees at the restaurant, other than the Restaurateur.

6.        I was responsible for managing the restaurant and the employees 100% of the time.  That was my primary duty as an Apprentice.

-1-

7.     More specifically, as an Apprentice, I was responsible for selecting, interviewing and screening out job candidates to work at the restaurant.  At the beginning of my time as an Apprentice, I would make hiring decisions jointly with the Restaurateur.  As I gained more experience as an Apprentice, I made hiring decisions on my own.

8.     As an apprentice, I attended document training which taught me how to review worker eligibility documentation.  As a result, I was able to review and complete I-9 documents for newly hired employees while I was an Apprentice.

9.     As an Apprentice, I was also directly involved in the training, coaching, and development of the other employees so they could succeed, work productively and qualify for advancement.  Often, I would work shoulder to shoulder with the employees while supervising, instructing, and directing their work and offering feedback and advice so they could perform their duties satisfactorily and learn what is needed to advance at Chipotle.

10.     While supervising employees as an Apprentice, I constantly provided feedback, constructive criticism and suggestions and evaluated their productivity and efficiency.

11.     At my discretion, when I determined it was necessary, I was responsible as an Apprentice for disciplining employees.  For example, if an employee was late or called in without finding a replacement in violation of Chipotle's policies, I would counsel the employee and make a written note of the employee's violation of policy in the development journal that I kept for the employee.   I would also give the employee advice and set a goal on how he or she could improve.   I was able to discipline employees at my own discretion and without seeking approval from the Restaurateur.

12.     I was also authorized as an Apprentice to terminate employees if necessary.  During my time as an Apprentice, I terminated two employees, one for repeated lateness and

another for being disrespectful to other employees. These termination decisions were made jointly with the Restaurateur

13.    As an Apprentice, I was also responsible for directing, assigning work and prioritizing the work of the employees in the restaurant.

14.    In addition, I was responsible for evaluating the performance of employees and for making recommendations for promotions. As mentioned above, I kept development journals on employees which tracked their training and progress. I was also responsible for completing performance evaluations for employees every six months.

15.    As an Apprentice it was in my discretion to delegate work to employees and plan work for the day. I would also walk around the restaurant to make sure that employees were completing assigned tasks.

16.    As an Apprentice, I organized staff meetings every few months at my discretion. The purpose of the meetings was to inform employees of any developments in the restaurant and in staffing. I was responsible for calling and conducting these staff meetings.

17.    Furthermore, as an Apprentice I was responsible for addressing employee complaints and grievances, approving employee leaves of absence, addressing customer complaints, creating and approving work schedules, reviewing financial reports and data, maintaining the budget and controlling costs of the restaurant, ensuring safety of employees and ensuring that the restaurant complies with health and safety laws.

18.    In short, as an Apprentice, I had the authority to perform the same job duties that a General Manager or Restaurateur performs.

19.    When the Restaurateur was not present at the St. Marks Restaurant, as the Apprentice, I acted as the highest level manager of the restaurant. At the beginning of my time

-3-

as an Apprentice, the Restaurateur was present during part of my shifts.  By the end of my time

as an Apprentice, I spent almost all of my work time as the highest manager on duty.   When the

Restaurateur was present in the restaurant, I was still responsible for managing the restaurant and

supervising the employees.

20.     I estimate that during my employment at Chipotle as an Apprentice at the St.

Marks Restaurant, I routinely spent approximately sixty percent (60%) of my work time

performing the management duties and responsibilities set forth in paragraphs 7 through 17

above.

21.     I estimate that I spent the remaining forty percent (40%) of my work time as an

Apprentice in the St. Marks Restaurant performing various tasks within the restaurant including

serving customers, cutting vegetables, grilling meats, preparing food, cashiering, cleaning the

restaurant, unloading deliveries and stocking food.  I determined in my discretion when to assist

crew members and lower level managers with these job duties, when to work in the office, which

tasks to perform and when I wish to perform them.  Even when I was performing these duties, I

was constantly supervising, directing and assigning work to the crew members and lower level

managers to make sure that they were properly performing their job duties in the order and

manner I direct.  I also instruct crew members and lower level managers on how to perform these

job duties and constantly evaluate their performance so I can maximize their productivity and

efficiency while ensuring a positive experience for our patrons as well as safety and compliance

with applicable health standards.

22.     During my employment at Chipotle as an Apprentice at the St. Marks Restaurant,

I usually worked between 50 and 53 hours per week.

23.     As the General Manager of the Varick Street Restaurant, I have been responsible for supervising the Apprentice working at the restaurant.   The Apprentice at the Varick St. Restaurant is responsible for overseeing the day to day operations of the restaurant and supervising the employees working at the restaurant.

24.     I expect the Apprentice working with me at the Varick Street Restaurant to manage the restaurant and the employees in the restaurant 100% of the time.

25.     Jessenia Aragon is the Restaurateur for both the Varick Street Restaurant and St. Marks Restaurant where I have worked.

26.     When I was the Service Manager at the St. Marks Restaurant, the Apprentice working at the restaurant was Maxcimo Scott.

27.     As the Apprentice, Mr. Scott was my direct supervisor and he was responsible for training me.  Mr. Scott recommended me for promotion to the Apprentice position.

28.     When I worked for him, Mr. Scott's primary responsibility as the Apprentice was to manage the day to day operations of the restaurant and supervise the employees working in the restaurant.

29.     As an Apprentice, Mr. Scott was responsible for performing all of the management duties and responsibilities set forth in paragraphs 7 through 17 above.

30.     As explained above, one of my responsibilities as an Apprentice at the St. Marks Restaurant was to train and develop employees for promotion.  In fact, before I could be promoted to the position of General Manager, I had to train a replacement to take over my position as Apprentice.   The person who I trained and recommended to replace me as an Apprentice was Joseph Rodriguez.

