UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __  3/27/2015
```

MAXCIMO SCOTT and JAY ENSOR, et al., on behalf
of themselves and all others similarly situated,

                            Plaintiffs,

             -against-

CHIPOTLE MEXICAN GRILL, INC.,

                           Defendant.

-------------------------------------------------------------------X

12-CV-08333 (ALC)(SN)

MEMORANDUM AND ORDER

SARAH NETBURN, United States Magistrate Judge:

      This discovery dispute arises between plaintiffs and defendant corporation Chipotle

Mexican Grill, Inc., in a nationwide collective action alleging violations of the Fair Labor

Standards Act, 29 U.S.C. §§ 201, et seq. ("FLSA" or the "Act"), and class action claims under

the New York Minimum Wage Act, N.Y. Lab. Law, art. 6 §§ 190, et seq., art. 19 §§ 650, et seq.

("NYLL"), as well as similar state laws in Missouri, Colorado, Washington, Illinois, and North

Carolina. The factual and procedural history of this case is complex, and knowledge is assumed

for the purposes of this order.

      As part of fact discovery, Chipotle provided the plaintiffs with a privilege log outlining

its claims of privilege over 30 documents. On February 3, 2015, the plaintiffs filed a letter

seeking a pre-motion conference on their objections to the log (ECF No. 865). On February 6,

2015, Chipotle filed a response (ECF No. 870). On February 9, 2015, the parties appeared before

me for a discovery conference at which I ordered that, by February 20, 2015, (i) the defendants

were to submit an amended privilege log, with privileged documents for *in camera* review; and

(ii) the parties were to submit a joint status letter. On February 13, 2015, Chipotle submitted that

first set of documents, along with an *ex parte* letter explaining them, for *in camera* review. On

February 20, 2015, the parties asked for a four-day extension to submit their joint letter (ECF

No. 875), which I granted (ECF No. 876). On February 24, 2015, the plaintiffs filed a letter

motion to compel production of certain documents listed in Chipotle's revised privilege log,

which more fully outlined their position on the dispute at hand (ECF No. 880). On March 1,

2015, the plaintiffs filed a letter (ECF No. 895) in further support of their February 24, 2015

letter motion to compel. On March 5, 2015, the plaintiffs filed another such letter (ECF No. 903).

On March 9, 2015, the defendant responded with another letter (ECF No. 909). That same day,

the plaintiffs responded to the defendant's response (ECF No. 910). On March 19, 2015, the

defendants sought leave to file further letter briefing on this issue (ECF No. 925), and I granted

their request that same day (ECF No. 926). On March 23, 2015, Chipotle filed its final letter on

the matter (ECF No. 937), and the plaintiffs responded to it on March 25, 2015 (ECF No. 938).

 For the reasons stated below, the plaintiffs' motion to compel is granted in part and

denied in part.

**LEGAL STANDARDS**

## I. Attorney-Client Privilege

 The attorney-client privilege applies to "(1) a communication between client and counsel

that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of

obtaining or providing legal advice." In re County of Erie, 473 F.3d 413, 419 (2d Cir. 2007). See

also United States v. Mejia, 655 F.3d 126, 132 (2d Cir. 2011).[1] Its purpose is "to encourage full

---

[1] An alternative articulation of the attorney-client privilege states:
 (1) [W]here legal advice of any kind is sought (2) from a professional legal advisor in his
 capacity as such, (3) the communications relating to that purpose, (4) made in confidence
 (5) by the client, (6) are at his instance permanently protected (7) from disclosure by
 himself or by the legal advisor, (8) except the protection be waived.

and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). See also In re John Doe, Inc., 13 F.3d 633, 635-36 (2d Cir. 1994). "[T]he privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." Upjohn, 449 U.S. at 390.

"The availability of sound legal advice inures to the benefit not only of the client who wishes to know his options and responsibilities in given circumstances, but also of the public which is entitled to compliance with the ever growing and increasingly complex body of public law." In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983, 731 F.2d 1032, 1036-37 (2d Cir. 1984). Because the privilege "stands in derogation of the public's right to every man's evidence . . . it ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle." In re Grand Jury Proceedings, 219 F.3d 175, 182 (2d Cir. 2000) (internal quotation marks and citation omitted). The party asserting the privilege bears the burden of establishing facts to prove "the essential elements of the privileged relationship." In re Grand Jury Subpoena Dated Jan. 4, 1984, 750 F.2d 223, 224 (2d Cir. 1984).

Corporations may be considered clients for the purposes of attorney-client privilege, and the internal communication of corporate legal advice does not necessarily waive the privilege. Upjohn, 449 U.S. at 392. "The administration of the attorney-client privilege in the case of

---

United States v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO, 119 F.3d 210, 214 (2d Cir. 1997) (quotation marks and citation omitted). See also Kingsway Fin. Servs., Inc. v. Pricewaterhouse-Coopers LLP, 03 Civ. 5560 (RMB)(HBP), 2007 WL 473726, at *7 (S.D.N.Y. Feb. 14, 2007) ("Kingsway I").

