**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X

**MAXCIMO SCOTT and JAY ENSOR, et al.,** on
behalf of themselves and all others similarly situated,

                                        **Plaintiffs,**

                    -against-

**CHIPOTLE MEXICAN GRILL, INC. and**
**CHIPOTLE SERVICES, LLC,**

                                        **Defendants.**
----------------------------------------------------------------X

**12-CV-08333 (ALC)(SN)**

**<u>OPINION & ORDER</u>**

**SARAH NETBURN, United States Magistrate Judge:**

       The plaintiff and class representative Maxcimo Scott filed a nationwide class and collective action complaint on November 15, 2012, alleging violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201, et seq. ("FLSA" or the "Act"), and the New York Minimum Wage Act, N.Y. Lab. Law, art. 6 §§ 190, et seq., art 19 §§ 650, et seq. ("NYLL"), against the defendants Chipotle Mexican Grill, Inc. and Chipotle Services, LLC (together "Chipotle"). Later amendments to the complaint added class action claims under Missouri, Colorado, Washington, Illinois and North Carolina law. The plaintiffs—salaried "apprentices" employed or formerly employed by Chipotle restaurants nationwide—allege primarily that Chipotle did not pay them overtime and spread-of-hours compensation as required by federal or state law. On June 20, 2013, the Honorable Andrew L. Carter, Jr. conditionally certified the plaintiffs' collective action.

       Following the close of expert discovery, the defendants filed a motion to strike portions of the expert reports submitted by plaintiffs' experts John A. Gordon and Dr. Phillip Johnson. On the same day, the plaintiffs filed a motion to strike portions of the rebuttal report submitted by Chipotle's expert Robert W. Crandall.

The defendants' motion to strike portions of Mr. Gordon's report is GRANTED with respect to the parts of his report that impute motives to the defendants and where Mr. Gordon proposes to testify about the actual duties and work performed by apprentices, but DENIED on all other grounds. The defendants' motion to strike Dr. Johnson's testimony regarding potential subclasses of plaintiffs is GRANTED, but defendants' remaining objections to Dr. Johnson's testimony are DENIED. The plaintiffs' motion to strike portions of Mr. Crandall's testimony is GRANTED to the extent he impermissibly testifies to legal argument or legal conclusions, and with respect to his use of benefits data in his hourly rate calculation, but DENIED with respect to all other grounds.

## I.    The Parties' Expert Reports

### A.    John A. Gordon

John A. Gordon is a restaurant analyst and advisory consultant and the founder and principal of Pacific Management Consulting Group. His professional background includes experience as General Manager/Area Supervisor for a domestic quick service restaurant chain, Cost Analyst and Financial Analyst for a publicly traded chain restaurant corporation, Manager of Financial Analysis and Chief Financial Officer/Director of Finance for a large international hospitality chain, and managing subject matter expert of a global management consulting firm. (Gordon Decl. ¶ 2.) He is a certified Master Analyst of Financial Forensics and specializes in complex restaurant operations, financial and business analytical projects. Id.

Mr. Gordon has experience working on complex restaurant operational assessment projections, on both operational and corporate levels. He testified that he has an "analytical familiarity" with "all core business disciplines," including operations, financial management and human resources. (Gordon Decl. ¶ 4.) Mr. Gordon "routinely" performs restaurant operations

analyses on topics such as labor management, labor scheduling and optimization, and labor operating expense optimization. (Gordon Decl. ¶ 3.)

Mr. Gordon was hired to offer an opinion on Chipotle's business model, including what motivates the business model and how the business model relates to the role of apprentices. (Gordon Decl. ¶ 8). His testimony describes Chipotle's business and operational structure and the company's fiscal growth between 2006 and 2014. He wove together deposition testimony with information pulled from various financial statements and media clippings. Throughout his report, Mr. Gordon assessed Chipotle's internal culture and the motivations behind Chipotle's business practices. For example, Mr. Gordon opined that "Chipotle relies heavily on its centralized scheduling and reporting systems to control store labor costs," and "Chipotle's Wall Street investors react positively to the top-down control Chipotle exercises over stores through its centralized systems and standardized business management." (Gordon Decl. ¶¶ 15, 16.)

Mr. Gordon concluded that Chipotle is "very regimented and top-down managed," with a deeply embedded corporate culture, standardization of business practices, and centralized systems to handle food orders, budgets, security, timekeeping, personnel record-keeping, recruitment and employee training. (Gordon Decl. ¶¶ 10–15.) In order to maintain its position as the highest valued restaurant on the market, Mr. Gordon believes Chipotle needs to maintain a certain level of growth and profitability. (Gordon Decl. ¶ 20.) The apprentice position is a short-term training position that is "essential to fuel new store growth" because it supplies Chipotle with a steady stream of General Managers to run new stores. (Gordon Decl. ¶¶ 23, 28.)

According to Mr. Gordon, Chipotle seeks to lower labor costs to offset high food prices. (Gordon Decl. ¶ 32.) Apprentices, who are salaried employees, are often assigned manual labor roles, performing food production and customer service duties. (Gordon Decl. ¶ 33.) If a store

exceeds its hourly labor budget, apprentices are required to work extra hours to keep labor costs down. Id.

Mr. Gordon concluded that the apprentice position is not necessary for Chipotle stores to function because each store is also staffed by a kitchen manager, service sanager and general manager. (Gordon Decl. ¶ 35.) Additionally, Chipotle employs corporate support employees who perform many of the managerial duties that are traditionally assigned to in-store managers, such as marketing, recruiting, customer service, human resources, and training. (Gordon Decl. ¶¶ 38–40.) The hourly employees who constitute Chipotle's "crews" are "empowered" to take responsibility for store operations and act like "owners" of their respective restaurants. (Gordon Decl. ¶ 41.) These "top performing" crews "likely require less hands-on management by store-level managers, compared with the hourly workforce in a traditional restaurant." Id.

During his deposition, Mr. Gordon was asked about the job duties of an apprentice and responded that he did not "analyze these attributes." He testified at his deposition that he would not offer trial testimony regarding the work performed by an apprentice. (Gordon Dep. Tr. 118:17–119:8; 119:13–24.)

## B.    Dr. Phillip M. Johnson

Plaintiffs' second expert, Dr. Phillip M. Johnson, Ph.D., is an economist and Managing Director at Econ One Research, Inc., an economic research and consulting firm. He conducts market analyses and assesses economic damages, including the calculation of damages in connection with wage and hour lawsuits. Dr. Johnson relied on data from Chipotle's human resources and payroll databases, including the PeopleSoft, Menulink, and Aloha databases, as well as sample declarations from current and former Chipotle apprentices.

Dr. Johnson was hired to analyze Chipotle's staffing, scheduling and compensation data in order to: (i) "Determine whether the data indicates there are substantive differences in Chipotle's use of restaurant staff within Class states and across the group of stores where members of the Opt-in Class were employed;" (ii) "Compare the compensation of Apprentices to Chipotle's hourly and other salaried employees;" (iii) "Determine whether it is possible to ascertain potential subclasses of Apprentice employees;" and (iv) "Compute damages and spread-of-hours pay for the class and collective." (Johnson Rep. ¶ 6.)

Dr. Johnson concluded that apprentices are paid substantially less than other Chipotle salaried restaurant staff and receive a similar hourly rate to Chipotle's hourly manager employees. To reach this conclusion, Dr. Johnson developed the following formula to calculate the "effective hourly rate" for apprentices:

*Effective Hourly Rate = (Gross Pay) / (Regular Hours + 1.5\*Overtime Hours)*

This effective hourly rate represents "the hourly rate that would result in the same pay if apprentices had been paid hourly for their hours . . . with hours over 80 per a 2-week pay period treated as overtime." (Johnson Rep. ¶ 35.) Dr. Johnson then compared the median effective hourly rate of apprentices to the median regular rate of Service Managers. He noted that "[a]ctual hours may be higher than scheduled hours" and added "[t]o the extent that Apprentices worked more hours than shown in the Menulink schedules, the calculation would be conservative." (Johnson Rep. ¶ 36.)