31.     While I was training him, I made it clear to Mr. Rodriguez that an Apprentice is responsible for maintaining and running the operations of the restaurant.   Only after he proved that he was able to manage the restaurant and supervise the employees did I recommend him for the position of Apprentice.

32.     I understand that there is a proposed class action lawsuit against Chipotle that has been filed by two individuals who previously worked as Apprentices alleging wage and hour violations, including allegations that they and others were not properly paid overtime in violation of federal and state laws.   I understand the former Apprentices want to include me and other individuals who have worked as Apprentices in the lawsuit and that this declaration may be used in the lawsuit.

33.     I have completed this declaration voluntarily of my own free will and am choosing to do so because it is true and correct.   I have not been pressured, coerced, threatened or promised anything in connection with this declaration.   I understand that I will not be retaliated against as a result of my choice to either sign or not sign this declaration.   Chipotle informed me that it is entirely my choice whether to sign this declaration and that my choice would not affect my job in any way.

I declare to the best of my knowledge that the foregoing is true and correct under penalty of perjury.

Executed on April 5, 2013 at New York, New York.

_____

TOMAS ESPEJEL

# EXHIBIT 4

## DECLARATION OF MYNOR MENDIZABAL

I, Mynor Mendizabal, declare as follows:

1.     I am currently employed by Chipotle Mexican Grill, Inc. ("Chipotle") as a Restaurateur in the restaurant located in Paramus, New Jersey.

2.     I have personal knowledge of the following facts and, if called as a witness, can competently testify thereto.

3.     I have worked for Chipotle since approximately April 2010. I started at Chipotle as a Kitchen Manager In-Training working at the restaurant located at 9 Saint Marks Place, New York, New York 10003. I worked in that position until approximately June 2010, when I was promoted to Kitchen Manager. In late August 2010, I was promoted to the position of Apprentice and transferred to the restaurant located in Clifton, New Jersey. Although I was promoted to the Apprentice position in Clifton, I effectively functioned as the General Manager since the General Manager of the Clifton restaurant had been terminated the day before my transfer. From February 2011 until June 2011, I worked on a television-based project on behalf of Chipotle called America's Next Great Restaurant. In July 2011, I was formally promoted to General Manager at the Paramus, New Jersey restaurant and in February 2013, I was promoted to Restaurateur at the Paramus restaurant.

4.     In total, I held the title of Apprentice for approximately four months.

5.     As an Apprentice at the Clifton store, there was no time when I was working at my restaurant when I was not responsible for the restaurant and all its employees, including my Service Manager, Kitchen Manager, Cashiers and Crew Members. As an Apprentice at the Clifton restaurant, this included approximately five managers and 30 Crew Members.

6. In fact, because the General Manager at the Clifton store had been terminated the day before my transfer there as an Apprentice, I immediately was in charge of the entire restaurant and spent my time on managerial duties exclusively.

7. My primary duty as an Apprentice consisted of the management of the restaurant. My duties included, but were not limited to interviewing, hiring and training new Crew Members and managers, directing and supervising the work of all employees, evaluating performance, addressing employee grievances and customer complaints, ordering food, monitoring inventory, setting employee schedules, issuing discipline when I determined it was appropriate, approving employee leaves of absence including leaves of absence under the Family & Medical Leave Act, creating a budget and ensuring that my restaurant operated within it, conducting audits, monitoring the restaurant's profit and loss data and reviewing sales reports, making all personnel decisions, and delegating tasks to my managers as I determined in my sole discretion.

8. It is difficult to itemize every task I performed as an Apprentice in Clifton because I was directly responsible for the success of the restaurant overall as I was the most senior manager present in the Clifton store for the entirety of my tenure as an Apprentice.

9. As an Apprentice, I had and exercised total discretion with respect to whether to hire new Crew Members or managers. Although I would sometimes permit my Kitchen or Service Managers to conduct initial screening interviews with candidates, I always conducted a second interview myself and was solely responsible for deciding whether or not to extend an offer of employment to a candidate.

10. As an Apprentice, I was also responsible for training and developing all of my employees or delegating the training to my Kitchen or Service Managers. At times, my training consisted of physically showing an employee how to assemble a burrito; at other times, it

consisted of me simply explaining how to operate the cash register; and at still other times, it consisted of me delegating the training tasks to my Kitchen or Service Manager. Whenever I worked alongside Crew Members or lower level managers, I remained the highest level manager in charge of the store and was always involved in the oversight, supervision and direction of the entire restaurant and all of its employees.

11.    I was also responsible for training my replacement Apprentice. Approximately one and a half months after I became an Apprentice in Clifton, I began training John Denson. My method of training Mr. Denson involved working side-by-side with him, showing him how to perform responsibilities by example, and then allowing him to perform those responsibilities subject to my review and approval. With scheduling employees, for example, Mr. Denson sat with me to watch me prepare weekly schedules in two consecutive weeks. In the third week, I allowed Mr. Denson to prepare the schedule himself and I reviewed it for errors. In each successive week, I delegated schedule preparation to Mr. Denson with less and less oversight from me as I became more confident that he could perform the task effectively. I repeated this approach with other managerial tasks such as preparing a budget, conducting an audit, and ordering supplies.

12.    As the most senior manager in Clifton, as an Apprentice, I was always responsible for directing and prioritizing work and delegating responsibilities to my Kitchen and Service Managers.

13.    Currently, as a Restaurateur in Paramus, I have two Apprentices working for me: Henry Alvarez and Eric Contreras. Mr. Alvarez and Mr. Contreras are responsible for co-managing the restaurant with me and running the restaurant when I am not there, which is approximately 30% of the time.

14.     I have vested Mr. Alvarez and Mr. Contreras with the authority to discharge all managerial and administrative tasks at the Paramus store. Because I still hold overall accountability for the performance of the store, I may review and approve some of their decisions, but rarely overrule them and have confidence that they will make the appropriate decisions using their discretion and judgment.