corporations, however, presents special problems. As an inanimate entity, a corporation must act through agents." Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 348 (1985).

When a party withholds a discovery document on the basis of attorney-client privilege (or the work product doctrine, which the parties do not address in their submissions to the Court), the Local Rules in this district require that the party provide complete identifying information, date, type of document, and subject matter in a privilege log at the time the party responds to discovery. Dey, L.P. v. Sepracor, Inc., 07 Civ. 2353 (JGK)(RLE), 2010 WL 5094406, at *2 (S.D.N.Y. Dec. 8, 2010) (citing Local Civil R. 26.2(c)).

## DISCUSSION

I have reviewed Chipotle's amended privilege log, the exhibits *in camera*, and the supplemented deposition transcript excerpts. I will address each of the disputed entries in turn.

## I.      Cinda Daggett Consultative Report

Privilege Log Entry No. 1 describes a November 8, 2011 report from consultant Cinda Daggett to John Shunk, an attorney at Messner Reeves LLC and counsel to Chipotle. The report examines the activities of four employees holding Chipotle's Apprentice position, the classification that is the subject of the underlying action. The plaintiffs contend that because Daggett is not an attorney, but rather a human resources ("HR") consultant, her report is not privileged, regardless of her having sent it to Shunk. Chipotle, meanwhile, claims that Shunk retained Daggett as his agent in order to help him assess a legal issue. The defendant has not met its burden to demonstrate that this report is privileged.

### A.      Agent of Attorney Doctrine

Chipotle relies on United States v. Kovel, 296 F.2d 918 (2d Cir. 1961) (Friendly, J.), for its argument that the report is privileged. Kovel addressed the application of the attorney-client

privilege to a non-lawyer employed by a law firm. The Court of Appeals held that an accountant employed by a law firm was within his rights to refuse to answer questions before a Grand Jury on privilege grounds. Recognizing that the accountant was "necessary, or at least highly useful for the effective consultation between the client and the lawyer," communications between the client and the accountant must be privileged. 296 F.2d at 922. The court, however, set limits on what could fall within that privilege:

> What is vital to the privilege is that the communication be made *in confidence for the purpose of obtaining legal advice* from the lawyer. If what is sought is not legal advice but only accounting service . . . or if the advice sought is the accountant's rather than the lawyer's, no privilege exists.

Id. (emphasis supplied). Noting that accounting is a particularly complex subject, and that advice on it may be necessary for a lawyer to represent a client adequately, the Court of Appeals found that this was a case where "outside help" was necessary. Id.

The Kovel exception to the normal waiver of privilege has received the attention of various courts in the intervening years. For instance, the Court of Appeals has clarified that, under Kovel, "[i]nformation provided to an accountant by a client at the behest of his attorney for the purposes of interpretation and analysis is privileged *to the extent that it is imparted in connection with the legal representation*." United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir. 1989) (emphasis supplied). See also NXIVM Corp. v. O'Hara, 241 F.R.D. 109, 139 (N.D.N.Y. 2007) ("[A]n exemption from the waiver accrues if such communications are shared with an agent of the attorney, which may include investigators and accountants retained to assist the attorney in rendering legal advice and instruction." (citing Schwimmer)). Thus, in United States v. Adlman, 68 F.3d 1495 (2d Cir. 1995), the Court of Appeals held, in part, that communications with an accounting firm were not privileged where "[t]here [was] virtually no contemporaneous documentation supporting the view that" the accounting firm was operating in

a legal capacity, rather than as a non-privileged accountant. Id. at 1500. In finding that the Kovel exception did not apply, the court noted that the moving party's "interpretation was suggested primarily by litigation affidavits prepared by interested persons four years after the fact and lacking any support in contemporaneous documentation." Id.

Some lower courts have extended the Kovel principle to other types of professionals, but they have always carefully limited these exceptions. See In re Grand Jury Subpoenas Dated Mar. 24, 2003 Directed to (A) Grand Jury Witness Firm & (B) Grand Jury Witness, 265 F. Supp. 2d 321, 330 (S.D.N.Y. 2003) [hereinafter In re Grand Jury Subpoenas] (public relations consultants fell within Kovel exception because "the ability of lawyers to perform some of their most fundamental client functions . . . would be undermined seriously if lawyers were not able to engage in frank discussions of facts and strategies with the lawyers' public relations consultants."). But see Ravenell v. Avis Budget Grp., Inc., 08 Civ. 2113 (SLT)(SMG), 2012 WL 1150450, at *3 (E.D.N.Y. Apr. 5, 2012) (noting that In re Grand Jury Subpoenas, "[t]he case that has arguably extended the [Kovel] privilege the furthest," is limited by its specific holding and context); Comm'r of Revenue v. Comcast Corp., 901 N.E.2d 1185, 1198 n.20 (Mass. 2009) (noting that In Re Grand Jury Subpoenas is "in the minority"), holding modified in other part by McCarthy v. Slade Associates, Inc., 972 N.E.2d 1037 (Mass. 2012).