At the plaintiffs' request, Dr. Johnson used PeopleSoft Employment History Data to identify three separate potential subclasses of plaintiffs: (i) "Acting General Managers"; (ii) "Managers in Training"; and (iii) "New Store Apprentices." (Johnson Rep. ¶¶ 41–47.) To identify potential members of the Acting General Managers group, Dr. Johnson identified the

weeks during which an apprentice was employed and checked whether a general manager or a restaurateur was employed during those weeks. If neither a general manager nor a restaurateur was employed for the entire week, Dr. Johnson counted it as an Acting General Manager workweek. (Johnson Rep. ¶ 42.) To identify potential members of the Managers in Training subclass, Dr. Johnson used PeopleSoft data to identify employees who were hired directly into the positions of apprentice, assistant manager in training, and assistant manager, restauranteur. (Johnson Rep. ¶ 45.) Dr. Johnson used a similar method to identify potential members of the New Store Apprentices class, and used PeopleSoft data to identify apprentices who were hired or transferred into a new store within 14 days of its opening. (Johnson Report ¶ 47.) Dr. Johnson conducted no further analysis beyond identifying these subclasses.

### C.   Robert A. Crandall

Robert A. Crandall is a Partner at Resolution Economics LLC, a firm that conducts labor studies, performs economic and statistical analyses, and provides complex data analysis in connection with litigation matters. Mr. Crandall has been retained as an expert or consultant in over 400 class or collective action matters alleging wage and hour violations under FLSA and various state laws. He has extensive experience collecting and analyzing data related to the work activities of class members through the use of scientific surveys, time and motion observation studies, and other forensic data studies. Mr. Crandall has also conducted surveys of retail and restaurant managers, and has studied non-exempt labor practices of various restaurants, retailers, and other industries. (Crandall Decl. ¶ 1.)

Mr. Crandall was hired by Chipotle as a rebuttal witness to provide analyses of scheduling, timekeeping, customer flow, and payroll data in order to test the theories presented by Mr. Gordon and Dr. Johnson. He analyzed data extracted from Chipotle's Menulink, Aloha

and PeopleSoft databases. Mr. Crandall also reviewed qualitative data, such as employee job descriptions and performance evaluations. Chipotle provided him with declarations from 226 current and former apprentices, as well as 18 declarations that were produced by the plaintiffs, 13 of which were from apprentices. Mr. Crandall also reviewed deposition testimony from 85 apprentices and 14 corporate representatives. (Crandall Dec. ¶¶ 11, 12.)

Mr. Crandall broadly concluded that Dr. Johnson failed to provide "analytical support for plaintiffs' contention of uniformity or that a class wide liability determination would not result in significant error" (Crandall Decl. 12.), and that "Mr. Gordon's analysis of SEC filings provides no information that would suggest uniformity of experiences exist across Apprentices." Id.

Mr. Crandall compared declarations submitted by plaintiffs and Chipotle and found that there is a "wide variation" in the amount of time that plaintiffs' apprentice declarants claimed to spend on managerial tasks as compared to what defendants' declarants stated. (Crandall Decl. ¶ 19.) Extrapolating data from these declarations, Mr. Crandall created three charts that reflect the percentage of time declarants spent performing managerial duties. (Crandall Decl., Exs. 1–3.)

Mr. Crandall also concluded that if Dr. Johnson had "drilled down into the data," he would have determined that there is a wide variation in the percentage of time for which apprentices were the highest ranking employees in the restaurant. (Crandall Decl. 14–15.) He explained that even during work weeks when a general manager or restaurateur is present, their schedules often do not overlap with those of apprentices, resulting in apprentices being the "highest-ranking manager" on site for approximately 69.7% of their work time. (Crandall Decl. ¶ 21.) Mr. Crandall offered this opinion to rebut plaintiff's anticipated argument "that during time periods when the Apprentices is the highest ranking employee in the restaurant, his or her *primary duty* is management." Id. (emphasis in the original). He also provided exhibits to

demonstrate that "there is a wide variation in the percentage of work time spent as the highest ranking employee in the restaurant across opt-in Apprentices and across Apprentices who worked in each state." (Crandall Decl. 15.)

Mr. Crandall also opined that "[i]f Dr. Johnson had studied staffing, he would have discovered that there is wide variation in head count across restaurants in terms of the number of non-exempt employees, the amount of non-exempt labor hours used, and the frequency and amount of overtime hours." (Crandall Decl. 17.) In support of this conclusion, Mr. Crandall created exhibits showing the average total non-exempt headcount per restaurant. He concluded that there is "no common answer with regards to how a restaurant is staffed that can be applied to all Apprentices." (Crandall Decl. ¶ 25.) He offered this testimony to rebut plaintiffs' claim that short staffing often caused apprentices to fill-in for hourly employees and perform non-exempt work. Id.

In addition to variations in staffing, Mr. Crandall also found "variation across restaurants in terms of the average total number of labor hours used, the average number of shifts worked per week by hourly employees, and the average shift duration." (Crandall Decl. ¶ 26.) He concluded that "variation in labor hours suggests that there is no rule of thumb that can be applied to make reliable liability determinations for 'absent' Apprentices." (Crandall Decl. ¶ 28.)

Mr. Crandall found "wide variations" across restaurants in terms of customer flow and the ratio of customers to employees. (Crandall Decl. ¶ 37.) To reach this conclusion, Mr. Crandall compared the number of customers to the number of employees at fifteen-minute increments throughout the day. He created a graph showing the average ratio of customers to staff throughout the day at all Rule 23 and Opt-in restaurants. (Crandall Decl., Ex. 13a.) He

created additional charts that compared the ratio of customers to employees at seven randomly selected restaurants. (Crandall Decl., Ex. 13b–g.)

To rebut Dr. Johnson's effective hourly wage calculations, Mr. Crandall offered his own methodology for calculating the "regular hourly rate" of apprentices. He performed two separate calculations: first, he divided all cash compensation by the number of scheduled hours to reach an average regular rate of $15.07 per hour. (Crandall Decl. ¶ 49.) Second, he added the hourly rate of the value of the apprentices' benefits to their total compensation and divided it by their number of scheduled hours, to reach an average regular rate of $20.27 per hour. (Crandall Decl. ¶ 50.) For purposes of comparing apprentices' salaries to other employees,' Mr. Crandall factored benefits into his calculations of the regular hourly rates of service and kitchen managers, as well as for crew and cashiers. He based these calculations on benefits information listed in a PowerPoint presentation that Chipotle produced in discovery. (Crandall Decl. ¶ 50, n.26.)

Mr. Crandall also gave an overview of Chipotle's business and labor models and analyzed the job descriptions and performance evaluation forms for apprentices. He determined that the job descriptions of hourly and salaried employees were "very different" and "demonstrate that the Apprentice position is much more similar to the General Manager position in terms of duties and responsibilities as compared to the Service or Kitchen Manager positions." (Crandall Decl. ¶ 56.) He also compared apprentices' declarations to their job descriptions to determine whether apprentices' actual duties and responsibilities lined with up those listed on the job description. He found that "plaintiffs' and Chipotle's declarants describe their job duties very differently as to their role in interviewing and hiring staff." (Crandall Decl. 46.)

II.   **_Daubert_ and Rule 702 Standards**

Trial courts serve as gatekeepers for expert evidence and are responsible for "ensuring

that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993). Under Federal Rule of

Evidence 702, expert testimony is admissible where:

> (a) the expert's scientific, technical, or other specialized
>      knowledge will help the trier of fact to understand the evidence
>      or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods;
>      and
>
> (d) the expert has reliably applied the principles and methods to
>      the facts of the case.

"To determine whether a proposed expert's testimony passes muster under Rule 702, this

Court must inquire into: (1) the qualifications of the proposed expert; (2) whether each proposed

opinion is based on reliable data and reliable methodology; and (3) whether the proposed

testimony would be helpful to the trier of fact." S.E.C. v. Tourre, 950 F. Supp. 666, 674

(S.D.N.Y. 2013) (citing Nimely v. City of New York, 414 F.3d 381, 396–97 (2d Cir. 2005)).

When evaluating the reliability of an expert's testimony, the court must "undertake a

rigorous examination of the facts on which the expert relies, the method by which the expert

draws an opinion from those facts, and how the expert applies the facts and methods to the case

at hand." Amorgianos v. National R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002). If the

expert's testimony does not rest on traditional scientific methods, the court may permit testimony

"where a proposed expert witness bases her testimony on practical experience rather than

scientific analysis." Davis v. Carroll, 937 F. Supp. 2d 390, 412 (S.D.N.Y. 2013). When

conducting its analysis, the district court "must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." Amorgianos, 303 F.3d at 266. Nonetheless, "conclusions and methodology are not entirely distinct from one another" and "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). Accordingly, a district court may exclude expert testimony if it determines that "there is simply too great an analytical gap between the data and the opinion proffered." Id.