15.     I am training them both to be General Managers because it is my, and Chipotle's expectations, that they will have acquired the skills and experience to function as a General Manager immediately upon promotion from the Apprentice position. In fact, I believe that it is a duty of an Apprentice to perform management responsibilities well enough to become a General Manager.

16.     Thus, my Apprentices are responsible for training and developing Crew Members, Kitchen Managers and Service Managers, directing workflow, conducting Crew Member reviews and recommending promotions or pay increases, handling employee grievances and customer complaints, working within the budget that I set with their input, preparing employee schedules, approving time off, and performing any other responsibility associated with the management and successful operation of the restaurant.

17.     There are times when my Apprentices work shoulder to shoulder with others in performing tasks such as working the grill, assembling a burrito, or operating the cash register. However, this is never their primary duty and occurs while they are simultaneously supervising, training and prioritizing the work of other employees. It is the result of them exercising their discretion to oversee the store and other employees to ensure the store's success. They can decide at any time to rotate from whatever they are doing at the time to another activity such as scheduling, interviewing, or coaching in the exercise of their managerial discretion.

-4-

18.   For example, if the store becomes particularly busy and we are short on Crew Members, my Apprentices may jump onto the "line" to expedite orders to maximize sales. Even I, as a Restaurateur, will do so on occasion if I determine that is what the business demands at that moment.

19.   I would estimate that performing responsibilities like this might comprise 5% of my total time as well as 5% of the total time of my Apprentices. Even when my Apprentices are engaged in these tasks, I still consider the tasks to be managerial in nature because we continue to supervise and prioritize work as we work alongside Crew Members and are doing what we determine is necessary for the success of the store.

20.   In my experience, there are numerous factors that vary from store to store and even shift to shift that impact the duties an Apprentice performs. The most notable factor would be business volume. In a low volume store with less Crew Members, Apprentices may spend more time cutting vegetables, working the grill, or operating the cash register. Even then, less then 10% of the total time is spent on such duties. In a high volume store with more Crew Members, Apprentices typically spend more time directing work flow, supervising, and prioritizing tasks.

21.   The personality of an Apprentice also plays a role. An Apprentice who is motivated to move into the role of General Manager will devote significantly more time to mastering the skills and gaining the managerial and administrative experience necessary to be a General Manager. An Apprentice who is less motivated to move into the role of a General Manager may choose to spend less time on the managerial aspects of the job, and instead focus on customer service.

22.   The skill levels and quality of performance of the Crew Members at a particular store impacts the duties performed by an Apprentice. If the Crew Members are well-trained and capable, the amount of time spent on training and discipline may be less, even though the Apprentice constantly manages the store. If the Crew Members are not good performers, or employee turnover is high, an Apprentice will necessarily spend more time on hiring, interviewing, training and discipline.

23.   I worked with Maximo Scott at the Saint Marks Place restaurant for approximately three months. During that time, I witnessed him perform many of the responsibilities discussed above including, but not limited to, interviewing, hiring and training Crew Members, evaluating their performance, addressing employee grievances and customer complaints, setting employee schedules, opening and closing the store, conducting audits, and delegating tasks to Crew Members. Except on occasions when business demanded that he perform some incidental tasks like grilling food or cutting vegetables, I witnessed Mr. Scott performing managerial duties for the majority of his working time.

24.   I understand that there is a proposed class action lawsuit against Chipotle that has been filed by two individuals who previously worked as Apprentices alleging wage and hour violations, including allegations that they and others were not properly paid overtime in violation of federal and state laws. I understand the former Apprentices want to include me and other individuals who have worked as Apprentices in the lawsuit and that this declaration may be used in the lawsuit.

25.   I have completed this declaration voluntarily of my own free will and am choosing to do so because it is true and correct. I have not been pressured, coerced, threatened or promised anything in connection with this declaration. I understand that I will not be

retaliated against as a result of my choice to either sign or not sign this declaration. Chipotle

informed me that it is entirely my choice whether to sign this declaration and that my choice

would not affect my job in any way.

I declare to the best of my knowledge that the foregoing is true and correct under

penalty of perjury.

Executed on April 12, 2013 at New York, New York.

MYNOR MENDIZABAL

# EXHIBIT 5

<u>DECLARATION OF ALEJANDRA GARCIA</u>

I, ALEJANDRA GARCIA, declare as follows:

1.      I am currently employed by Chipotle Mexican Grill, Inc. ("Chipotle") as a Restaurateur in Parker, Colorado.

2.      I have personal knowledge of the following facts and, if called as a witness, can competently testify thereto.

3.      I have worked for Chipotle since approximately September of 2006.  I started at Chipotle as a shift supervisor working at the restaurant located at 9500 Heritage Hills Circle #500, Lone Tree, Colorado (the "Lone Tree Restaurant").  I worked in that position until April of 2007 when I was promoted to the position of Service Manager.

4.      In or about November of 2008, I transferred to the Chipotle restaurant located at 13700 East Colfax Avenue, Denver, Colorado (the "Fitzsimmons Restaurant"). In or about April of 2009, I was promoted to the position of Apprentice and transferred to the restaurant located at 18701 East Main Street, Parker, Colorado (the "Parker Restaurant").

5.      In or about May of 2009, I became the General Manager of the Parker Restaurant. Finally, in or about January of 2011, I was promoted to the position of Restaurateur at the Parker Restaurant.

6.      As an Apprentice, my job was to manage the operations of the Parker Restaurant at all times I was on duty. In performing my job as an Apprentice, I had all of the responsibilities of a General Manager. During the time I was an Apprentice, I was always the highest level manager at the Parker Restaurant because there was not a General Manager or Restaurateur assigned to that restaurant.