Other courts, meanwhile, have interpreted the Kovel exception more narrowly. "[T]he extension has always been a cabined one, and '[t]o that end, the privilege protects communications between a client and an attorney, not communications that prove important to an attorney's legal advice to a client.'" Mejia, 655 F.3d at 132 (alteration in original) (quoting United States v. Ackert, 169 F.3d 136, 139 (2d Cir. 1999)); see also Ackert, 169 F.3d at 139 (third party involvement must be necessary "to improve the comprehension of the

communication between attorney and client.") "Kovel recognized a privilege derivative of the attorney-client privilege where a third party clarifies or facilitates communication between attorney and client in confidence 'for the purpose of obtaining legal advice' from the attorney. [Kovel, 296 F.2d] at 922. The caveat to the Kovel rule, however, is that the advice rendered must be that of the attorney, not the agent." Gucci Am., Inc. v. Guess?, Inc., 271 F.R.D. 58, 70-71 (S.D.N.Y. 2010). "The standard is whether the third-party agent is supervised directly by an attorney and whether the communications were intended to remain confidential." Id. at 72 (collecting cases). See also McNamee v. Clemens, 09 Civ. 1647 (SJ)(CLP), 2014 WL 6606661, at *2 (E.D.N.Y. Nov. 19, 2014) ("the 'critical inquiry' is whether the communication with the person assisting the lawyer was made in confidence and for the purpose of obtaining legal advice") (citing Allied Irish Banks, P.L.C. v. Bank of Am., N.A., 252 F.R.D. 163, 168 (S.D.N.Y. 2008) (citations omitted)); Calvin Klein Trademark Trust v. Wachner, 198 F.R.D. 53, 44 (S.D.N.Y. 2000) (the privilege applies only where the third party "enabl[es] counsel to understand aspects of the client's own communications that could not otherwise be appreciated.")

The Court of Appeals for the District of Columbia Circuit, meanwhile, has interpreted the Kovel line of cases as holding that "the attorney-client privilege can attach to reports of third parties made at the request of the attorney or the client where the purpose of the report was to put in usable form information obtained from the client." FTC v. TRW, Inc., 628 F.2d 207, 212 (D.C. Cir. 1980) (citing Kovel, 296 F.2d at 922). See also Occidental Chem. Corp. v. OHM Remediation Servs. Corp., 175 F.R.D. 431, 436 (W.D.N.Y. 1997) (citing FTC and stating that "the application of the privilege in Kovel is now recognized as extending to representatives of the attorney such as accountants, administrative practitioners not admitted to the bar (such as

patent agents employed by patent attorneys), and non-testifying experts."). "But a 'usable form' is not simply one that is more convenient or concise. In <u>FTC</u>, the report in question was necessary to explain a complicated computerized reporting system in 'a form that lawyers could understand.'" <u>United States ex rel. Barko v. Halliburton Co.</u>, 05 Civ. 1276 (JSG), 2014 WL 7212881, at *6 (D.D.C. Dec. 17, 2014). This hews closely to the Second Circuit's current interpretation of <u>Kovel</u>, which is that "the inclusion of a third party in attorney-client communications does not destroy the privilege if the purpose of the third party's participation is to improve the comprehension of the communications between attorney and client." <u>Ackert</u>, 169 F.3d at 139.

### B.    Application

Chipotle has not met its burden under any formulation of the <u>Kovel</u> exception. Chipotle has not established that it or Messner Reeves engaged Daggett for anything more than factual research and to assist Chipotle in making a business decision, rather than to assist Messner Reeves in its communications with Chipotle or its rendering of legal advice. Although drafted as a memo for Messner Reeves, this formalism is insufficient to establish that it is a privileged communication. This conclusion finds support not only in the substance of the report, but the context in which it was provided: the record shows that the Daggett report came *after* Chipotle received legal advice from two firms, and no subsequent contemporaneous documents show that it was used beyond assisting Chipotle in making a business decision.

Kristen Dominguez, the compensation manager for Chipotle during the relevant period, testified at her deposition that Chipotle originally reached out to Messner Reeves for legal advice on the classification of Apprentices after hearing industry "buzz" about the classification of assistant managers in 2010 or early 2011. Dominguez Dep. at 8:23-9:21. Dominguez testified

that no one at Chipotle interviewed any apprentices in order to provide information to Messner Reeves so that the firm could render its legal opinion because Chipotle already "had all the information that we needed to give" the firm from the corporate level. Dominguez Dep. at 22:7-19. Privilege Log Entry No. 2, which is privileged, describes a February 18, 2011 memorandum from Messner Reeves to Chipotle giving legal advice on the classification question. Following the advice from Messner Reeves, Chipotle reached out to the Mountain State Employers Counsel ("MSEC") for a second opinion. Dominguez Dep. 24:2-24:13. Privilege Log Entry Nos. 5-6, which, as explained below, are largely privileged, reflect communications on this matter between Chipotle and MSEC in April and May 2011. Upon receiving legal advice from MSEC, Chipotle contacted Messner Reeves again to discuss the issue further. Dominguez Dep. 36:7-36:16.