The court must also conclude that the proposed testimony will assist the trier of fact. In re Rezulin Products Liab. Litig., 309 F. Supp. 2d 531, 54 (S.D.N.Y. 2004). "This 'helpfulness' standard . . . requires as a precondition to admissibility that the expert testimony possess a valid and specialized connection to the pertinent inquiries in the litigation." Krys v. Aaron, No. 14-2098 (JBS/AMD), 2015 WL 3660332, at *3 (D.N.J. June 12, 2015) (citing Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003)) (internal quotation marks omitted). "Testimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of understanding on his or her own." United States v. Mejia, 545 F.3d 179, 194 (2d Cir. 2008).

In light of the liberal admissibility standards of the Federal Rules of Evidence, exclusion of expert testimony is warranted only when the district court finds "serious flaws in reasoning or methodology." In re Fosamax Prods. Liab. Litig., 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009). Otherwise, if an expert's testimony falls within "the range where experts might reasonably differ," the duty of determining the weight and sufficiency of the evidence on which the expert relied lies with the jury, rather than the trial court. Kumho Tire, Co. v. Carmichael, 526 U.S. 137,

153 (1999). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." <u>Daubert</u>, 509 U.S. at 596. "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements under Rule 702 are satisfied." <u>United States v. Williams</u>, 506 F.3d 151, 160 (2d Cir. 2007) (citing <u>Daubert</u>, 509 U.S. at 593 n.10).

Testimony that is admissible under Rule 702 still may be struck under Federal Rule of Evidence 403 if the Court finds that "the probative value of the evidence is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Expert testimony is particularly susceptible to these dangers, "due to the unique weight such evidence may have in a jury's deliberations." <u>Nimely</u>, 414 F.3d at 397. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than lay witnesses." <u>Daubert</u>, 509 U.S. at 595 (quoting Jack B. Weinstein, <u>Rule 702 of the Federal Rules of Evidence Is Sound; It Should Not Be Amended</u>, 138 F.R.D. 631, 632 (1991)).

## III.     The Scope of a Rebuttal Report

### A.     Legal Standard

Federal Rule of Procedure 26 permits parties to submit expert testimony that is "intended solely to contradict or rebut evidence on the same subject matter identified by another party." Fed. R. Civ. P. 26(a)(2)(D)(ii). "A rebuttal expert report is not the proper place for presenting new legal arguments, unless presenting those arguments is substantially justified and causes no

prejudice." Ebbert v. Nassau Cty., 05 Civ. 5445 (FB)(AKT), 2008 WL 4443238, at *13

(E.D.N.Y. Sept. 26, 2008) (quoting STS Software Sys., LTD. v. Witness Sys., Inc., 04 Civ. 2111,

2008 WL 660325, at *2 (N.D. Ga. Mar. 6, 2008)) (internal quotation marks omitted). "Rebuttal

evidence is properly admissible when it will explain, repel, counteract or disprove the evidence

of the adverse party." Sci. Components Corp. v. Sirenza Microdevices, Inc., 03 Civ. 1851 (NGG)

(RML), 2008 WL 4911440, at *2 (E.D.N.Y. Nov. 13, 2008) (quoting Crowley v. Chait, 322 F.

Supp. 2d 530, 551 (D.N.J. 2004)). "The scope of a rebuttal is limited to the same subject matter

encompassed in the opposing party's expert report, but district courts have been reluctant to

narrowly construe the phrase 'same subject matter' beyond its plain language." Allen v. Dairy

Farmers of America, Inc., 09-cv.-230, 2013 WL 211303, at *5 (D. Vt. Jan. 18, 2013) (quoting

T.C. Sys. Inc. v. Town of Colonie, New York, 213 F. Supp. 2d 171, 180 (N.D.N.Y. 2002))

(internal citations and quotation marks omitted). A rebuttal expert is permitted to use new

methodologies "for the purpose of rebutting or critiquing the opinions of [the opposing party's]

expert witness." Park W. Radiology v. CareCore Nat'l LLC, 675 F. Supp. 2d 314, 326 (S.D.N.Y.

2009). "[A] district court has wide discretion in determining whether to permit evidence on

rebuttal." United States v. Tejada, 956 F.2d 1256, 1266 (2d Cir. 1992).

When offering expert testimony, the defendant has "no burden to produce models or

methods of their own; they need only attack those of the plaintiffs' experts." In re Zyprexa Prods.

Liab. Litig., 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007). At a minimum, however, rebuttal

experts must meet Daubert's threshold standards regarding the qualifications of the expert,

sufficiency of the data, reliability of the methodology, and relevance of the testimony. See, e.g.,

Washington v. Kellwood, 105 F. Supp. 3d 293, 327 (S.D.N.Y. 2015) (finding that a rebuttal

expert's testimony based on general accounting standards was reliable); Clark v. Edison, 881 F.

Supp. 2d 192, 212 (D. Mass. 2012) (admitting rebuttal expert testimony that directly contradicted the plaintiff's expert's testimony because both experts' testimony fell "within the range where experts might reasonably differ"); <u>Cospelich v. Hurst Boiler & Welding Co., Inc.</u>, 08CV46-LG-JMR, 2009 WL 8599064, at *2 (S.D. Miss. July 7, 2009) (excluding testimony where the rebuttal expert failed to employ a reliable methodology or illustrate how his experience informed his analysis); <u>Rondor Music Int'l Inc. v. TVT Records LLC</u>, CV 05-2909-JTL, 2006 WL 5105272, at *3 (C.D. Cal. Aug. 21, 2006) (excluding testimony where the rebuttal expert was unable to articulate a specific process or methodology by which she reached her conclusions).

### B.    Mr. Crandall's Rebuttal Report

In a footnote, the plaintiffs ask the Court to strike portions of Mr. Crandall's declaration that allegedly exceed the appropriate scope of a rebuttal report. They argue that most of Mr. Crandall's rebuttal testimony constitutes "an affirmative analysis not responsive to any of Plaintiffs' experts." (Pls.' Mot. 1, n.2.) Plaintiffs contend that because Chipotle failed to disclose its affirmative expert report in the time required by the Court's disclosure schedule, the Court should strike all portions of Mr. Crandall's report that are not responsive to the reports of Mr. Gordon and Dr. Johnson.

Arguments made only in a footnote are generally deemed to be waived. <u>City of Syracuse v. Onondaga Cty.</u>, 464 F.3d 297, 308 (2d Cir. 2006). Accordingly, the Court does not believe this argument was intended to be advanced—certainly not with any force. In any event, it fails on the merits. The testimony offered by Mr. Crandall falls within the permissible bounds of rebuttal testimony. Mr. Crandall's testimony regarding variations in staffing and customer flow are offered to refute Dr. Johnson's findings that Chipotle's employment data show that it makes similar use of restaurant staff within the Class states and across the stores where members of the

14

Opt-In Class were employed. Likewise, Mr. Crandall's testimony related to apprentices' job descriptions is appropriate rebuttal testimony to Mr. Gordon's testimony regarding the duties and responsibilities of apprentices and other restaurant employees. Accordingly, to the extent the plaintiffs premised their motion on this ground, it is DENIED.

## IV.     Narrative Expert Testimony

### A.     Legal Standard

Both parties seek to exclude portions of the other's expert testimony based on the argument that they contain impermissible factual narratives. "Simply rehashing evidence about which an expert has no personal knowledge is impermissible under Rule 702." Sharkey v. J.P. Morgan Chase & Co., 978 F. Supp. 2d 250, 252 (S.D.N.Y. 2013) (quoting Ridge Clearing & Outsourcing Solutions, Inc. v. Khashoggi, 2011 WL 3686468, at *2 (S.D.N.Y. Aug. 12, 2011)). Although an expert may rely on facts or other data in evidence when constructing an expert report, a party may not present an expert to the jury "solely for the purpose of constructing a factual narrative based upon record evidence." Highland Capital Mgmt., L.P. v. Schneider, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005.) See also In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d at 551 (finding that expert testimony on the regulatory history of a diabetes drug was merely narrative, and the expert's "simple inferences drawn from uncomplicated facts" served "only to buttress the plaintiffs' theory of the case"); In re Longtop Fin. Techs. Ltd. Sec. Litig., 32 F. Supp. 3d 453, 462 (S.D.N.Y. 2014) (excluding portions of expert's testimony where the expert merely summarized findings of audit opinions, facts provided by the defendant, and the contents of other documents on the record, but admitting expert's summaries of technical financial documents, "to the extent that the documents would not be comprehensible to the average layperson").