-1-

7.      More specifically, as an Apprentice, I was responsible for determining the work schedule of all of the other employees at the restaurant. Each week I would make a schedule of the shifts that every employee would work during the following week. I used my judgment to evaluate the staffing needs of the restaurant compared to the availability and ability of the restaurant's employees.  Eventually I trained a Service Manager to make the schedules for the restaurant.  After I delegated the task of creating a schedule, I double-checked the Service Manager's work to make sure that she had properly carried out my instructions.

8.      As an Apprentice, I was also responsible for reviewing the profit-and-loss statements or "PnL's" for the restaurant.  For example, to ensure that the restaurant was operating profitably, I monitored the food costs reflected in the PnL's and determined how much the restaurant would spend on various food items in the coming weeks or months.

9.      In addition to being responsible for the restaurant's financial performance as an Apprentice, I also ran shifts at the restaurant. This involved directing the restaurant's employees as well as instructing them and coaching them on the tasks that I directed them to complete.

10.      As an Apprentice, I did all of the interviewing necessary to hire employees for the restaurant. Before hiring a new employee, I would consult with the Kitchen and Service Managers who worked under me at the restaurant, but it was ultimately my decision as to who to hire.

11.      I also made decisions about terminations as an Apprentice. Before I made a final decision, I consulted with my mentor at another restaurant. That mentor assisted me in having termination discussions with employees at my restaurant. For example, I decided to terminate an employee who had a lot of experience but had a bad attitude and poor customer service. Before I decided to terminate her, I gave her several warnings that her attitude and customer service

needed to improve. When it did not improve, I consulted my mentor, who supported my decision to terminate that employee and assisted me in delivering that message to the employee.

12.     Because I was entirely responsible for the operation of the Parker Restaurant when I was an Apprentice, the managers who I supervised at the restaurant would call me for assistance even when I was not on duty at the restaurant.  The managers would ask for my approval of decisions or for my advice in performing their own duties.

13.     As an Apprentice, I was also responsible for evaluating and coaching the other employees who worked at the restaurant. At times, I would work shoulder to shoulder with the employees I supervised in order to direct and instruct them. When I was working shoulder to shoulder with my employees, I was always looking around to evaluate them and provide feedback. My approach to shoulder-to-shoulder training was to explain to an employee everything that needed to be done, then to show the employee how to do it by having the employee follow me closely while I demonstrated what to do.

14.     Although an Apprentice might perform some tasks like cutting vegetables or working on the grill, in my experience, these tasks make up a very small percentage of an Apprentice's time. An Apprentice always has the authority to direct another employee to perform those tasks if the Apprentice chooses to do so. Additionally, even when an Apprentice is performing a task like cutting vegetables, the Apprentice is still responsible for the operation of the restaurant and must be overseeing and directing the other employees.

15.     My goal as an Apprentice was to make sure that the restaurant was meeting and exceeding Chipotle's standards and that everyone understood what they needed to do to advance at Chipotle.  To help the employees advance at Chipotle and improve in their duties, I kept development journals for the employees in which I tracked their progress and made notes about

-3-

areas where they needed to improve. I also directed other managers working under me to complete development journals with the employees.

16.     As a General Manager and Restaurateur, I have overseen five Apprentices. All of the Apprentices I have overseen have been responsible for managing the operations of the restaurant. I have been available to the Apprentices if they wanted my input on a particular decision or needed assistance in mastering specific management responsibilities.

17.     For example, the Apprentices I have overseen have been responsible for interviewing and hiring employees to meet the restaurant's staffing needs. If an Apprentice wanted my input on whether a particular candidate would fit in well at Chipotle, he or she might ask me for my opinion. On the other hand, the Apprentices also know that they have the power to make a decision on their own.

18.     One of the Apprentices I have overseen is Leah Turner. As an Apprentice, Ms. Turner was responsible for the operations of the Parker Restaurant. For example, Ms. Turner was responsible for directing and evaluating all of the employees at the restaurant, managing customer relations, and maintaining the financial performance of the restaurant. I was available to Ms. Turner as a resource if she needed guidance on a difficult decision.

19.     When Ms. Turner was an Apprentice, she called me frequently to ask me what she should do in various situations. My response to Ms. Turner was to remind her that she was in charge of the restaurant and to inform her that she needed to make her own decisions.

20.     I understand that there is a proposed class action lawsuit against Chipotle by two former Apprentices alleging wage and hour violations, including allegations that they and others were not properly paid overtime in violation of federal and state laws.  I understand the former

employees want to include me and other current and former Apprentices in the lawsuit and that this declaration may be used in the lawsuit.

21.     I have completed this declaration voluntarily of my own free will and am choosing to do so because it is true and correct.  I have not been pressured, coerced, threatened or promised anything in connection with this declaration.  I understand that I will not be retaliated against as a result of my choice to either sign or not sign this declaration.  Chipotle informed me that it is entirely my choice whether to sign this declaration and that my choice would not affect my job in any way.

I declare to the best of my knowledge that the foregoing is true and correct under penalty of perjury.

Executed April *11*, 2013 at *Parker*, Colorado.


_____
**ALEJANDRA GARCIA**

# EXHIBIT 6

<u>DECLARATION OF RUPERTO URIBE</u>

I, Ruperto Uribe, declare as follows:

1.    I am currently employed by Chipotle Mexican Grill, Inc. ("Chipotle") as a General Manager in the restaurant located at 7515 South University Boulevard, Littleton, Colorado (the "Dry Creek Restaurant").

2.    I have personal knowledge of the following facts and, if called as a witness, can competently testify thereto.

3.    I have worked for Chipotle since approximately November of 2010.  I started at Chipotle as a cashier working at the restaurant located at 18701 East Main Street, Parker, Colorado (the "Parker Restaurant").   I worked in that position until May of 2011 when I was promoted to the position of Service Manager.

4.    In May of 2012, I was promoted to the position of Apprentice at the Parker Restaurant. Finally, in March of 2013, I was promoted to General Manager at the Dry Creek Restaurant.