Dominguez testified in her deposition that Messner Reeves requested more information after hearing from Chipotle about the MSEC advice. Dominguez Dep. 51:6-51:20. In an e-mail sent on June 29, 2011, listed in Entry No. 7 and which is largely non-privileged for reasons stated below, Christine Moore, compensation analyst for Chipotle during the relevant period, advises Dominguez that she had not heard back from Messner Reeves with a recommendation for who could conduct a "job function analysis." That e-mail chain also includes a PowerPoint presentation prepared by Chipotle that outlines Chipotle's position on the classification, including legal advice it had received from Messner Reeves and MSEC, but the corresponding email notes that it omits any information that might be provided from the job function analysis.

It is clear that as late as September 20, 2011, the consultant for the job function analysis still had not yet been identified. Dominguez testified that Shunk eventually suggested Daggett. Dominguez Dep. 7:20-8:1. She said the purpose of Daggett's investigation was "to get a really good understanding of what [Apprentices] do . . . in their day-to-day jobs," id. at 56:20-56:22,

and "to provide Messner & Reeves and John Shunk with information on the ground [] so that they could . . . give us an opinion on what we were asking," id. at 57:2-57:5. The plaintiffs submitted e-mails, obtained from Chipotle during discovery, which demonstrate that as of October 26, 2011, Daggett was setting up interviews with Apprentices without mentioning that the interviews were privileged, confidential, or to assist Chipotle in obtaining legal advice. (See Pls.' February 24, 2015 Letter, Ex. 4.) Chipotle has also produced certain of Daggett's interview notes without asserting a privilege objection.

Entry No. 1 describes the Daggett report itself, which is dated November 8, 2011. Moore testified in her deposition that Daggett did not provide Chipotle with any legal advice. Moore Dep. 101:2-101:8. Dominguez testified that Daggett communicated her report only to Messner Reeves directly, and not to Chipotle. Dominguez Dep. 59:1-59:15. Following the receipt of the Daggett report, Chipotle allegedly again spoke with Messner Reeves. Id. at 60:14-60:18. But no documents in the privilege log indicate any further written legal advice from Messner Reeves on the classification issue. Moore testified that Chipotle reached out to each firm only once for advice. Moore Dep. 67:4-67:7.

The assignment that would become the Daggett report is referred to by Moore as a "job function analysis." Such a term is somewhat ambiguous, but seemingly refers to a non-privileged, factual investigation pertaining to the responsibilities of an employee or position. See Richardson v. Friendly Ice Cream Corp., 594 F.3d 69, 75-76 (1st Cir. 2010) (listing evidence bearing on job function analysis); Willingham v. Town of Stonington, 847 F. Supp. 2d 164, 187 (D. Me. 2012) (citing Richardson for "the types of evidence bearing on the essential job function analysis"). The Court has found no federal cases applying the attorney-client privilege to such an analysis, but a case from our sister court in the Eastern District of New York, Ravenell, is

10

instructive. In that case, a party used an outside audit company to organize electronically

responses to a questionnaire and then to make a statutory assessment of whether or not certain

employees were exempt under FLSA. In holding that the privilege had been waived, the court

noted that the auditors' "assessments neither 'improve[d] the comprehension of the

communications between attorney and client,' Ackert, 169 F.3d at 139, nor provided advice

outside the general expertise of attorneys yet essential to the ability of defendants' lawyers to

provide legal advice, In re Grand Jury Subpoenas, 265 F. Supp. 2d at 330." Ravenell, 2012 WL

1150450, at * 3.

One way for Chipotle to establish application of the attorney-client privilege would be for

it to show that Messner Reeves engaged Daggett as its agent for a specific type of information it

could not otherwise obtain. "The communications here, however, do not fit the Kovel

framework." Merck Eprova AG v. Gnosis S.p.A., 07 Civ. 5898 (RJS)(JCF), 2010 WL 3835149,

at *2 (S.D.N.Y. Sept. 24, 2010) (noting that third-party consultants "were not acting as

'interpreters' of scientific concepts," but rather "providing expert information"). Though Daggett

writes that she produced the report at the request of Messner Reeves, neither she nor any

documents from Chipotle indicate that she was in fact hired to assist Messner Reeves in

providing legal advice. To be sure, the mere statements by Daggett (in writing) and Dominguez

and Moore (in depositions) that Daggett was hired by a law firm may not *ipse dixit* establish

privilege *ex post facto* (particularly, as here, where the report is not labeled confidential or

privileged). See La Suisse, Societe d'Assurances Sur La Vie v. Kraus, 06 Civ. 4404

(CM)(GWG), 2014 WL 6765684, at *6 (S.D.N.Y. Dec. 1, 2014) (noting the lack of evidence

"that the [party seeking privilege] in this matter ever manifested any intent to grant authority to

[a third party] to act as their agents for purposes of seeking legal advice"). Like in Adlman, here

there is "virtually no contemporaneous documentation supporting the view that" Daggett was hired to, and did in fact, assist Messner Reeves in providing legal advice, rather than providing Chipotle with information to make its ultimate business decision. 68 F.3d at 1500.