Expert testimony is, however, admissible where it "synthesizes" or "summarizes" data in a manner that "streamline[s] the presentation of that data to the jury, saving the jury time and avoiding unnecessary confusion." Louis Vuitton Malletier S.A. v. Sunny Merch. Corp., 97 F. Supp. 3d 485, 504 (S.D.N.Y. 2015) (quoting Gill v. Arab Bank, PLC, 893 F. Supp. 2d 523, 536 (E.D.N.Y. 2012)). An expert also may offer commentary on documents in evidence if the expert's testimony relates to the "context in which [documents] were created, defining any complex or specialized terminology, or drawing inferences that would not be apparent without the benefit of experience or specialized knowledge." In re Fosamax, 645 F. Supp. 2d at 192.

Relatedly, experts may not offer opinions regarding the intent or motive of parties as part of their analysis. As a general rule, "[i]nferences about the intent or motive of parties or others lie outside of the bounds of expert testimony." See In re Rezulin Prods., 309 F. Supp. 2d at 547 (excluding expert testimony where the expert admitted that his testimony about the corporate defendant's profit motive was an "inference" unrelated to any scientific analysis and also testified that he was not an expert on corporate intent). An expert may not testify on the "intent, motives or states of mind of corporations, regulatory agencies and others" if the expert has "no basis in any relevant body of knowledge or expertise." Id. at 546. Experts may, however, offer testimony discussing "ordinary practices and usages" in a particular industry. See Highland Capital Mgmt., L.P., 379 F. Supp. 2d at 471 (discussing instances in which courts permitted testimony from expert witnesses regarding customs and practices in the securities industry based upon the expert's knowledge of standard trading practices).

**B.      Mr. Gordon's Testimony**

Based on his restaurant industry knowledge and expertise, Mr. Gordon proposes to testify about how Chipotle manages its restaurants, returns high profits for its investors, and promotes

store growth. Chipotle seeks to exclude portions of Mr. Gordon's declaration that present "a biased factual summary of the evidence provided to him by Plaintiffs' counsel in an effort to construct a narrative that comports with Plaintiffs' theories." (Def.'s Mot. 1.)

Chipotle first attacks Mr. Gordon's report as merely a narrative account of the record evidence. For example, Mr. Gordon cites to deposition transcripts and documents to explain Chipotle's "simply conceptualized, standardized, and structured business operation." (Gordon Decl. ¶ 10.) Mr. Gordon describes Chipotle's "extensive support to store-level employees" and "centralized scheduling and reporting systems." (Gordon Decl. ¶¶ 14, 15.) Mr. Gordon also explains that "Chipotle's food costs are its principal store level expense, and that its cost of goods sold percentage has risen in the last four years." (Gordon Decl. ¶ 31.) Chipotle contends that this rehashing of the record evidence is not the product of any expert analysis, methodology, or opinion, and should be excluded.

This argument misses the permissible purpose of Mr. Gordon's testimony. Mr. Gordon's role is to identify Chipotle's practices and structures and place them within a larger context of industry norms. To do so, of course, he must lay a foundation that necessarily requires restating facts in evidence. But his testimony goes beyond that. Relying on his expertise, Mr. Gordon draws conclusions about Chipotle's historical success and growth and the costs and pressures associated with its business practices. His testimony will assist the trier of fact in understanding Chipotle's business model and comparing Chipotle's practices and financial success to those restaurants that implement a franchise model. Mr. Gordon's testimony may also help explain common business practices related to cost savings.

Thus, to render his opinion about the Chipotle business model and how it relates to the apprentice role, Mr. Gordon may testify about how Chipotle organizes its operations, whether

such structure is typical in the industry, and how choices Chipotle makes affect costs and revenue. He may also testify about Chipotle's growth and how that affects staffing and management. Accordingly, Chipotle's motion to exclude Mr. Gordon's testimony as merely a narrative account of record evidence is DENIED. See, e.g., Louis Vuitton, 97 F. Supp. 3d at 507; Int'l Franchise Ass'n, Inc. v. City of Seattle, 97 F. Supp. 3d 1256, 1264–65, 1276 (W.D. Wash. 2015).

But Mr. Gordon may not assign Chipotle's motivation or intent behind its business model. At times, Mr. Gordon suggests that Chipotle's decision-making is motivated by "Wall Street investor expectations." (Gordon Decl. ¶¶ 18, 21) He describes Chipotle's "desperate need" for new managers to keep up with store growth, and concludes that "Chipotle's goal was to promote Apprentices to a General Manager role as soon as they were ready to fuel new store growth." (Gordon Decl. ¶¶ 23, 24, 28.) He concludes without attribution that the "high rate of [apprentice] promotion is consistent with, and necessary to, fueling Chipotle's continual growth." (Gordon Decl.¶ 29.) Such testimony is improper.

To be sure, Mr. Gordon is qualified to offer *a* business reason for why a restaurant chain might make the types of business management choices that Chipotle has made; but he may not state that Chipotle in fact was motivated by such calculations without dispositive support. Such argument is reserved for counsel.

### C.    Mr. Crandall's Testimony

As a rebuttal expert, Mr. Crandall's role is to undermine the soundness of the plaintiffs' experts' conclusions. Still, his testimony must be reliable and helpful to the trier of fact. The plaintiffs object to portions of Mr. Crandall's report as simply summarizing or quoting deposition and declarant testimony. They contend that, in contrast to Mr. Gordon's testimony,

Mr. Crandall fails to draw expert conclusions from this evidence. Plaintiffs also challenge the admissibility of Exhibits 1–3, which reflect the percentage of managerial duties performed as reported by plaintiffs' and Chipotle's declarants, arguing that the exhibits present narrative testimony and are misleading.

Plaintiffs draw the Court's attention to portions of Mr. Crandall's report where he repeats declarant statements and concludes with a summary of the same. For example, Mr. Crandall identifies a plaintiffs witness and Chipotle witness and quotes extensively from their statements. (See Crandall Decl. ¶¶ 62–63.) Mr. Crandall employs no analysis or methodology in reaching the self-evident conclusion that these two witnesses describe their duties in substantially different ways. But Mr. Crandall uses these examples to support his thesis that apprentices' experiences were not uniform and therefore the methodology used by plaintiffs' experts—to gain averages from Chipotle data—do not adequately reflect the individualized nature of the employment. In this example, the use of the record evidence is to illustrate a point. It is not impermissible for Mr. Crandall to testify that one (or more) plaintiffs witness testified radically differently from one (or more) Chipotle witness. This point, however can be made without Mr. Crandall actually repeating the witnesses' statements on the stand. Any challenge to the reliability of such evidence is better reserved for cross-examination.

Similarly, Mr. Crandall's testimony related to job descriptions and performance evaluations is helpful. Much like Mr. Gordon, Mr. Crandall uses record evidence as a foundation for his expert opinion. As with the witness statements, he relies on these documents to attack the probative value of plaintiffs' experts' opinion that apprentices' work experiences are uniform. As discussed further below, while he may not go a step further and render an opinion on what that

means for plaintiffs' burden at the class certification stage, he may identify areas of distinction and draw different conclusions from the record evidence.

Relatedly, the visualization of the data presented in Exhibits 1–3 presents a helpful tool that can aid jurors in viewing possible variations in apprentices' testimony. Likewise, his discussions of these charts gives the trier of fact background information regarding the graphs and helps the trier of fact interpret the data. The charts are not misleading. And the plaintiffs have presented no arguments to support a finding that Mr. Crandall's charts create an unfair prejudice that substantially outweighs their probative value. The plaintiffs are free to question Mr. Crandall about the validity the data in his charts on cross-examination.