5.    As an Apprentice, I was responsible for the overall operation of the Parker Restaurant. Although I had a Restaurateur who could give me advice if I wanted it, I ran the restaurant in my own way by implementing all of the things I had learned in preparation for becoming an Apprentice.

6.    When I was an Apprentice, I was in charge of all of the other employees at the Parker Restaurant, except the Restaurateur assigned to the restaurant. The number of employees at the Parker Restaurant varied, but I was typically responsible for 15-20 crew members and 3-4 Kitchen Managers of Service Managers. Although I was accountable to the Restaurateur, she

was often not present at the Parker Restaurant and expected me to make all of the decisions necessary to operate the restaurant, consulting her if I was unsure about a decision.

7.     More specifically, one of my strengths was training and developing new employees. I spent a significant amount of my time as an Apprentice coaching the restaurant's employees, including its Kitchen Managers and Service Managers who worked under me. At times, I would instruct the Kitchen Managers or Service Managers to coach or train the crew members. In turn, I would coach and train the Kitchen Managers and Service Managers so that they were developing the skills necessary to become an Apprentice.

8.     For example, when a new crew member started work at the Parker Restaurant, I would assign someone to shadow him or her for an entire week. That employee would train the new hire by staying by his or her side and evaluating everything he or she did.  Sometimes I would personally train new employees in this same way. I would let the new hires practice the techniques I was trying to teach them so that I could coach them. If the new hires were not performing the tasks very well, I would sometimes complete the tasks myself and have them watch me for thirty minutes or an hour. Although I may have been chopping lettuce or cutting peppers, for example, I viewed this as necessary to properly train the new employees.

9.     To make sure that I was properly evaluating the managers who worked under me, each week I would complete a development journal with them in order to give them specific feedback and areas for improvement. I also wanted to make sure that the crew members I supervised were receiving regular feedback, so I delegated to my Kitchen Managers and Service Managers the task of completing development journals for the crew members.

10.    As an Apprentice, I was also responsible for determining when all of the restaurant's employees would work. I typically carried out this task by delegating the creation of

-2-

a schedule to one of the two Service Managers who worked under me. I had the Service Managers take turns making the schedule for the restaurant. One of them would complete the task each week, and I would check his or her work and offer guidance as necessary.

11.     Part of my responsibility as Apprentice was to make sure the restaurant was succeeding financially. I would evaluate profit-and-loss reports based on the restaurant's costs and sales to determine how much I should budget for certain items. I also looked for areas where I might be overspending the restaurant's funds and decided if spending should be cut back in those areas.  I trained my Kitchen Managers and Service Managers to do the same type of analysis so that they could move up to the Apprentice position and assume responsibility for a restaurant.

12.     To build customer loyalty and develop sales for the Parker Restaurant, I frequently spoke with customers and decided to give them free or discounted meals. As an Apprentice, as I had the authority to make these decisions in order to reward regular customers or bring in new customers.

13.     As an Apprentice, I regularly interviewed candidates for hire at the Parker Restaurant. At other times, I directed other employees to conduct or participate in interviews of candidates for hire. Before deciding whether to extend a job offer to a candidate, I consulted with the other managers of the restaurant, including the Restaurateur to whom I reported. As an Apprentice, I also completed all of the paperwork necessary to officially hire some employees.

14.     I was also responsible for disciplining employees as an Apprentice. For example, I had the authority to suspend employees and send them home. In particular, I remember conducting an investigation into a potential theft by one of the employees at the Parker Restaurant. I interviewed every employee at the restaurant and viewed surveillance footage to

-3-

determine who the thief was. When I made that determination, I sent the employee home and told him to await further instructions.

15.      Part of my responsibility for running the restaurant as an Apprentice involved calling pre-shift meetings for all of the employees in the restaurant. These meetings allowed me to assign the employees to the specific roles they would be performing each day. Most of the time, I directed one of my Service Managers to conduct these pre-shift meetings. This allowed me to evaluate the way in which the Service Manager ran the meeting, so that I could coach him on how to organize and instruct the other employees.

16.      When the Parker Restaurant was serving customers, I sometimes worked amongst the other employees to assist in customer service. I always chose my specific position or task carefully so that I could evaluate, coach and direct other employees and ensure positive relationships with customers.

17.      As an Apprentice, I occasionally performed tasks like chopping vegetables or grilling meats, but I usually only did these tasks when one of the crew members I had scheduled to work was late or absent. On average, I believe I spent less than an hour a day performing tasks like chopping vegetables or grilling meats. I always had the authority to tell another employee to perform those tasks if I did not want to do them, but it was important to me to help my crew members and ensure that the restaurant was running smoothly, since I was responsible for the overall operation of the restaurant.

18.      Before I became an Apprentice at the Parker Restaurant, I worked under an Apprentice at the Parker Restaurant named Leah Turner. My recollection of Ms. Turner is that she was late to work and left work early. As an Apprentice, Ms. Turner had the same overall

responsibility for the operations of the Parker Restaurant that I had when I was the Apprentice at the Parker Restaurant, as I have described.

19.     I understand that there is a proposed class action lawsuit against Chipotle by two former Apprentices alleging wage and hour violations, including allegations that they and others were not properly paid overtime in violation of federal and state laws.  I understand the former employees want to include me and other current and former Apprentices in the lawsuit and that this declaration may be used in the lawsuit.

20.     I have completed this declaration voluntarily of my own free will and am choosing to do so because it is true and correct.  I have not been pressured, coerced, threatened or promised anything in connection with this declaration.  I understand that I will not be retaliated against as a result of my choice to either sign or not sign this declaration.  Chipotle informed me that it is entirely my choice whether to sign this declaration and that my choice would not affect my job in any way.

I declare to the best of my knowledge that the foregoing is true and correct under penalty of perjury.