Regardless of Chipotle's or Messner Reeves's intentions in engaging her, Daggett is an HR consultant, not an attorney, and her report does not provide any specialized knowledge that the attorneys at Messner Reeves could not have acquired or understood on their own or directly through its client. It strains credulity to imagine that an attorney evaluating wage and hours laws would not be able to speak with employees or interpret those laws on his own. The plaintiffs, meanwhile, have provided the Court with an e-mail chain between Chipotle employees indicating that "a Consultant working for Chipotle by the name of Cinda Daggett" was coming to Chipotle stores to "study[] what it is that really good Apprentices do at our restaurants." (Pls. Feb. 24, 2015 Letter, Ex. 4 at 2.) This e-mail chain makes no mention of the law or of legal advice, nor does it indicate in any way that the conversations would be privileged or should be kept confidential, thus falling short of the Gucci standard. See 271 F.R.D. at 72. Likewise, nothing indicates that Daggett was taking information that was incomprehensible to Chipotle's attorneys and putting it into a "usable form" rather than merely consolidating employee interviews and delivering a factual analysis; there is nothing legal about her report. See Barko, 2014 WL 7212881, at *6. See also Dominguez Dep. 4:24-5:1 (Daggett's job "was to look at our apprentices on the ground to [] shadow what they do on a daily basis."). Chipotle's own HR team could easily have undertaken the same investigation that Daggett did, and in that case, Chipotle would have no argument that its own report was privileged.

Finally, the chronology of events makes plain that Messner Reeves did use the Daggett report to render legal advice. The firm delivered its own analysis of and advice regarding the

Apprentice classification in February 2011, well before receiving the Daggett report in November 2011. Compare Entry No. 1 (describing Daggett report, dated Nov. 8, 2011) with Entry No. 2 (describing memorandum from Messner Reeves with "Legal Advice Regarding Classification of Chipotle's Apprentice Position," dated Feb. 18, 2011). Indeed, Chipotle's own position and the legal advice it received from Messner Reeves, both outlined in the PowerPoint presentation attached to the June 29, 2011 e-mail described in Entry No. 7, pre-date the Daggett report. Though Dominguez testified that Messner Reeves needed the Daggett report to finalize its advice, nothing else in the record indicates that anyone at Messner Reeves gave Chipotle advice after receiving the report. As mentioned above, Moore testified that Chipotle sought advice from Messner Reeves once, not twice. Moore Dep. 67:4-67:7. Thus, application of the privilege was not necessary for Messner Reeves "to perform some of their most fundamental client functions." In re Grand Jury Subpoenas, 265 F. Supp. 2d at 330.[2] Instead, following the delivery of legal advice from two sources, Daggett provided Chipotle with business advice on how it should classify its employees. It would be disingenuous to allow Chipotle to cloak the Daggett report in the attorney-client privilege by claiming it was necessary for legal advice *after* that advice had already been delivered.

Chipotle has not made the necessary showing that Daggett assisted Messner Reeves in its communication with Chipotle or provided advice outside the firm's general expertise yet essential to its ability to provide legal advice. Accordingly, the Daggett report is not privileged.

---

[2] In re Grand Jury Subpoenas hinged on the logic that public relations consultants, specifically, were necessary in that high profile case, and does not stand for the larger proposition that all third-party consultants' communications are privileged. See 265 F. Supp. 2d at 331 ("[T]his Court holds that (1) confidential communications (2) between lawyers and public relations consultants (3) hired by the lawyers to assist them in dealing with the media *in cases such as this* (4) that are made for the purpose of giving or receiving advice (5) directed at handling the client's legal problems are protected by the attorney-client privilege.") (emphasis supplied).

To the extent that Daggett or Chipotle has objected to the plaintiffs' subpoena of documents in Daggett's possession on the grounds of the attorney-client privilege, Daggett is ordered to comply with the subpoena.

## II.     Mountain State Employers Council

The other main source of dispute in Chipotle's privilege log pertains to Entry Nos. 5-6, which describe e-mails between Moore, Dominguez and Mark Parcheta, an attorney at MSEC. Chipotle claims that Parcheta was acting as its attorney and providing the corporation with legal advice, while the plaintiffs claim that Parcheta was instead providing business advice. Both sides developed their arguments in numerous letters to the Court, but Chipotle has the stronger argument.

### A.     Communication with Legal Non-Profit Agency

In the context of corporate counsel, the question of whether the attorney-client privilege applies "usually is whether the communication was generated for the purpose of obtaining or providing legal advice as opposed to business advice." County of Erie, 473 F.3d at 419. See also Complex Systems, Inc. v. ABN AMRO Bank N.V., 279 F.R.D. 140, 150 (S.D.N.Y. 2011). A document may be privileged as an attorney-client communication when "the predominant purpose of the communication is to render or solicit legal advice." County of Erie, 473 F.3d at 420. "When an attorney is consulted in a capacity other than as a lawyer, as (for example) a policy advisor, media expert, business consultant, banker, referee or friend, that consultation is not privileged." Id. at 421. "Moreover, even if a business decision can be viewed as both business and legal evaluations, the business aspects of the decision are not protected simply because legal considerations are also involved." Complex Systems, 279 F.R.D. at 150 (internal quotation marks and citation omitted). The mere fact that business was *one* purpose of the

advice, however, does not vitiate any actual legal nature. See Upjohn, 339 U.S. at 392 ("In light of the vast and complicated array of regulatory legislation confronting the modern corporation, corporations, unlike most individuals, constantly go to lawyers to find out how to obey the law . . . .") (internal quotation marks and citation omitted).