Mr. Crandall may not, however, simply parrot a witness's prior statement without use of that statement to support a larger point. So, for example, in another portion of his report, Mr. Crandall quotes 14 lines from Matt Elder's deposition transcript to challenge plaintiffs' theory that a reduction in the labor matrix results in apprentices performing non-managerial work. (See Crandall Decl. ¶ 30.) Here, Mr. Crandall offers no independent analysis or conclusion on whether apprentices "fill-in" to limit non-exempt hours. Instead, he repeats Chipotle's legal theory and then quotes Mr. Elder. Mr. Elder, however, is perfectly capable of offering this testimony at trial; and the jury does not need Mr. Crandall's repetition to understand such testimony.

The Court therefore GRANTS the plaintiffs' motion to preclude Mr. Crandall from quoting witnesses' prior statements on the stand, and from repeating witnesses' prior statements without any further analysis as he did in paragraph 30 of his report; but DENIES the plaintiffs' motion to strike the charts illustrating the percentage of managerial duties performed by

apprentices, or the expert testimony related to job descriptions, performance evaluations, or deposition and declarant statements generally.

## V.      Testimony on Issues of Law

### A.      Legal Standard

In deciding whether expert testimony will be helpful to the fact-finder, the Court must determine whether the testimony "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." United States v. Lumpkin, 192 F.3d 280, 289 (2d Cir. 1999); accord United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991). While an expert "may opine on an issue of fact within the jury's province," an expert "may not give testimony stating ultimate legal conclusions based on those facts." Bilzerian, 926 F.2d at 1294; see also Hygh v. Jacobs, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion") (citing cases). Accordingly, courts exclude expert testimony that "'provide[s] legal opinions, legal conclusions, or interpret[s] legal terms; those roles fall solely within the province of the court." Highland Capital Mgmt. L.P., 379 F. Supp. 2d at 470 (quoting Roundout Valley Ctr. Sch. Dist. v. Coneco Corp., 321 F. Supp. 2d 469, 480 (N.D.N.Y. 2004)).

Relatedly, no expert may "supplant the role of counsel in making argument at trial, and the role of the jury [in] interpreting the evidence." Primavera Familienstiftung v. Askin, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001) (abrogated on other grounds by Casey v. Merck & Co., 653 F.3d 95 (2d Cir. 2011)); see also LinkCo, Inc. v. Fujitsu Ltd., 00 Civ. 7242 (SAS), 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002) (rejecting plaintiff's expert's report because the report "'does no more than counsel for [plaintiff] will do in argument, i.e., propound a particular interpretation of [defendant]'s conduct'") (quoting Primavera, 130 F. Supp. 2d at 530)).

### B.      Mr. Crandall's Testimony

Plaintiffs argue that portions of Mr. Crandall's testimony should be precluded because he "impermissibly weaves legal arguments and legal conclusions into his analysis, placing himself in the role of advocate and trier of fact." (Pls.' Mot. 2.) Chipotle responds that Mr. Crandall—as a rebuttal expert—appropriately identifies analytical flaws or overlooked information from Dr. Johnson's analysis that would undermine the plaintiffs' expert's view of uniformity and impact class certification. By Chipotle's lights, Mr. Crandall defers to the Court or the fact-finder, as he must, on what factors should be considered for legal conclusions and how much weight should be afforded to the evidence.

To be sure, the line between permissibly identifying evidence that was overlooked by plaintiffs' expert and impermissibly suggesting to the Court that such evidence is important may be thin. Mr. Crandall, however, has overstepped his authority. For example, Mr. Crandall opines whether class certification is possible given the record evidence. He offers to the Court that "a 'one-size-fits-all' liability determination would likely result in considerable error," (Crandall Decl. ¶ 16; see also ¶¶ 22, 46, 67), that "the group average may not be a valid and reliable measure of the individual experiences of many Apprentices," (Crandall Decl. ¶ 20; see also ¶ 28), that one must examine the evidence "on a week-by-week basis," (Crandall Decl. ¶ 27; see also ¶ 36), and that "extrapolating the experiences of 'representative' Apprentices to 'absent' Apprentices is likely to result in significant errors." (Crandall Decl. ¶ 22; see also ¶¶ 27, 41.) Mr. Crandall was retained to challenge the methodology used and assumptions held by plaintiffs' experts. Accordingly, it is perfectly appropriate for him to identify variations in the evidence or record evidence overlooked. But his expert opinion on what that means for the plaintiffs' case is impermissible.

Chipotle seeks to avoid this conclusion by suggesting that Mr. Crandall "defers" to the Court in each instance. Mr. Crandall's deference notwithstanding, on these occasions, Mr. Crandall's testimony reads more like lawyer's argument. Chipotle's counsel will certainly be able to rely upon the data provided by its expert to argue that class certification is inappropriate because "the group average may not be a valid and reliable measure of the individual experiences," and rather the Court must examine each apprentices' experience individually and "on a week-by-week basis," to avoid errors related to absent apprentices. But these are arguments to be made by counsel. And the Court or the jury will ultimately determine whether they hold true. Thus, those portions of Mr. Crandall's testimony that purport to analyze the relevance of plaintiffs' evidence are struck, and Mr. Crandall is precluded from testifying about what conclusions should be drawn from the evidence he has gathered. The Court, therefore, adopts as its own those sections designated as impermissible legal conclusions about classwide evidence by the plaintiffs in their annotated copy of the Crandall Declaration. ECF No. 1048–3. The portions of the following paragraphs, where highlighted in yellow or green, are stuck: Crandall Decl. ¶¶ 16, 20, 22, 27, 28, 36, 41, 46, 67, 71, 73, 74, 75 & 76, as well as footnote 18 and the heading for Section I. In addition, the Court strikes Crandall Decl. ¶ 69 ("this data suggests that one would need to collect individualized, person specific experiences in order to make reliable liability determinations").

The Court also strikes any testimony that equates the fact that an apprentice might be the highest ranking employee with that apprentice's purported role as a decision-maker, or whether that apprentice's primary duties are therefore management. The term "management" is a legal term defined in 29 C.F.R. § 541.102, and the determination of whether an employee's primary duty is "management of the enterprise" is a factor that the trier of fact must consider in the

primary duty test under 29 C.F.R. § 541.100. "It is particularly inappropriate for a witness to track the exact language of statutes and regulations." <u>U.S. ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cty, N.Y.</u>, 06 Civ. 2860 (DLC), 2009 WL 1110577, at *2 (S.D.N.Y. Apr. 22, 2009). Chipotle conceded at oral argument that the phrase "primary decision maker" was "problematic," and represented that they would replace it with the phrase "highest ranking manager." (Mar. 3, 2016, Oral Arg. Tr. 51:8–13.)

Accordingly, Mr. Crandall may testify about the rate at which apprentices are the highest ranking employee, but he is not qualified to testify about the work performed or decisions made by an apprentice at such times. When Mr. Crandall draws the conclusion that the highest ranking employee has management as his primary duty, he assumes the role of advocate for Chipotle. Accordingly, the Court strikes those portions of the following paragraphs from the plaintiffs' annotated copy of the Crandall Declaration, where highlighted in orange or green: Crandall Decl. ¶¶ 7, 21, 22, 30, 32. The Court permits Mr. Crandall to testify as proposed in the following paragraphs so long as the phrases "senior decision maker" and "primary decision maker" are replaced by "highest ranking employee": Crandall Decl. ¶¶ 12, 18, 22, 23, the heading for Section V(D) and note 31. The Court does not strike the highlighted portions of the following paragraphs: Crandall Decl. ¶¶ 12 & 56. The Court also does not strike Exhibits 4a–g. Although the Court finds that the charts themselves are admissible, Mr. Crandall may not offer testimony indicating that the highest ranking employee is also the senior decision maker. This is a legal conclusion for which Mr. Crandall offers no support.

In sum, the plaintiffs' motion is GRANTED in part to the extent that Mr. Crandall may not testify as to what factors are relevant to legal conclusions, how much weight should be

afforded to the evidence, what the primary duty of the apprentice is and whether apprentices'
work constitutes management.

## VI.    Objections to the Reliability of Expert Testimony

### A.    Legal Standard

The test for reliability of expert testimony is flexible, especially in cases where the
expert's knowledge is non-scientific and based on his experience. See In re Methyl Tertiary
Butyl Ether ("MTBE") Prods. Liab. Litig., MDL No. 1358 (SAS), 2008 WL 1971538, at *6
(S.D.N.Y. May 7, 2008); see also Advisory Committee Notes, 2000 Amendment, Fed. R. Evid.
702 ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable
expert testimony"). In cases where experts "draw a conclusion from a set of observations based
on extensive and specialized experience," Kumho Tire, 526 U.S. at 156, "the method is the
application of experience to facts." In re MTBE, 2008 WL 1971538 at *6.