Executed April _11_, 2013 at _Littleton-_, Colorado. _80122 -_

**RUPERTO URIBE**

-5-

# EXHIBIT 7

DECLARATION OF KRISTEN DOMINGUEZ

I, Kristen Dominguez, declare as follows:

1.  I am currently employed by Chipotle Mexican Grill, Inc. ("Chipotle") as the Compensation Manager at its corporate headquarters located in Denver, Colorado.

2.  I have personal knowledge of the following facts and, if called as a witness, can competently testify thereto.

3.  In my capacity as Compensation Manager, I am familiar with the databases of electronic employee records that Chipotle maintains.

4.  In the course of Chipotle's business, Chipotle regularly updates its databases to store electronic records regarding the start date, termination date, job title, and employment location of each of its employees.

5.  The electronic employee records that Chipotle stores in its databases are entered into Chipotle's databases by individuals who have knowledge of the facts from which those records are derived or have received the information from individuals who have such knowledge.

6.  I have reviewed Chipotle's databases for electronic records concerning the start dates, termination dates, job titles, and employment locations of Maxcimo Scott, Marvins Georges, and Francisco Mayorga.

7.  I have also reviewed Chipotle's databases for electronic records concerning the start dates, termination dates, job titles, and employment locations of Joseph Rodriguez, Naihomy White, Kyle White, Steven Zimmer, Patrice Dildger, Dominique Orton, Beth Joyner, Thaddeus Williams, and Yvonne Hickey.

8.  Chipotle does not have any record of employees by the names of Naihomy White, Steven Zimmer, Patrice Dildger or Dominique Orton.

9.      Although Chipotle has records of an employee named Elizabeth Joyner, Chipotle's records indicate that Ms. Joyner, never held the position of Apprentice.

10.     Chipotle's records indicate that Thaddeus Williams and Yvonne Hickey have not worked for Chipotle as an Apprentice or Assistant Restaurant Manager between November 15, 2009 and present.

11.     Thaddeus Williams held the position of Assistant Restaurant Manager between October 20, 2003 and June 21, 2004. He also held the position of Assistant Restaurant Manager between June 28, 2004 and February 21, 2005.

12.     Yvonne Hickey held the position of Assistant Restaurant Manager between February 7, 2005 and October 29, 2007.

13.     According to Chipotle's records, Maxcimo Scott was hired on August 26, 2005 and terminated on September 05, 2006. Chipotle then rehired Mr. Scott on November 11, 2007.

14.     Chipotle's records indicate that Mr. Scott held the position of Apprentice at the restaurant located at 19 St. Mark's Place, New York, New York (the "St. Mark's Restaurant") between August 30, 2010, and October 23, 2011. On October 24, 2011, Mr. Scott transferred to the restaurant located at 405 6th Avenue, New York, New York (the "Greenwich Village Restaurant") and was promoted to the position of General Manager.  Mr. Scott has not held positions at any restaurants other than the St. Marks Restaurant and the Greenwich Village Restaurant.

15.     Chipotle's records indicate that Marvins Georges held the position of Apprentice at the restaurant located at 200 Varick Street, New York, New York (the "Varick Street Restaurant") between December 6, 2010, and October 23, 2011. Mr. Georges has held the position of Apprentice at the St. Mark's Restaurant, since November 19, 2012. Mr. Georges has

not held positions at any restaurants other than the St. Marks Restaurant and the Varick Street Restaurant.

16.    Chipotle's records indicate that Maxcimo Scott never worked at the same Chipotle restaurant at the same time as Marvins Georges. In fact, Mr. Scott never worked at the Varick Street restaurant where Mr. Georges previously served as Apprentice.  Also, Mr. Scott has not worked at the St. Marks Restaurant since Mr. Georges began working there at that restaurant as an Apprentice.

17.    Chipotle's records indicate that Joseph Rodriguez held the position of Apprentice at the St. Mark's Restaurant between August 6, 2012 and October 21, 2012. Mr. Rodriguez has held the position of Apprentice at Chipotle's restaurant located in Kips Bay, New York, New York (the "Kips Bay Restaurant") since October 22, 2012.

18.    Chipotle's records indicate that Maxcimo Scott never worked in the same Chipotle restaurant as Joseph Rodriguez while Mr. Rodriguez held the position of Apprentice. In addition, Mr. Scott has never worked in the Kips Bay Restaurant. Finally, Mr. Scott did not work at the St. Marks Restaurant between August 6, 2012, and October 21, 2012 when Mr. Rodriguez held the Apprentice position at that restaurant.

19.    Chipotle's records indicate that Kyle White held the position of Apprentice at Chipotle's restaurant located in West Pembroke Pines, Florida (the "West Pembroke Pines Restaurant") between November 22, 2010 and May 8, 2011. Mr. White has not held the position of Apprentice at any other restaurant.

20.    Chipotle's records indicate that Francisco Mayorga never worked in the same Chipotle restaurant as Kyle White while Mr. White held the position of Apprentice. In fact, Mr. Mayorga worked at Chipotle's "restaurant located in Miami Lakes, Florida (the "Miami Lakes

Restaurant") during the entirety of Mr. White's tenure as an Apprentice at the West Pembroke

Pines Restaurant.

I declare to the best of my knowledge that the foregoing is true and correct under

penalty of perjury.

Executed this April 15, 2013 in Denver, Colorado

_____
KRISTEN DOMINGUEZ

# EXHIBIT 8

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

LEAH TURNER

individually and on behalf of others
similarly situated

Plaintiff,

v.

CHIPOTLE MEXICAN GRILL OF COLORADO, LLC,

Defendant.