### B.      Application

MSEC is a non-profit that provides a variety of services to employers, including HR advice and legal services, for a fee.[3] Chipotle became a member of MSEC for an initial fee of $3,200 as of March 1, 1997, when Chipotle operated under the name World Foods, Inc. (Def.'s March 9, 2015 Letter, Ex. A at 2.) Both parties have submitted a portion of MSEC's Operations Manual dedicated to a Code of Conduct for Attorneys, which indicates that "MSEC lawyers must act in a manner that preserves the evidentiary privilege." (Id. at 6.) It is undisputed that Parcheta is an attorney and that he provided advice to Chipotle as part of Chipotle's membership in MSEC. While Chipotle does not have a formal engagement agreement with MSEC, that is not a requirement for the formation of an attorney-client relationship. See Protostorm, LLC v. Antonelli, Terry, Stout & Kraus, LLP, 834 F. Supp. 2d 141, 154 (E.D.N.Y. 2011) ("Since no written retainer agreement exists, the court must look to the words and actions of the parties to ascertain if an attorney-client relationship was formed." (internal quotation marks and citation omitted)); Merck Eprova AG v. ProThera, Inc., 670 F. Supp. 2d 201, 210 (S.D.N.Y. 2009) ("No special formality is required to demonstrate the establishment of the [attorney-client] relationship.").

---

[3] See About MSEC, MOUNTAIN STATE EMP'RS. COUNCIL (last visited March 26, 2015), https://www.msec.org/aboutmsec/Pages/default.aspx ("MSEC serves the human resource and employment law needs of the business community, helping employers manage all aspects of the employment relationship.").

Unlike the Daggett report, the e-mails from Parcheta are privileged. It is not merely Parcheta's law degree or bar admission that allows his e-mails to fall under the privilege; indeed, one's "status as an attorney does not transform what would otherwise be human resources and business communications into legal communications." Koumoulis v. Indep. Fin. Mktg. Grp., Inc., 295 F.R.D. 28, 45 (E.D.N.Y. 2013), aff'd, 29 F. Supp. 3d 142 (2014). An *in camera* review of the documents, however, satisfies the Court that Parcheta's advice is legal in nature. Briefly stated, Parcheta writes as a lawyer and discusses and analyzes the law, beyond bare recitation of regulations or the giving of non-legal business advice. It is not merely his degree which renders his advice legal, but rather the focus of his attention and the nature of his communication with Chipotle; his correspondence with Moore would not be out of place in the outbox of a major law firm. It would be disingenuous to discount Parcheta's legal advice merely because he or his employer also provides other types of advice. Accordingly, the privilege applies, regardless of MSEC's nontraditional structure.

In supplemental briefing, the plaintiffs argue that Dominguez waived Chipotle's privilege as to the Parcheta documents by testifying in her deposition in such a way as to imply what Parcheta's advice might have been. (Pls'. Mar. 25, 2015 Letter at 1.) This argument is unavailing. Nowhere in the deposition transcript pages provided to the Court does Dominguez state what legal advice Parcheta provided to her or to Chipotle, and Chipotle's counsel carefully objected to the legal aspects of Dominguez's conversation with Parcheta. Dominguez Dep. 38:2-38:9. Instead, in response to the plaintiffs' line of questioning, Dominguez testified both that she believed that the Apprentices were correctly categorized as exempt and that she disagreed with Parcheta. Id. at 37:15-41:16.

Dominguez's testimony about her own beliefs and legal conclusions does not waive the privilege. To hold otherwise would make the privilege meaningless. Clients often take actions that reflect the advice received from their counsel; their actions do not, however, waive the attorney-client privilege as a result. And an individual stating that they did or did not agree with their attorney does not put at issue everything that their attorney said to them. Such a statement is far from the intentionality that Federal Rule of Evidence 502(a) requires in order to waive the privilege in a federal proceeding.

## III.    E-mails Between Corporate Employees

The plaintiffs object to several entries on Chipotle's privilege log on the grounds that no attorneys are involved in the communications. (Pls.' Feb. 3, 2015 Letter at 3.) Chipotle, meanwhile, contends that corporate employees are entitled to discuss legal advice among themselves without waiving the privilege.

### A.    Third-Party Waiver in the Corporate Context

With some exceptions, the attorney-client privilege is automatically waived when a privileged communication is disclosed to a third party or litigation adversary. See Ricoh Co., Ltd. v. Aeroflex Inc., 219 F.R.D. 66, 70 (S.D.N.Y. 2003); Kingsway Fin. Servs., Inc. v. Pricewaterhouse-Coopers LLP, 03 Civ. 5560 (RMB)(HBP), 2007 WL 1837133, at *2 (S.D.N.Y. June 27, 2007) ("Kingsway II") ("The attorney-client privilege is not absolute, however, and may be waived through, among other things, the voluntary disclosure of a privileged communication to a third party, especially a litigation adversary.") (collecting cases).