### B.    Mr. Gordon's Testimony Related to Apprentice Duties

Chipotle urges the Court to exclude portions of Mr. Gordon's testimony related to the
duties and responsibilities of apprentices because he undertook no study into what work an
apprentice actually performs. The plaintiffs seem to concede this point, stating in their brief:

> Gordon focuses his attention on the business management of Chipotle, not
> personnel studies. He does not testify about the apprentices' in-store performance
> compared to the job description, variations in apprentices performing manual or
> managerial work, or the percentage of time apprentices perform particular duties.

Pls.' Opp'n. Br. 15. This is consistent with Mr. Gordon's deposition testimony that he would not
be rendering an opinion about what activities the apprentices carry out or their day-to-day
operations. But his report includes assertions for which he is unqualified to opine. For example,
he states that "Chipotle offsets hourly employee labor costs by assigning salaried Apprentices to
work in manual labor roles, such as food production, customer services, and restaurant upkeep

roles." (Gordon Decl. ¶ 33.) He concludes that "[m]uch of Chipotle's day-to-day management is performed by the hourly Kitchen Manager and Service Manager. . . ." (Gordon Decl. ¶ 36.) And he posits that "less management is likely necessary at the store level" because Chipotle's hourly employees are "[h]igher quality." (Gordon Decl.¶ 41.)

The portions of Mr. Gordon's testimony that contain opinions about the relationship between Chipotle's business model and the role of apprentices are generally offered "without benefit of citation to research, studies or other generally accepted support for expert testimony." LinkCo, Inc., 2002 WL 1585551 at *3. Mr. Gordon has no basis on which to render these conclusions. Accordingly, Chipotle's motion in this regard is GRANTED, and Mr. Gordon is precluded from testifying about the actual work performed by apprentices or how that work, in fact, affects staffing models.

### C.   Mr. Crandall's Testimony Related to "Wide Variations"

Plaintiffs argue that Mr. Crandall's testimony regarding allegedly "wide variations" in class members' experiences is unreliable because Mr. Crandall failed to provide any statistical reference or objective criteria for the purported variations reflected in his analysis. They urge the Court to exclude Exhibits 5a–6g, as well as Exhibits 11a–f, because Mr. Crandall failed to control for other factors that might explain variations in the data. They also argue that Mr. Crandall's results in Exhibits 13b-g are unreliable because he did not use representative random samples in his analysis of customer and staffing counts.

Plaintiffs' objection that Mr. Crandall's analysis fails to control for other variables goes to the weight, rather than the admissibility, of his testimony. Mr. Crandall bases his opinions regarding the "wide variations" in Chipotle's staffing and employment data on his 17 years of experience conducting labor studies and working as a labor economics consultant. He did not run

a regression analysis on his calculations, nor did he offer a standard deviation for each chart included in his report. Instead, Mr. Crandall applied his expertise to create charts that, for example, illustrate the dispersion of scheduling and spread of hours worked by apprentices in the various class states. He then applied his expert knowledge and experience in examining labor models and staffing levels to reach conclusions regarding variances in the data. See Arista Records LLC v. Lime Group LLC, 06 Civ. 5936 (KMW), 2011 WL 1674796, at *7 (S.D.N.Y. May 2, 2011) (permitting a non-statistician expert to offer rebuttal testimony about technological matters within his areas of expertise, even if they implicated statistical conclusions). "Disputes regarding the proper variables to employ in statistical studies are more properly left for juries to consider and to decide." EEOC v. Morgan Stanley & Co., 324 F. Supp. 2d 451, 458 (S.D.N.Y. 2004); see also McCullock v. H.B. Fuller Co., 61 F. 3d 1038, 1044 (2d Cir. 1995) ("Disputes as to the strength of [an expert's] credentials, faults in his use of . . . methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony").

Furthermore, Chipotle offers Mr. Crandall's testimony as rebuttal evidence, rather than an affirmative analysis. Mr. Crandall presents his charts as a means of displaying variances in the data that were not discussed by the plaintiffs' experts; he does not present them for the purpose of proving a scientifically significant level of variation in the data. Mr. Crandall's models and testimony regarding variations in restaurant staffing and apprentices' allocation of time are offered to critique Dr. Johnson's and Mr. Gordon's findings related to uniformity of restaurant staffing and apprentices' experiences. Plaintiffs will have the opportunity at trial to subject Mr. Crandall to vigorous cross-examination about his methodologies and conclusions regarding the "wide variations" in data. As a rebuttal witness, Mr. Crandall was under no obligation to create models or methods of his own; instead, he presented Chipotle's employment history data in a

visual format that allowed him to highlight variations in the data. The plaintiffs' request to exclude Mr. Crandall's testimony regarding "wide variances" in data, along with discussions of his analysis of Chipotle's staffing data, is therefore DENIED.

The Court likewise finds no flaws in Mr. Crandall's methodology analyzing the customer staffing ratios as shown in Exhibits 13b-g. "[T]he reliability of any analysis relies upon an unbiased selection of sample data." <u>U.S. Info. Sys., Inc. v. Int'l Broth. of Elec. Workers Local Union No. 3, AFL-CIO</u>, 313 F. Supp. 2d 213, 233 (S.D.N.Y. 2004). For Mr. Crandall to testify that "taken collectively, [Exhibits 13a–g] demonstrate that customer flow and employee staffing can vary significantly across restaurants," his conclusion must be based on an unbiased sampling of data from a random selection of Chipotle stores. (Crandall Decl. ¶ 44.) Despite plaintiffs' allegations that Mr. Crandall "cherry picked" his sample for convenience, they present no evidence to support this allegation. (Pls.' Mot. 20.) In both his deposition and declaration, Mr. Crandall stated that he randomly selected seven restaurants for his analysis. (Crandall Dep. Tr. 172:8; Crandall Decl. ¶ 44.)  In his deposition, he explained that he identified these restaurants using a random number generator. (Crandall Dep. Tr. 172:10.) Because plaintiffs have offered no evidence to the contrary, the Court finds that the stores used in Mr. Crandall's analysis were randomly selected and the corresponding exhibits are therefore admissible. The plaintiffs' request to exclude Crandall Exhibits 13b–g is therefore DENIED.

## VII.    Methods for Calculating Apprentices' Hourly Rate

### A.    Legal Standard

Chipotle disputes the reliability of the hourly rate formula derived by Dr. Johnson. In the first step of the <u>Daubert</u> analysis, the trial court must determine that "the testimony or evidence is not only relevant, but reliable." <u>Daubert</u>, 509 U.S. at 589. The court must perform a two-step

analysis, determining first "whether the reasoning or methodology underlying the testimony is scientifically valid," and second, "whether that reasoning or methodology properly can be applied to the facts in issue." Id. at 592. A trial court "should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." Amorgianos, 303 F.3d at 267 (quoting In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 746 (3d Cir. 1994)).

To show that apprentices were employed in a "bona fide executive capacity," Chipotle must show that their "primary duty is management of the enterprise." 29 C.F.R. § 541.100. The regulations define primary duty as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). To determine whether an employee's performance of management activities constitutes his primary duty, the court must consider "the character of an employee's job as a whole," as well as a list of factors that includes "the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." Id.

Dr. Johnson's hourly rate calculation is offered as a means to compare the relationship between apprentices' salaries with the wages paid to non-exempt Chipotle employees. When evaluating a plaintiffs' compensation for purposes of the primary duty analysis, courts often consider any bonuses or other additional income plaintiffs receive. See, e.g. Clougher v. Home Depot, U.S.A, Inc., 696 F. Supp. 2d 285, 293 (E.D.N.Y. 2010) (considering the plaintiff's bonuses, stock options, and other tokens of executive employment in its compensation comparison); Anderson v. Dolgencorp of N.Y., Inc., 09-cv-360 (GLS\RFT), 09-CV-363 (GLS\RFT), 2011 WL 1770301, at *13 (N.D.N.Y. May 9, 2011) (considering the plaintiff's eligibility for a larger bonus than an hourly employee); but see Hale v. Dolgencorp, Inc.,

09CV00014, 2010 WL 2595313, at *6 (W.D. Va. June 23, 2010) (considering two separate comparisons of the plaintiff's salary: one which included bonuses she received, and the other which excluded bonuses and calculated an hourly rate by dividing her base salary by total hours worked).