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, LEAH TURNER on behalf of herself files this Complaint against Defendant, CHIPOTLE MEXICAN GRILL OF COLORADO, LLC, and states as follows:

### PRELIMINARY STATEMENTS

This action is brought to recover damages stemming from violations of the Fair Labor Standards Act of 1938, as amended, 29 USC. §201, *et. seq.* (FLSA), and under the Colorado Wage Act C.R.S. 8-4-101 *et. seq.* Plaintiff was classified as a non-exempt hourly employee of Defendant working as a Kitchen Manager and Service Manager. Plaintiff was improperly denied compensation for hours worked pursuant to the FLSA and The Colorado Wage Act

## JURISDICTION

1. The FLSA authorizes court actions by private parties to recover damages for violation of the FLSA's wage and hour provisions. Jurisdiction over Plaintiff's FLSA claims is based upon 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

2. Subject Matter jurisdiction is conferred on this Court by Title 28 U.S.C. § 1337 and by Title 29 U.S.C. § 216(b). At all times pertinent to this Complaint, Defendant was an enterprise engaged in interstate commerce or in the production of goods for consumers as defined § 3(r) and 3(s) of the FLSA, 29 U.S.C. §§ 203(r) and 203(s). The annual gross sales volume of the Defendant was in excess of $500,000 per annum.

3. Alternatively, Plaintiff worked in interstate commerce so as to fall within the protections of the FLSA.

4. This Court also has jurisdiction over Plaintiff's claims for violations of the Colorado Wage Act pursuant to 28 U.S.C. § 1367 (for those employees working in the State of Colorado) because the State claims are so related to the FLSA claims that they form part of the same case or controversy.

5. This Court has supplemental jurisdiction over Plaintiff's unjust enrichment claims pursuant to 28 U.S.C. § 1367(a) because Plaintiff's claims form a part of the same case or controversy and arise out of the common nucleus of operative facts as wage and hour claims.

6. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to the claim occurred in the District of Colorado.

## PARTIES

7. Plaintiff incorporates herein by this reference the allegations contained in Paragraphs 1 through 6 of this Complaint as if set forth *verbatim.*

8. At all times pertinent hereto, individual Plaintiff Leah Turner was a citizen of the United States of America and a resident of the State of Colorado with a residential address of: 5291 East 123rd Avenue, Thornton, Colorado 80241.

9. At all times material hereto, Plaintiff worked at Defendant's corporately-owned location at: 5642 Allen Way, Space 104, Castle Rock, CO 80104.

10. Plaintiff was classified as a non-exempt hourly employee of Defendant working as a Kitchen Manager from March 2010 though June 2010.

11. Plaintiff was classified as a non-exempt hourly employee of Defendant working as a Service Manager from June 2010 though May 2011.

12. At all times material hereto, Plaintiff was performing her duties for the benefit of and on behalf of Defendant.

13. At all times material hereto, Plaintiff was an "employee" pursuant to 29 U.S.C. § 203(e)(1).

14. At all times material hereto, Defendant was an "employer" pursuant to 29 U.S.C. § 203(d).

15. Plaintiff suffered or was permitted to work by Defendant pursuant to 29 U.S.C. § 203(g).

16. Section 13 of the FLSA, 29 U.S.C. § 213, exempts certain categories of employees from overtime pay obligations. None of the FLSA exemptions apply to Plaintiff during all time material hereto. Accordingly, Plaintiff must be paid overtime pay in accordance with the FLSA.

17. Defendant should be in possession of the time and wage records for Plaintiff for each and every work week.

18. Upon information and belief, Defendant is a Colorado Corporation with a Colorado Registered Agent, Bryant S. Messner, located at 1430 Wynkoop Street, Suite 400, Denver, Colorado 80202.

19. At all times relevant to this action, Defendant, either directly or indirectly had the authority to: (a) hire and fire employees of their facilities; (b) determine the work schedules for the employees or conditions of employment; (c) control the finances and operations of facilities; and (d) determine the rate and method of payment and maintain employment records. By virtue of having regularly exercised that authority on behalf of the grocery stores, the Defendant is an "employer" defined by 29 U.S.C. § 201 *et. seq.*

## COVERAGE

20. Plaintiff incorporates herein by this reference the allegations contained in Paragraphs 1 through 19 of this Complaint as if set forth *verbatim.*

21. At all times material hereto, Plaintiff was an "employee" of Defendant within the meaning of FLSA.

22. At all times material hereto, Defendant was an "employer" within the meaning of FLSA.

23. Defendant was, and continues to be an "employer" within the meaning of FLSA.

24. At all times material hereto, Defendant was, and continues to be an "enterprise engaged in commerce" within the meaning of FLSA.

25. At all times material hereto, Defendant was, and continues to be an enterprise engaged in the "production of goods for commerce" within the meaning of the FLSA.

26. Based upon information and belief, the annual gross revenue of Defendant was in excess of $500,000 per annum during the relevant time periods.

27. At all times material hereto, Defendant had two (2) or more employees handling, selling, or otherwise working on goods or materials that had been moved in or produced for commerce.

28. At all times material hereto, Plaintiff "engaged in commerce" and is subject to individual coverage of the FLSA.

29. At all times material hereto, Plaintiff was engaged in the "production of goods for commerce" and subject to the individual coverage of the FLSA.

30. At all times material hereto, the work performed by the Plaintiff was directly essential to the business performed by Defendant.

## GENERAL ALLEGATIONS

31. Plaintiff incorporates herein by this reference the allegations contained in Paragraphs 1 through 30 of this Complaint as if set forth *verbatim*.

32. At all times material hereto, Plaintiff worked at Defendant's corporately-owned location at: 5642 Allen Way, Space 104, Castle Rock, CO 80104.

33. Plaintiff was classified as a non-exempt hourly employee of Defendant working as a Kitchen Manager from March 2010 though June 2010.

34. Plaintiff was classified as a non-exempt hourly employee of Defendant working as a Service Manager from June 2010 though May 2011.

35. From March 2010 though May 2011, Plaintiff was required to clock-out after she worked forty hours for Defendant in a work week. However, she would be required by Defendant to continue to work off-the-clock.