As with other aspects of the attorney-client privilege, however, the third-party waiver doctrine applies differently in the corporate context. In Upjohn, the Supreme Court pointedly rejected the "control group" test for the attorney-client privilege, which extended only to top

17

executives. In doing so, the Court emphasized that "[t]he attorney's advice will also frequently be more significant to noncontrol group members than to those who officially sanction the advice, and the control group test makes it more difficult to convey full and frank legal advice to the employees who will put into effect the client corporation's policy." 449 U.S. at 392.

Lower courts have recognized the necessity of corporate employees discussing advice received by one agent of the corporation. "Therefore, although dissemination of privileged information to third parties generally waives attorney-client privilege, the distribution within a corporation of legal advice received from its counsel does not, by itself, vitiate the privilege." Strougo v. BEA Associates, 199 F.R.D. 515, 519-20 (S.D.N.Y. 2001). See also Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc., 06 Civ. 7785 (PKC), 2007 WL 1573913, at *2 (S.D.N.Y. May 24, 2007) ("The distribution of attorney communications between or among senior officers of a corporation who have a need to know the information also does not vitiate the privilege."); Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 442 (S.D.N.Y. 1995) ("[T]he privilege protects from disclosure communications among corporate employees that reflect advice rendered by counsel to the corporation."). A corporate entity's attorney-client privilege may, however, be waived by disclosure of the communication to employees of the corporation who are not in a position to act or rely on the legal advice contained in the communication. See JA Apparel Corp. v. Abboud, 07 Civ. 7787 (THK), 2008 WL 111006, at *2 (S.D.N.Y. Jan. 10, 2008) ("[I]f McMullen is a low-level employee to whom the legal advice in the Cowan Memo would have had no significance, his presence [at the board meeting where the memo was disclosed] may have constituted a waiver of the privilege."); E.B. v. New York City Board of Educ., 2002 Civ. 5118 (CPS)(MDG), 2007 WL 2874862, at *4 (E.D.N.Y. Sept. 27, 2007) ("Courts determining whether dissemination of a document to

employees amounts to a waiver of an entity's attorney-client privilege apply a need to know standard: did the recipient need to know the content of the communication in order to perform her job effectively or to make informed decisions concerning, or affected by, the subject matter of the communication?" (internal quotation marks and citation omitted)).

### B.    Application

The plaintiffs dispute Privilege Log Entry Nos. 3-4, 7, 24-25, and 29-30 on the grounds that no attorney is involved in some or all of the e-mails described. The plaintiffs also requested *in camera* review of Entry Nos. 23-28 on the independent but related grounds that they may not have been legal in nature. Since the disputed e-mails involve the same groups of individuals and the same subjects, they will be considered together. Those individuals were: Dominguez; Moore; David Gottlieb, director of compliance and field people support for Chipotle; David Hahn, who worked in training at Chipotle; Robert Wilner, executive director of HR for Chipotle; Michael Ferguson, director of compensation and benefits for Chipotle; Julie Wozniak, director of training for Chipotle; attorneys Denise Clem, Ed. J. Hafer, and John Shunk of Messner Reeves; and Jeanine Montoya, a staff member at Messner Reeves.[4]

Entry No. 3 describes e-mails between Dominguez, Gottlieb, and Moore regarding legal advice. Entry No. 4 describes e-mails between Gottlieb, Dominguez, Moore, Ferguson, and Hafer regarding and discussing legal advice, including an attached memorandum from Messner Reeves that is plainly marked privileged and confidential and intended as legal advice. Entry No. 7 describes e-mails between Dominguez and Moore with an attachment that, in part, plainly describes legal advice. Entry No. 23 describes an e-mail between Wilner and Hahn and an attachment (a draft and "marked up" copy of the Labor Management Guide) with clear legal

---

[4] The Court has inferred the positions of Hahn and Wozniak from other information available to it, beyond the parties' submissions regarding the Privilege Log.

advice. Entry Nos. 24-25 describe e-mails between Hahn, Shunk, and Wilner also plainly describing legal advice, with attachments updating the Guide. Entry No. 26 describes e-mails between Hahn, Clem, and Wozniak. Entry Nos. 27-28 were not provided for *in camera* review, but the privilege log describes them both as e-mails (and an attachment on Entry No. 28) between Hahn, Clem, Wozniak, and Shunk regarding legal advice.[5] Entry No. 29 describes e-mails between Dominguez and Ferguson regarding the implementation of legal advice. Entry No. 30 describes e-mails between Ferguson, Dominguez, Montoya, Shunk, and Moore, which include the Daggett report as an attachment.

An *in camera* review of all of the relevant e-mails themselves indicates that, of these e-mails, the following Entry Nos. are privileged: 3, 4, portions of 7, 23-25,[6] 26-28, and portions of 29. These documents are privileged because, as described above, they either contain or refer to legal advice.[7] The content of the messages is clearly related to implementing the advice Chipotle received from Messner Reeves, and as a large corporation, Chipotle could not realistically have acted on that advice without communicating it to its own employees. Accordingly, to the extent that it is correct that all recipients were able to act upon or implement the information or advice they received (and given their titles the Court assumes that is the case), the e-mails and the attachments are privileged. To hold otherwise would disable corporations from implementing legal advice, exactly what Upjohn seeks to avoid.