Courts vary in their methods for calculating an employee's hourly rate of pay. For example, in Johnson v. Big Lots Stores, Inc., the district court added the plaintiff's yearly salary to his average quarterly bonus, and then divided the result by the total hours worked in a year to calculate his effective hourly rate. 604 F. Supp. 2d 903, 918 (E.D. La. 2009). But in Thomas v. Speedway SuperAmerica, LLC, the Sixth Circuit concluded that the plaintiff's bonus eligibility was too "indeterminable" to be included in the court's hourly rate calculations, and instead simply divided the plaintiff's weekly salary by her total hours worked. 506 F.3d 496, 508–09 (6th Cir. 2007).

Both parties object, respectively, to assumptions made by Dr. Johnson and Mr. Crandall regarding their utilization of underlying data to complete their hourly rate calculations. "Unless the information or assumptions that plaintiff's expert relied on were 'so unrealistic and contradictory as to suggest bad faith,' inaccuracies in the underlying assumptions or facts do not generally render an expert's testimony inadmissible." R.F.M.A.S., Inc. v. Mimi SO, 748 F. Supp. 2d 244, 269 (S.D.N.Y. 2010) (quoting Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC, 571 F.3d 206, 214 (2d Cir. 2009)). "Other contentions that assumptions are unfounded go to the weight, not the admissibility, of the testimony." Zerega, 571 F.3d at 214 (quoting Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996).

Courts are required to "determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony." Boucher, 73 F.3d at 21.

"Assumptions based on conclusory statements of the expert's client, rather than on the expert's independent evaluation are not reasonable." Supply & Bldg. Co. v. Estee Lauder Int'l, Inc., 95 Civ. 8136 (RCC), 2001 WL 1602976, at *4 (S.D.N.Y. Dec. 14, 2001).

An expert opinion, however, "is not *per se* unreliable because it relies on some unverified or inaccurate information provided by the expert's client." Lee Valley Tools, Ltd. v. Indus. Blade Co., 288 F.R.D. 254, 267 (W.D.N.Y. 2013) (citing R.F.M.A.S., Inc., 748 F. Supp. 2d at 269). Data or information that has been compiled by a client in the ordinary course of business may "provide some indicia of reliability for the data." Lee Valley Tools, Ltd., 288 F.R.D. at 267 (quoting Dreyer v. Ryder Auto. Carrier Grp., Inc., 98-CV-82A(F), 2005 WL 1074320, at *26 (W.D.N.Y. Feb. 9, 2005)).

### B.    Dr. Johnson's Hourly Rate Calculations

Chipotle argues that Dr. Johnson's effective hourly wage formula is flawed because he ignored any bonuses or other benefits paid to apprentices and instead only considered their yearly salaries in his calculations. As a result, according to Chipotle, Dr. Johnson omitted approximately $12,700 per year of apprentices' total compensation. (Def.'s Mot. 16.) Chipotle argues that Dr. Johnson's methodology is further flawed because he applied a multiplier of 1.5 to hours worked over 40 per week. Chipotle contends that Dr. Johnson should have followed the formula for calculating the "regular hourly rate" for salaried employees pursuant to 29 C.F.R. § 778.109, which provides "[t]he regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment . . . in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid." These alleged flaws in Dr. Johnson's effective hourly rate formula result in an "artificially low" effective hourly rate. (Def.'s Mot. 17.)

In opposition to the defendants' motion, the plaintiffs argue that Dr. Johnson was not obligated to include bonuses or benefits in his effective hourly rate calculation. They contend that the inclusion of a 1.5 multiplier for hours worked over 40 creates an "apples to apples comparison" between apprentices' hourly compensation and the hourly wages of service managers, who receive time-and-a-half for hours worked per week over 40. (Pls.' Opp'n Br. 21.)

In light of the liberal standard for admitting expert testimony, as well as the lack of a standard methodology for calculating a salaried employee's effective hourly rate, Dr. Johnson's formula does not suffer from such "serious flaws in reasoning or methodology" that require exclusion. In re Fosamax, 645 F. Supp. 2d at 173. Although Dr. Johnson's formula differs from that used by some other courts to calculate an effective hourly rate, it is not based on unsupported methodology. Dr. Johnson explained that his effective hourly rate formula reflects "the hourly rate that would result in the same pay if the Apprentices had been paid hourly for their hours." (Johnson Rep. ¶ 35.) His formula assumes that apprentices should have received time-and-a-half of their hourly rate for every hour worked above 40. "When proffered expert testimony is not scientific in nature, but involves discipline that requires the use of professional judgment, . . . judgment calls that the expert makes regarding appropriate methodology to employ or appropriate variables to plug into calculation may and should be explored and highlighted through cross-examination and presentation of contrary evidence." 31 Am. Jur. Trials Defense Use of Economist 287 § 1 (2016). Chipotle is free to challenge the soundness of Dr. Johnson's effective hourly rate formula on cross-examination.

Chipotle also argues that Dr. Johnson improperly assumed that on average, apprentices work a minimum of 50 hours per week. Chipotle asserts that Dr. Johnson acknowledged during his deposition that he made this assumption based on direction from plaintiffs and on the basis of

approximately 10 declarations that were specifically selected for him by the plaintiffs. The resulting calculations of apprentices' effective hourly rate are therefore, according to Chipotle, "based upon biased data that eschews any probative value that may be assigned to his analysis." (Def.'s Mot. 18.) The plaintiffs argue that Dr. Johnson's assumption regarding the average weekly hours worked by apprentices was appropriately based on data pulled from Menulink, rather than on a small subset of employee testimony or other biased data provided to Dr. Johnson by the plaintiffs.

This narrow contest is better left for a later date. For Daubert and Rule 702 purposes, Dr. Johnson's assumption that the average apprentice works a minimum of 50 hours a week does not render his opinion inadmissible. Chipotle inaccurately describes Dr. Johnson's deposition testimony regarding the source of his data for his average hours calculation. Both in his expert report and at his deposition, Dr. Johnson indicated that his calculation of average weekly hours was derived from scheduling data in MenuLink, and not from a small subset of declarations. In his report, he cited to ten declarations for the purpose of explaining that the hours reflected in the Menulink data might be a conservative representation of the actual hours worked. (Johnson Dep. 97:1–4; Johnson Rep. ¶ 36.) The Court finds no glaring inaccuracies in Dr. Johnson's general assumptions regarding the average weekly hours worked by apprentices. To the extent that Chipotle wishes to challenge Dr. Johnson's calculation of average weekly hours, they may do so on cross-examination. Chipotle's request to strike portions of Dr. Johnson's testimony related to calculations of apprentices' effective hourly rate is therefore DENIED.

Even if the Court concludes that Dr. Johnson's methodology is reliable, Chipotle alternatively argues that Dr. Johnson's analysis should be stricken because the prejudice of his misleading analysis substantially outweighs the probative value of the evidence he presents.

Chipotle contends that employee compensation data definitely show that apprentices earn substantially more than service managers. Dr. Johnson's charts, in contrast, show a comparison that Chipotle alleges "does not bear a relationship to actual earnings" and therefore creates an "overt prejudice" against Chipotle. (Def.'s Mot. 19.) Chipotle contends that Dr. Johnson's analysis is also prejudicial because his comparison of apprentice's effective hourly rate to the hourly wages of service manages is contravened by law. Because service managers also perform some managerial duties, Chipotle alleges that they are an inappropriate group for comparison under 29 C.F.R. § 541.700(a). In opposition, plaintiffs contend that Chipotle incorrectly interprets case law regarding appropriate groups of employees for purpose of the primary duty comparison.