Case 1:12-cv-02833-ALC-SN Document 46 Filed 04/16/13 Page 67 of 70

36. Plaintiff worked unpaid hours and overtime for hours worked in excess of forty in a work week.

37. In some instances, Plaintiff's overtime hours were moved to the following work week where she was improperly paid straight time, but not time-and-a-half.

38. Further, Plaintiff was required to work during her meal breaks while off-the-clock.

39. Plaintiff was never compensated by Defendant for work during her meal breaks while off-the-clock.

40. Finally, Plaintiff was required to work holidays, but received no compensation from Defendant for this work.

41. In the course of employment with Defendant, the Plaintiff worked unpaid hours and/or overtime hours based upon Defendant's custom and practice, among other violations of the FLSA and state law.

## FIRST CLAIM FOR RELIEF
### Violation of the Fair Labor Standards Act of 1938

42. Plaintiff incorporates herein by this reference the allegations contained in Paragraphs 1 through 41 of this Complaint as if set forth *verbatim*

43. At all times material herein, Plaintiff has been entitled to the rights, protections, and benefits provided under the FLSA, 29 U.S.C. §§ 201 *et seq*.

44. Plaintiff is an "employee" pursuant to 29 U.S.C. § 203(e)(1).

45. Defendant is an "employer" pursuant to 29 U.S.C. § 203(d).

46. Plaintiff suffered and/or was permitted to work by Defendant pursuant to 29 U.S.C. § 203(g).

47. Section 13 of the FLSA, 29 U.S.C. § 213, exempts certain categories of employees from overtime pay obligations. None of the FLSA exemptions apply to Plaintiff. Accordingly, Plaintiff must be paid overtime pay in accordance with the FLSA.

48. The FLSA regulates, among other things, payment of overtime pay by employers whose employees are engaged in the alleged activities of the Defendant's facilities.

49. Defendant was, and is, subject to the recordkeeping, minimum wage and overtime pay requirements of the FLSA because it is an enterprise engaged in commerce and its employees are engaged in commerce.

50. Defendant violated the FLSA by failing to pay Plaintiff all of her time worked, including overtime. In the course of perpetrating these unlawful practices, Defendant has also willfully failed to keep accurate records of all hours worked by employees.

51. Section 13 of the FLSA, 29 U.S.C. § 213, exempts certain categories of employees from overtime pay obligations. None of the FLSA exemptions apply to Plaintiff. Accordingly, Plaintiff must be paid overtime pay in accordance with the FLSA.

52. Plaintiff is a victim of a uniform compensation policy practice. This uniform policy and practice, in violation of the FLSA.

53. Plaintiff is entitled to damages equal to the unpaid wages and mandated overtime premium pay within the three years preceding the filing of this Complaint, plus periods of equitable and agreed-upon tolling, because Defendant acted willfully and knew, or showed reckless disregard of whether, its conduct was prohibited by the FLSA.

54. Defendant has not acted in good faith, nor with reasonable grounds to believe its actions and omissions were not a violation of the FLSA, and as a result thereof, are entitled to recover an award of liquidated damages in an amount equal to the amount of unpaid wages and overtime pay described above pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b). Alternatively, should the Court find Defendant did not act willfully in failing to pay overtime wages, Plaintiff is entitled to an award of pre- and post-judgment interest at the applicable legal rate.

55. As a result of the aforesaid willful violations of the FLSA overtime provisions, overtime compensation has been unlawfully withheld by Defendant from Plaintiff for which Defendant is liable pursuant to 29 U.S.C. § 216(b), together with an additional equal amount as liquidated damages, pre- and post-judgment interest, reasonable attorneys' fees, and costs of this action.

## SECOND CLAIM FOR RELIEF
### Violation of the Colorado Wage and Hour Laws

56. Plaintiff incorporates herein by this reference the allegations contained in Paragraphs 1 through 55 of this Complaint as if set forth *verbatim*.

57. Defendant violated the Colorado Wage and Hour laws, C.R.S. §§ 8-6-101 *et seq*.

58. Defendant is in the retail and service industry. 7 COLO. CODE. REGS. § 1103-1:2(A).

59. Defendant is required under Colorado law to pay Plaintiff for her time worked. 7 COLO. CODE REGS. § 1103-1:2; 7 COLO. CODE REGS. § 1103-1:7.

60. Defendant is required under Colorado law to pay Plaintiff for unpaid wages and overtime work. 7 COLO. CODE REGS. § 1103-1:4.

61. Because Defendant has not paid Plaintiff for overtime wages, Plaintiff has been damaged in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
### Unjust Enrichment

62. Plaintiff incorporates herein by this reference the allegations contained in Paragraphs 1 through 61 of this Complaint as if set forth *verbatim*.

63. Defendant suffered and/or permitted Plaintiff to perform off-the-clock work in one or more work weeks.

64. Plaintiff was not compensated for these off-the-clock hours.

65. Defendant knowingly accepted the off-the-clock work, but Defendant did not compensate Plaintiff for this work.

66. Defendant has been unjustly enriched as a result of its accepting the work of Plaintiff without proper compensation.

67. It would be unjust to allow Defendant to enjoy the fruits of the Plaintiff's labor without proper compensation.

68. Plaintiff's unjust enrichment claim seeks unpaid straight time compensation for the off-the-clock work for Plaintiff at her regular rates of pay for all hours worked.

**WHEREFORE**, Plaintiff demands judgment against Defendant, for the payment of compensation for which she has not been properly paid, liquidated damages, reasonable attorneys' fees and costs, prejudgment interest, and for all other appropriate relief.

## JURY DEMAND

Plaintiff requests a trial to a jury on all issues so triable.

DATED this March 27, 2013.

Respectfully submitted,

*/s/ Colleen T. Calandra*
Colleen T. Calandra, Esq. (# 41788)
BACHUS & SCHANKER, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Telephone: 303.893.9800
Facsimile:  303.893.9900
colleen.calandra@coloradolaw.net
*Attorneys for Plaintiff*