---

[5] These privilege log entries are facially valid and the plaintiffs have not clearly stated specific objections to them over the course of their letters.

[6] The Court assumes, without ordering, that the following documents mentioned in the privilege log and its underlying documents have already been produced: The "spot survey" mentioned (but not produced) as an attachment to the April 7, 2011 e-mail at Entry No. 5; the job description attached to that same e-mail and included in Entry No. 5; and the final version of the Labor Management Guide from August 2009, drafts of which are included in Entry Nos. 23-24.

[7] The plaintiffs do not dispute the privilege pertaining to e-mails to and from Messner Reeves.

The following entries, however, do not meet these standards and must be produced because they do not reflect legal advice. The email chain listed on Entry No. 7 is communication between Dominguez and Moore that does not discuss legal advice. It also attaches an internal PowerPoint presentation that reflects Chipotle's conclusions regarding the classification issue. This document is not entirely privileged and must be partially produced. Chipotle may redact all of the text beneath "Messner & Reeves" or "Messner & Reeves (cont.)" on pages 2-4, and the text beneath "MSEC" or "MSEC (cont.)" on pages 5-6. The last page on Entry No. 7 – a one-page memo on "Apprentice Classification" and dated June 29, 2011 – shall be produced as follows: Chipotle may redact starting from the fourth sentence in the Background section ("We asked…") to the near end of the page, ending the redactions just above "Our Position/Next Steps."

The email chain described in Entry No. 29 is communication between Chipotle employees Dominguez and Michael Ferguson. In the September 20, 2011 email from Ferguson, he discusses communications he had with counsel. Accordingly, Chipotle may redact the paragraph at the bottom of the page starting after the words "Met with john . . ." The remainder of the communication, however, discusses business decisions, not legal advice.

Finally, the email chain described in Entry No. 30 is communications between attorney Shunk and Chipotle, forwarding the Daggett report, and between Chipotle employees. Chipotle may redact from Shunk's email starting with the second sentence that begins "I . . . ."

**IV.    Lack of Detail**

In their initial letter, the plaintiffs also objected, without citing case law, to numerous privilege log entries on the grounds that they lacked sufficient detail on which to evaluate the underlying claims of privilege. (Pls'. Feb. 3, 2015 Letter, Ex. 2.) Chipotle, however, has since revised its privilege log (see Def.'s Feb. 13, 2015 Letter at 1), and the plaintiffs have not renewed their objections on this ground. Even if the plaintiffs did intend to maintain their objection, I find that Chipotle's Fifth Amended Privilege Log is sufficiently detailed to overcome the plaintiffs' objections to the Fourth Amended Privilege Log. In accordance with Local Rule 26.2(c), Chipotle has provided the plaintiffs with the type of document; general subject matter; author, addressees, and recipients; and the privilege asserted.

Entry Nos. 23 through 26 in Chipotle's Fifth Log describe the "[d]iscussion of legal advice regarding Chipotle's Labor Management Guide," including various edits to it and highlights of it, such as Entry No. 25's note that the discussion "include[ed] Labor Management Guide attachment featuring highlighted sections requesting review by attorney John Shunk." This reflects an update from the Fourth Log, on which plaintiffs based their objections, which bore the same description for all four entries: "Legal advice regarding Chipotle's Labor Management Guide." The description of Entry No. 29's subject matter has been updated from "[d]iscussion of legal advice concerning Chipotle's apprentice position" to "[d]iscussion of meeting with John Shunk and legal advice concerning classification of Chipotle's apprentice position." Entry No. 30 has been updated from "[l]egal advice concerning Chipotle's Apprentice position" to "[d]iscussion of legal advice among corporate employees responsible for receipt and implementation of advice re: Classification of Chipotle's Apprentice Position, as well as emails conveying advice and attachment identified in Privilege Log Entry No. 1."

Chipotle's updated descriptions of the relevant documents are sufficiently detailed to give the plaintiffs adequate notice of the underlying claims of privilege because they identify that the documents are discussing legal advice on a particular topic. See Orenshteyn v. Int'l Bus. Machines Corp., 02 Civ. 5074 (JGK)(RLE), 2013 WL 208902, at *1 (S.D.N.Y. Jan. 15, 2013) ("The log also gives adequate bases for asserting the privilege claimed. (Entry No. 12, 'request for legal advice re issuance of patent and infringement by IBM')." (citation omitted)). To require more information would be to put the defendant in the contradictory position of having to risk its privilege in order to preserve it. Accordingly, I find that Chipotle has satisfied the plaintiffs' objections as to the amount of detail in the privilege log.

## CONCLUSION

The plaintiffs' motion to compel is granted in part and denied in part. It is GRANTED as to Entry No. 1, which is the Daggett report, and PARTIALLY GRANTED as to Entry Nos. 7, 29 and 30. The defendant must produce the non-privileged documents within two business days of today's date. The motion is DENIED as to all other entries, over which the defendant validly claims attorney-client privilege.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:  New York, New York
         March 27, 2015