      Dr. Johnson's charts do not create an unfair prejudice that substantially outweigh their probative value. As stated above, Chipotle is entitled to challenge Dr. Johnson's methodology and assumptions for performing his calculations. They may present their own rebuttal expert witness, who may refute Dr. Johnson's testimony and present his own calculations of the effective hourly wages of apprentice employees. Furthermore, Chipotle incorrectly asserts that, as a matter of law, the proper comparison is between apprentice compensation and that of employees doing exclusively nonexempt work. In Donovan v. Burger King Corp., the Court of Appeals found that the "evidence in the record is that employees doing exclusively non-exempt work were paid the minimum wage." 675 F.2d 516, 522 (2d Cir. 1982). Donovan did not, however, create a rule that for purposes of conducting the primary duty test, courts *must* compare the plaintiffs' salary to the wages earned by employees who exclusively perform non-exempt work. To the contrary, courts often compare plaintiffs' salaries with those of non-exempt employees who also perform some managerial tasks. See, e.g., Clougher, 696 F. Supp. 2d at

293–94 (examining the relationship between the plaintiffs' salary and the wages and overlapping responsibilities of non-exempt department supervisors). The defendant's request to exclude Dr. Johnson's hourly rate calculations is therefore DENIED.

### C.   Mr. Crandall's Hourly Rate Calculations

Plaintiffs contend that Mr. Crandall relied on unverified data to arrive at his own effective hourly rate calculations and improperly extrapolated his hourly rate to the entire class by assuming that all apprentices are eligible for the same benefits. Chipotle argues that Mr. Crandall is permitted to rely on data provided by the underlying client without the need to conduct an independent verification of the accuracy of the data. The defendants further assert that because Mr. Crandall's testimony is offered to critique the methodology employed by Dr. Johnson, it was not necessary for Mr. Crandall to independently verify that the benefits information is up-to-date and applies to all apprentices.

It was unreasonable for Mr. Crandall to rely upon the benefits data from Chipotle. The PowerPoint presentation on which he relied notes that "[a]ll values reflected are estimates. You may earn more based on various factors including: market, skill, tenure, etc." (Pls'. Mot., Swartz Decl., Ex. E.) Additionally, the title of the presentation, "Total Compensation Potential," indicates that the benefits values shown on the presentation do not necessarily reflect actual benefits that apprentices received. Indeed, there is no reference to the underlying data to support the "potential" suggested by the presentation. There is also no indication that Mr. Crandall made any attempts to verify the benefits data in the presentation, or confirm whether other employees receive such benefits as part of their compensation. Accordingly, the information on which Mr. Crandall relied is speculative and conjectural, and fails to comply with Daubert's reliability requirement. The plaintiffs' request to exclude Mr. Crandall's testimony that relies upon the

Total Compensation Potential for the value of benefits earned is GRANTED. Mr. Crandall may offer his expert opinion that benefits should be included in any hourly rate analysis, but he may not rely on the value predicted from this document. The Court strikes paragraph 50 from Mr. Crandall's report; paragraphs 49 and 51 are, however, admissible, because they do not include any discussion of benefits.

## VIII.   Methods for Ascertaining Potential Subclasses

Lastly, Chipotle argues that Dr. Johnson employed unreliable methods to determine the purported existence of three potential subclasses of plaintiffs. The plaintiffs asked Dr. Johnson to determine whether it was possible to ascertain, with available data, the following subclasses of employees: (1) apprentices in each Class State and in the Opt-In Class who were employed during weeks for which no general managers or restauranteurs were employed in the same store ("Acting GM Subclass"); (2) apprentices who were hired directly into apprentices titles ("Managers in Training Subclass"); and (3) apprentices who were hired or transferred into a new store within 14 days of its opening ("New Store Apprentice Subclass"). Dr. Johnson determined that it was possible to use PeopleSoft Employment History data to identify apprentice employees in each of these three categories. Chipotle argues that the subclass of "Acting General Managers" is "without meaningful distinction" because Dr. Johnson does not explain how an apprentice working in a store without a general manager or restauranteur differs from an apprentice working in a store as the highest manager on duty as a result of scheduling. Chipotle also contends that Dr. Johnson failed to identify any durational component that would adequately identify a "Manager in Training," and arbitrarily selected a 14-day window for defining a "New Store Apprentice."

In opposition, plaintiffs argue that Chipotle's objections to Dr. Johnson's testimony are premature and should be reserved for the class certification briefings. They contend that Chipotle does not actually assert that Dr. Johnson implemented an unreliable methodology to identify the potential subclasses of plaintiffs. To the extent that the Court considers Chipotle's challenges to Dr. Johnson's analysis, plaintiffs argue that these challenges go to the weight, rather than the admissibility, of Dr. Johnson's findings.

As a preliminary matter, Chipotle may raise Daubert objections to the admissibility of expert testimony for purposes of class certification. "Neither the Supreme Court nor the Second Circuit has definitively decided whether the Daubert standard governs the admissibility of expert evidence submitted at the class certification stage." Chen-Oster v. Goldman, Sachs & Co., 114 F. Supp. 3d 110, 114 (S.D.N.Y. 2015). In Wal-Mart Stores v. Dukes, however, the Supreme Court strongly implied that Daubert applies to expert testimony offered at the class certification stage. See Wal-Mart Stores, Inc. v. Dukes, 131 S.Ct. 2541, 2253–54 (2011) ("The District Court concluded that Daubert did not apply to expert testimony at the certification stage of class-action proceedings. We doubt that is so . . ."); see also Floyd v. City of New York, 283 F.R.D. 153, 166 (S.D.N.Y. 2012) (noting that "[i]n Wal-Mart, the Supreme Court strongly suggested that Daubert . . . applies at the certification stage of a class action proceeding"); but see Houser v. Pritzker, 28 F. Supp. 3d 222, 243–44 (S.D.N.Y. 2014) (finding that it was not necessary to resolve the parties' dispute over the admissibility of expert reports at the class certification stage, because a Daubert inquiry would reach the merits of the parties' claims, exceeding the proper scope of the class certification analysis). Despite the lack of a clear legal standard on this issue, trial courts in this circuit often subject expert testimony to Daubert's rigorous standards insofar as that testimony is relevant to the Rule 23 class certification analysis. See Chen-Oster, 114 F.

Supp. 3d at 115 (noting that "the scope of the <u>Daubert</u> analysis is cabined by its purposes at [the class certification] stage: 'the inquiry is limited to whether or not the expert reports are admissible to establish the requirements of Rule 23'" (quoting <u>Ge Dandong v. Pinnacle Performance, Ltd.</u>, No. 10 Civ. 8086 (JMF), 2013 WL 5658790, at *13 (S.D.N.Y. Oct. 17, 2013)) (internal quotation marks omitted)); <u>In re NYSE Specialists Sec. Litig.</u>, 260 F.R.D. 55, 66–69; <u>All Star Carts & Vehicles, Inc. v. BFI Canada Income Fund, IESI, Corp.</u>, 280 F.R.D. 78, 82 (E.D.N.Y. 2012).

Dr. Johnson limits his analysis to the identification of the three potential subclasses: that is, he extrapolates from the data employees who fit into one or more of these groups. Although the Court has no reason to doubt the validity of the methods Dr. Johnson employed to identify this data, his testimony lacks any *expert* analysis or conclusions regarding the significance of these subclasses. For his testimony to be admissible, an expert must "utilize his expertise in order to aid the finder of fact in understanding esoteric or complex evidence." <u>Chen-Oster</u>, 114 F. Supp. 3d at 124. An expert is precluded from offering testimony that is not based on any specialized knowledge, but rather involves "basic calculations." <u>See</u> <u>Schwartz v. Fortune Magazine</u>, 193 F.R.D. 144, 147 (S.D.N.Y. 2011).

There is no indication that Dr. Johnson utilized his specialized knowledge when he identified the three proposed subclasses in the PeopleSoft data. Instead, such an analysis and extrapolation of data could easily be run by plaintiffs themselves. In this regard, his testimony differs meaningfully from Dr. Crandall's. Whereas Dr. Crandall draws on record evidence to reach a conclusion—for example, that apprentices' experiences are substantially varied such that averages are meaningless—Dr. Johnson simply looks at the data and identifies categories of apprentices. This is not expert analysis.

Thus, the defendants' motion to strike the portions of Dr. Johnson's report regarding the ascertainability of subclasses of plaintiffs is GRANTED. Because there is no challenge to the methodology that identified these sub-classes–only to the meaning and value of them–the parties should confer on a method to stipulate to the identification of the sub-classes without a reliance on expert testimony. The parties may then make whatever arguments are appropriate at the class certification stage.

## CONCLUSION

For the reasons stated, the plaintiffs' motion to exclude testimony from Dr. Crandall is granted in part and denied in part. Chipotle's motion to exclude testimony from Mr. Gordon and Dr. Johnson is also granted in part and denied in part.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:      New York, New York
            April 15, 2016