Richard J. Simmons (admitted *pro hac vice*)
Lisa M. Lewis
Brian D. Murphy
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
30 Rockefeller Plaza
New York, New York 10112
Telephone: (212) 653-8700
Facsimile: (212) 653-8701

Bruce A. Montoya (admitted *pro hac vice*)
John Karl Shunk (admitted *pro hac vice*)
Lou Grossman (admitted *pro hac vice*)
MESSNER & REEVES LLC
1430 Wynkoop St. No. 300
Denver, CO 80202
Telephone: (303) 623-1800
Facsimile: (303) 623-0552

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MAXCIMO SCOTT, JAY ENSOR, MATTHEW MEDINA, EUFEMIA JIMENEZ, KRYSTAL PARKER, STACY HIGGS and CHRISTINE JEWEL GATELEY, on behalf of themselves and all others similarly situated,

Plaintiffs,

-against-

CHIPOTLE MEXICAN GRILL, INC. and CHIPOTLE SERVICES, LLC,

Defendants.

Case No. 12-CIV-8333(ALC)(SN)

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DECERTIFY THE CONDITIONALLY CERTIFIED COLLECTIVE ACTION**

Defendants Chipotle Mexican Grill, Inc., and Chipotle Services LLC respectfully submit this Memorandum of Law in Support of their Motion to Decertify the Conditionally Certified Collective Action pursuant to Section 216(b) of the Fair Labor Standards Act ("FLSA").

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........ 1

STATEMENT OF RELEVANT FACTS ........ 3

I. THE PARTIES ........ 3

A. Chipotle Mexican Grill, Inc., And Chipotle Services, LLC ........ 3

B. The Named Plaintiffs ........ 4

C. The Opt-In Plaintiffs ........ 5

II. CHIPOTLE'S EXPECTATIONS REGARDING THE APPRENTICE POSITION ........ 5

A. Chipotle Expects Apprentices To Manage Stores ........ 5

B. The Job Description Reflects Chipotle's Expectation That Apprentices Manage Their Stores By Exclusively Setting Forth Management Activities ........ 6

C. The Performance Review Reflects Chipotle's Expectation That Apprentices Manage Their Stores By Exclusively Evaluating Management Activities ........ 6

III. DESPITE CHIPOTLE'S EXPECTATIONS, THE RECORD REVEALS THAT APPRENTICES PERFORM DRASTICALLY DIFFERENT ACTIVITIES ........ 7

A. Apprentices Work In A Variety of Settings That Impact The Activities They Perform And The Amount Of Time They Spend Performing Such Activities ........ 7

B. The Named Plaintiffs And Opt-Ins Differ Radically In the Activities They Perform And The Time Spent On Such Activities ........ 9

1. "Interviewing [and] Selecting…Employees" ........ 9

2. "Training Employees" ........ 10

3. "Setting and Adjusting…Hours of Work" ........ 11

4. "Directing the Work of Employees…Apportioning the Work" ........ 12

5. "Appraising…Productivity and Efficiency for the Purpose of Recommending Promotions" & "Adjusting Their Rates of Pay" ........ 13

6. "Disciplining" & "Firing" ........ 15

7. "Planning and Controlling the Budget" ........ 16

8. Conflicting Versions of Responsibilities ........ 16

     C. Testimony From An Opt-In Reveals How Drastically Activities Vary .................... 18

IV. PROCEDURAL HISTORY RELEVANT TO THIS MOTION ........................................ 20

ARGUMENT ........................................................................................................................ 20

I. APPLICABLE STANDARD ............................................................................................ 20

II. DISPARATE FACTUAL & EMPLOYMENT SETTINGS COMPEL DECERTIFICATION ........................................................................................................ 21

A. Relevant Standards ........................................................................................................ 21

B. The Named And Opt-In Plaintiffs Are Not Similarly Situated With Respect To Their Factual And Employment Settings ........................................................ 23

C. The Named Plaintiffs And Opt-Ins Did Not Share A Primary Duty ........................ 30

1. The "Character Of The Job As A Whole" Does Not Render The Named Plaintiffs And Opt-Ins "Similarly Situated" .................................... 30

2. Relative Importance Of Exempt Duties Versus Other Duties....................... 31

3. The Amount Of Time Spent Performing Exempt Work.............................. 31

4. Freedom From Direct Supervision ......................................................... 32

5. Apprentices' Salary Versus Wages Paid To Non-Exempt Employees.......... 32

D. Various Chipotle Guides, Tools & Resources Do Not Render The Named Plaintiffs And Opt-Ins Similarly Situated ............................................................ 33

III. THE INDIVIDUALIZED DEFENSES AVAILABLE TO CHIPOTLE COMPEL DECERTIFICATION ........................................................................................................ 36

A. Chipotle's Executive Exemption Defense Is Highly Individualized And Necessitates Decertification........................................................................................ 36

B. The Combination Of The Executive And Administrative Exemptions Provides Further Grounds For Decertification ..................................................... 39

IV. FAIRNESS AND PROCEDURAL CONSIDERATIONS COMPEL DECERTIFICATION ........................................................................................................ 40

CONCLUSION .................................................................................................................... 40

**TABLE OF AUTHORITIES**

**Page(s)**

Cases

*Ahmed v. T.J. Maxx Corp.*
No. 10-CV-3609 (ADS)(ETB), 2013 WL 2649544 (E.D.N.Y. June 8, 2013) ............................ 5

*Amash v. Home Depot U.S.A., Inc.*
No. 12-CV-837, 2014 WL 4119409 (N.D.N.Y. Aug. 21, 2014) ............................................. 33

*Aquilino v. Home Depot, U.S.A., Inc.*
No. 04-4100 (PGS), 2011 WL 564039 (D.N.J. Feb. 15, 2011) ....................................24, 25, 33

*DeSilva v. North Shore Long Island Hospital,*
27 F.Supp.3d 313 (E.D.N.Y. 2014) ......................................................................................... 40

*Donovan v. Burger King Corp.*
675 F.2d 516 (2d Cir. 1982) ................................................................................................ 23, 25

*Gardner v. Western Beef Props., Inc.*
No. 07-CV-2345 (NGG)(JMA), 2013 WL 1629299 (E.D.N.Y. Mar. 25, 2013).......21, 22, 25, 40

*Green v. Harbor Freight Tools USA, Inc.*
888 F.Supp.2d 1088 (D. Kan. 2012)........................................................................................ 25

*Griffith v. Fordham Fin. Mgmt., Inc.*
No. 12-CIV-1117 (PAC), 2016 WL 354895 (S.D.N.Y. Jan. 28, 2016) .........................20, 21, 25

*Harper v. GEICO, Inc.*
No. 09-CV-2254 (LDW)(GRB), 2015 WL 9673810 (E.D.N.Y. Nov. 16, 2015) ......21, 25, 36, 40

*Hernandez v. Fresh Diet, Inc.*
No. 12-CV-4339, 2014 WL 5039431 (S.D.N.Y. Sept. 29, 2014) (Carter, J.) .................... *passim*

*Hinterberger v. Catholic Health System*
299 F.R.D. 22 (W.D.N.Y. 2014) .............................................................................................. 20

*Holt v. Rite Aid Corp.*
333 F.Supp.2d 1265 (M.D. Ala. 2004) ..................................................................................... 25

*Indergit v. Rite Aid Corp.*
293 F.R.D. 632 (S.D.N.Y. 2013).......................................................................................... *passim*

*Johnson v. Big Lots Stores, Inc.*
561 F.Supp.2d 567 (E.D. La. 2008)...................................................................................24, 25, 30

*Khan v. Airport Mgmt. Servs., LLC*
No. 10-CIV-7735 (NRB), 2011 WL 5597371 (S.D.N.Y. July 11, 2011).................................. 25

*Mota v. Imperial Parking Sys.*
No. 08-CIV-9526, 2010 WL 3377497 (S.D.N.Y. Aug. 24, 2010)............................................39

*Myers v. Hertz Corp.*
624 F.3d 537 (2d Cir. 2010)........................................................................................20, 21

*Pippins v. KPMG LLP*
921 F.Supp.2d 26 (S.D.N.Y. 2012)..............................................................................35

*Reyes v. Texas EzPawn, L.P.*
No. V-03-128, 2007 WL 101808 (S.D. Tex. Jan. 8, 2007)...........................................25

*Ruiz v. Citibank, N.A.*
93 F.Supp.3d 279 (S.D.N.Y. 2015)...............................................................................26, 40

*Santiago v. Amdocs, Inc.*
No. 1 10-4317 SI, 2013 WL 5444324 (N.D. Cal. Sept. 30, 2013)................................26

*Scarpinato v. East Hampton Point Mgmt. Corp.*
No. 12-CV-3681 (JFB), 2013 WL 5202656 (E.D.N.Y. Sept. 13, 2013)........................39

*Stevens v. HMSHost Corp.*
No. 10-CV-3571 (ILG)(VVP), 2014 WL 4261410 (E.D.N.Y. Aug. 27, 2014).................. *passim*

*Till v. Saks Inc.*
No. 11-0504 SBA, 2013 WL 5755671 (N.D. Cal. Sept. 30, 2013)................................25

*Tracy v. NVR, Inc.*
293 F.R.D. 395 (W.D.N.Y. 2013)................................................................................26, 31

*Zivali v. AT&T Mobility*
784 F.Supp.2d 456 (S.D.N.Y. 2011)............................................................................26

<u>Statutes & Regulations</u>

29 U.S.C. § 201, *et seq.* ........................................................................................ *passim*

29 C.F.R. § 541 *et seq.* ........................................................................................... *passim*

**PRELIMINARY STATEMENT**

The record before the Court requires decertification of the conditionally certified collective of 516 Chipotle Apprentices who have consented to participate with respect to the federal Fair Labor Standards Act ("FLSA") claims in this case.[1] Chipotle empowers Apprentices to perform exempt duties, such as hiring, firing, training, supervising, assigning and prioritizing work, making personnel decisions, participating in administrative responsibilities, and running their store, a multi-million dollar asset. To this end, Chipotle developed Job Descriptions and Performance Reviews that reflect its expectation that Apprentices spend a majority of their time on managerial duties. Chipotle appropriately compensates Apprentices for their managerial work, paying them guaranteed salaries that significantly exceed the minimum of $455/week and substantial management bonuses. The record, however, reveals that some Apprentices claim they do not meet Chipotle's reasonable expectations.

This case must be decertified because the Named Plaintiffs and Opt-Ins are not "similarly situated" to each other as required by Section 216(b) of the FLSA. The evidence demonstrates that the members of the collective spend their time performing drastically different activities based on their work settings. Opt-Ins testified that a variety of factors impacted both the activities they perform and the time spent performing such activities, such as whether a more senior manager is on-site, the manager's style, employee turnover rates, the number and experience level of hourly employees they supervise, and their own management style, goals and ambition. Whatever the reasons, the record pointedly illustrates that – as a whole – the Named Plaintiffs and Opt-Ins are not comparable to each other. Some make hiring decisions entirely on their own, some provide

[1] For the convenience of the Court, Chipotle submits herewith a Compendium of Deposition and Declaration Testimony ("Comp. ¶"), which organizes the testimony of over 100 deponents and over 200 Declarants. Although the Compendium is submitted in support of both this Motion and Chipotle's Motion to Deny Rule 23 Certification, the references to the Compendium in this Motion are solely to the testimony of Opt-Ins and not to the Declarations of Proposed Rule 23 Class Members from New York, Illinois, North Carolina, Washington, Colorado, and Missouri. The relevant pages from deposition transcripts are attached to the Declaration of Brian Murphy, Esq. dated May 9, 2016 ("Murphy Decl.") and referred to herein as "Ex. __."

effective hiring recommendations, and some do not participate in the hiring process at all. Some write schedules and assign tasks to hourly employees, some write schedules and assign tasks subject to approval, and some never write schedules or assign tasks. Some admittedly supervise all employees in the store during 100% of their working time, while others claim they exercise no supervisory authority whatsoever. Indeed, nearly equal numbers of Opt-Ins agree they primarily performed management duties as those that disagree claiming they were effectively Crew Members.

Although the divergent experiences between Named Plaintiffs and Opt-Ins alone warrant decertification, these differences exist among the Named Plaintiffs themselves, rendering this case unique and particularly well-suited for decertification. Named Plaintiffs Scott and Ensor, for instance, testified to having different responsibility for: (i) writing schedules; (ii) training others; (iii) supervising employees; (iv) assigning and directing work; (v) evaluating their subordinates; and (vi) exercising authority over their store when serving as the highest ranking manager on-site, among others. Named Plaintiffs Jimenez and Gateley too, although both from Illinois, also nevertheless testified to drastically different responsibilities on key exemption criteria. These differences are not surprising given the testimony of an exemplar Opt-In who worked in two different stores: "*I just had such differing experiences as an Apprentice from one restaurant to the next*." These differences only multiply if the testimony of additional Named Plaintiffs and Opt-Ins is considered, highlighting how necessary decertification is.

These variations do not concern matters at the "margins" of the exemption inquiry. Rather, the Named Plaintiffs and Opt-Ins testified to having different duties with respect to the core criteria used to determine exempt status under 29 C.F.R. §§ 541.102, 201. These distinctions are not just a matter of where a certain Plaintiff falls on the spectrum of responsibility for a given task: the testimony reveals that, in many instances, some Plaintiffs spent the vast majority of their time performing managerial and administrative tasks, whereas others stated they did not.

Under these circumstances, using representative testimony to determine collective liability at trial is impossible. Chipotle's due process right to present its individualized defenses will be fundamentally undermined if the divergent testimony concerning the actual experiences of Plaintiffs in this case is disregarded. This is precisely what Section 216(b) requires District Courts to avoid. Thus, decertification is warranted.

## STATEMENT OF RELEVANT FACTS

### I. THE PARTIES

#### A. Chipotle Mexican Grill, Inc., And Chipotle Services, LLC

Chipotle Mexican Grill, Inc., operates over 2,000 stores throughout the United States serving customers food made with fresh ingredients and naturally raised pork, chicken and beef. (Gottlieb Decl. ¶¶3-5).[2] Chipotle Services, LLC, formally employs Apprentices. (30(b)(6) Tr. (Ex. 45): 166:15-167:9). Chipotle's U.S. operations are divided among nine regions. (Gottlieb Decl. ¶6). The leadership structure for each Region varies but generally includes Team Directors, Area Managers, Team Leaders and Apprentice Team Leaders with different management styles. (*Id.* ¶7-8). The management structure of stores varies widely. Some stores are managed by a Restaurateur with responsibility for up to four locations, or a General Manager ("GM") and one or two Apprentices, or one or two Apprentices without a Restaurateur or GM. (*Id.* ¶10; Comp. ¶¶2-3). Below these salaried managers, stores may have one or two hourly Service Managers ("SM"), one or two hourly Kitchen Managers ("KM"), and between 5-35 full and part-time hourly Crew Members. (Comp. ¶5). As described below, stores vary in many other ways that impact the duties performed by Apprentices, including sales volume, staff size, hours of operation, and location.

[2] All references to "Gottlieb Decl." are to the Declaration of David Gottlieb, Chipotle's Rule 30(b)(6) designee, dated May 6, 2016.

**B. The Named Plaintiffs**

**Plaintiff Scott** worked as a Crew Member, KM and SM at the St. Mark's, NY store from August 2005 until his November 2010 promotion to Apprentice. (Scott Tr. (Ex. 84): 75:14-22; 81:19-23; 84:5-21; 96:9-15; 109:2-20). Scott was promoted to GM of the Greenwich Village, NY store in October 2011. (*Id.* 376:8-12). He resigned on April 13, 2013. (*Id.* 126:18-22).

**Plaintiff Ensor** was hired as an Apprentice in May 2010 at the Olathe, MO store. (Ensor Tr. (Ex. 39): 61:14-62:6). Ensor worked as an Apprentice at two additional stores in Mizzou and Columbia East, before being terminated on June 1, 2011. (*Id.* 62:3-25; 391:5-19).

**Plaintiff Jimenez** worked as a Cashier, KM and SM at the Piper's Alley, IL store from August 2010-July 2011. (Jimenez Tr. (Ex. 51): 74:3-12; 78:2-4; 79:15-19). She was promoted to Apprentice of the Ashland-Diversity store in December 2011. (*Id.* 82:23-83:5). She was promoted to GM in May 2012, and resigned on March 7, 2013. (*Id.* 87:23-88:3).

**Plaintiff Gateley** worked as a Crew Member, KM and SM at the Bloomingdale, IL store from October 2008-May 2010. (Gateley Tr. (Ex. 40): 28:5-29:7; 32:11-12). She was promoted to Apprentice in May 2010. (*Id.* 58:5-10). In March 2011, she was promoted to GM of the La Grange store. (*Id.* 147:22-148:3). She was terminated on February 16, 2012. (*Id.* 42:6-12).

**Plaintiff Higgs** worked as a Cashier, KM and SM at the Lynnwood, WA store from May 2010-February 2012. (Higgs Tr. (Ex. 49): 40:3-5). She was promoted to Apprentice in February 2012. (*Id.* 26:3-7). She resigned on July 14, 2012. (*Id.* 89:6-10; 96:21-24).

**Plaintiff Medina** worked as a Crew Member, KM and SM at the Union-Relo, CO store from April 2012-March 2013. (Medina Tr. (Ex. 62): 52:18-22; 69:15-18). He was promoted to Apprentice in March 2013. (*Id.* 139:10-13). He resigned on October 27, 2013. (*Id.* 19:19-21).

**Plaintiff Parker** worked as Crew, KM and SM at the Charlotte-Midtown, NC store from March-October 2012. (Parker Tr. (Ex. 74): 49:7-10; 52:4-7; 56:7-10). In October 2012, she was

promoted to Apprentice of the Charlotte University store.  (*Id.* 62:18-22).  She was demoted to SM in January 2013 for poor performance, and resigned on January 31, 2014.  (*Id.* 189:24-190:9).

### C.  The Opt-In Plaintiffs

The Opt-Ins consist of 516 current or former Apprentices (including Named Plaintiffs) out of 3,740 who received notice of the action from 37 states.  The claims of 66 additional Opt-Ins were either dismissed for failure to participate or were voluntarily withdrawn.  (Docket No. 1053).

## II.  CHIPOTLE'S EXPECTATIONS REGARDING THE APPRENTICE POSITION

### A.  Chipotle Expects Apprentices To Manage Stores

The GM and Apprentice positions are the most important positions at Chipotle because they are empowered to manage stores, build their teams, and "ensure the existence of a great culture." (Comp. ¶8).  As David Gottlieb, Chipotle's Rule 30(b)(6) designee, illustratively testified:

> Our apprentices are tasked with and we expect them to and they expect to lead in our restaurants…Their primary responsibility is to lead and direct the other individuals in that restaurant, to run a super business, to deliver great meals and create an environment for our employees where they feel encouraged by their circumstances and they feel there is a place for them and they belong and they are challenged.  (30(b)(6) Tr. (Ex. 44): 48:7–50:12).

Monty Moran, Chipotle's Co-CEO, testified similarly:

> [M]y belief is that the restaurant manager and apprentice positions, the people who run the restaurant, is the most important position at Chipotle because they're the ones who hire all of our people and ensure the existence of a great culture and a great restaurant customer experience. (Moran Tr. (Ex. 66): 80:3-9).

Chipotle classifies all Apprentices outside of California as exempt and pays them a guaranteed salary of approximately $38,000 to $51,000/year, well in excess of the FLSA's $455/week standard, to run their store (a multi-million dollar asset) and supervise SMs, KMs, and Crew, ranging from 5-35/store.  (Comp. ¶¶20-21).  Apprentices who effectively run their stores and build their teams are eligible for management bonuses.  (*Id.* ¶22).  Apprentice compensation is far greater than that paid SMs, KMs, and Crew, with Scott, for example, earning nearly $20,000/year

more as an Apprentice than as an SM. (*Id.* ¶25). Apprentices also receive management benefits such as paid vacations, insurance, a retirement plan, and tuition assistance. (*Id.* ¶23).

### B. The Job Description Reflects Chipotle's Expectation That Apprentices Manage Their Stores By Exclusively Setting Forth Management Activities

The Apprentice Job Description reflects Chipotle's expectation that Apprentices perform management duties during a majority of their time. (*Id.* ¶¶9-11). Among other "main" and "primary" duties identified therein, Chipotle expects that an Apprentice will be:

> (i) leading the restaurant's team in successful day-to-day operations; (ii) acting as GM when GM is not present; (iii) training and developing the team, especially KMs and SMs; (iv) ensuring that employees are properly paid, receive appropriate benefits, and are prepared for additional career opportunities; (v) identifying talent, interviewing, and hiring new Crew; (vi) participating in personnel decisions regarding the restaurant team; (vii) writing schedules that meet the needs of the business so that a great customer experience is delivered while maintaining financial responsibility; (viii) assisting the GM in performing administrative duties including payroll, inventory, food ordering, proper cash handling; (ix) building sales and managing the restaurant's budget; (x) assisting with local restaurant marketing opportunities; (xi) handling employee or customer complaints and grievances; and (xii) ensuring that safety and security standards within the restaurant are adhered to.

(*Id.*). The Job Description does not include any manual non-exempt duties. (*Id.*).

### C. The Performance Review Reflects Chipotle's Expectation That Apprentices Manage Their Stores By Exclusively Evaluating Management Activities

Chipotle reviews Apprentices (and GMs) on a form entitled "Restaurant Management (Salaried) Performance Review," which reflects Chipotle's expectation that they manage their stores. (*Id.* ¶13). The section entitled "Developing Great Managers" evaluates whether the Apprentice successfully hires, develops, and promotes "their people," "train[s] and develop[s] Crew into successful KMs and SMs," creates a "culture that rewards constant improvement," and "lead[s] with enthusiasm and optimism." (*Id.* ¶14). The section entitled "Building Sales and Running an Excellent Restaurant" evaluates an Apprentice's performance in "setting clear direction" for their store, "maintaining high standards," and finding new and better ways to "run their restaurant." (*Id.*

¶15). The section entitled "Financial Success," evaluates their store's profitability. (*Id.* ¶16). This Review differs markedly from that used for KMs and SMs. (*Id.* ¶17).

## III. DESPITE CHIPOTLE'S EXPECTATIONS, THE RECORD REVEALS THAT APPRENTICES PERFORM DRASTICALLY DIFFERENT ACTIVITIES

### A. Apprentices Work In A Variety of Settings That Impact The Activities They Perform And The Amount Of Time They Spend Performing Such Activities

While Chipotle empowers all Apprentices to manage their store as their primary duty, a myriad of factors impact the extent to which an Apprentice meets this goal and/or the time spent on various activities. (*Id.* ¶¶26-27). First, the management structure in each store varies. Some stores have a GM, some have a Restaurateur with responsibility for up to 4 stores (splitting time among them), and some have no GM or Restaurateur and are managed solely by one or two Apprentices. (*Id.* ¶¶28-30). These structural differences impact the amount of time Apprentices serve as the highest-ranking manager on duty, their supervisory and management functions, the authority they exercise, and the time spent on tasks. (*Id.*). Robert Crandall, Chipotle's expert, determined that, on average, Opt-Ins served as the highest-ranking manager for 70.2% of their time. (Crandall Decl. (Ex. 6): at Ex. 4(a)). However, there was significant variation, with Opt-Ins serving as the highest manager for anywhere between 20% and 100% of their time. (*Id.*).

Second, the management style and personality of the GM or Restaurateur impact the duties performed. Some Opt-Ins worked with GMs or Restaurateurs they described as "micro-managers" involved in many if not all managerial decisions, thereby limiting their authority. (Comp. ¶34). Other Opt-Ins worked with GMs or Restaurateurs who were "hands off" and allowed them to hire, fire, discipline, promote, evaluate, and supervise employees without interference. (*Id.* ¶35). Still other Opt-Ins worked with GMs or Restaurateurs who split duties and otherwise partnered with the Apprentice to run the store. (*Id.* ¶¶36-37).

Third, the sales volume of a store impacts the activities of an Apprentice. Stores vary in sales from approximately $4,000 to $13,000/day. (*Id.* ¶¶38-39). Increased sales results in an increase in the number of staff. (*Id.*). Many Opt-Ins testified that additional staff required them to devote more time to activities such as interviewing, hiring, disciplining, training, evaluating, and supervising, than was necessary in a low-volume store. (*Id.*).[3]

Fourth, personal goals, management style, and competence impact the activities an Apprentice performs. (*Id.* ¶40). Some Opt-Ins acknowledged performing their own duties, as well as those of a GM. (*Id.* ¶41). Others felt they were not trained to, or were prevented from, performing even the duties of an Apprentice and performed like Crew, KMs or SMs. (*Id.* ¶¶42-43).

There are numerous other factors involving disparate work settings contributing to the differences among Apprentices with respect to their duties, like hours a store is open, location, and whether a store is new as to require more training, hiring and supervision. As Mr. Gottlieb testified:

> There are 1600 restaurants. Every single one is different. When we open, when we close, how many hours we operate in any given day, whether there is inclement weather, whether it's a new store opening, whether we have a full slate of managers or we do not have a full slate, whether we are closing for some reason because of a structural problem….All of those things contribute to what an apprentice might do in a given day or any given week or any given market and at its core what we ask managers to do, including apprentice managers and general managers, is manage the work of others and run our business, run our restaurants…how they actually execute that varies greatly throughout the whole country and throughout every restaurant.

(30(b)(6) Tr. (Ex. 44): 84:6-18). Whatever the reasons, the record is clear: the contrast from Named Plaintiff to Named Plaintiff, Named Plaintiff to Opt-In, and Opt-In to Opt-In requires decertification.

---

[3]      Mr. Crandall analyzed other staffing-related variations that directly impact the activities Apprentices perform, including the number of non-exempt employees, the number of non-exempt labor hours worked, the frequency of overtime hours, and the amount of overtime hours worked. (Crandall Decl. (Ex. 6): ¶24). For instance, among stores where Opt-Ins worked, the average number of non-exempt employees scheduled per day varied from less than 5 to more than 20. (*Id.* ¶24; Ex. 5(a)). Moreover, among those same stores, the average number of hours worked by non-exempt employees on a weekly basis varied from less than 450 hours to over 1,000 hours. (*Id.* ¶28; Ex. 6(a)). Further, the data revealed considerable variation in the amount of overtime worked from store to store. (*Id.* ¶33; Ex. 10).

**B. The Named Plaintiffs And Opt-Ins Differ Radically In the Activities They Perform And The Time Spent On Such Activities**

The record reveals that the Named Plaintiffs and Opt-Ins performed different duties in their disparate work settings for varying amounts of time. These differences are strikingly apparent even among the Named Plaintiffs when viewed through the lens of 29 C.F.R. § 541.102, which identifies exempt activities. These differences only proliferate as the testimony of Opt-Ins is considered.

**1. "Interviewing [and] Selecting…Employees"**

The Named Plaintiffs had different experiences interviewing candidates. Scott and Gateley participated in group interviews. (Scott Tr. (Ex. 84): 30:8-31:7; Gateley Tr. (Ex. 40): 61:19-62:7; 188:24-189:8). Ensor and Parker, in contrast, conducted independent interviews. (Ensor Tr. (Ex. 39): 60:3-14; 163:4-9; Parker Tr. (Ex. 74): 45:7-10). Jimenez conducted initial interviews only. (Jimenez Tr. (Ex. 51): 53:9-23). Medina, in turn, testified that SMs primarily conducted interviews. (Medina Tr. (Ex. 62): 76:5-16).

Likewise, the Named Plaintiffs had different experiences with hiring. Scott did not have "any say." (Scott Tr. (Ex. 84): 30:8-31:7). Medina and Higgs provided recommendations that were given little weight. (Medina Tr. (Ex. 62): 76:22-77:5; 299:22-300:9; Higgs Tr. (Ex. 49): 105:4-18). Parker made hiring recommendations, but together with her SMs and KMs. (Parker Tr. (Ex. 74): 44:25-46:10; 91:19-20). Ensor, Jimenez, and Gateley, in contrast, made effective hiring recommendations. (Ensor Tr. (Ex. 39): 60:3-14; 163:4-9; Jimenez Tr. (Ex. 51): 51:3-10; 62:23-64:6; 125:12-17; Gateley Tr. (Ex. 40): 74:16-75:2; 84:23-85:23).

Similarly divergent experiences are apparent among Opt-Ins. Many conducted interviews and provided effective hiring recommendations. (Comp. ¶¶46-47). Others not only conducted interviews, but made hiring decisions entirely on their own. (*Id.* ¶48). Still others participated in group interviews and provided recommendations that were accorded little weight. (*Id.* ¶¶49-50).

**2. "Training Employees"**

Chipotle expects its Apprentices to train and develop SMs, KMs, and Crew so they can advance, but the Named Plaintiffs had different experiences in this regard. Some testified that training employees was one of their regular responsibilities. Jimenez, for instance, characterized herself as a "good leader" because she consistently mentored KMs and SMs. (Jimenez Tr. (Ex. 51): 38:7-39:21; 41:4-10; 113:13-114:19; 156:10-24). Higgs and Gateley likewise testified they were responsible for training all employees in the store. (Higgs Tr. (Ex. 49): 65:7-17; 73:16-19; 76:16-19; Gateley Tr. (Ex. 40): 48:24-49:22; 60:9-14; 129:14-20; 131:5-133:10). Parker and Scott, however, testified they had minimal to no role in training. (Parker Tr. (Ex. 74): 68:15-25; 138:13-20; Scott Tr. (Ex. 84): 133:16-134:8).

The Named Plaintiffs who did provide training used a variety of techniques. Jimenez, Higgs and Gateley used the "shoulder-to-shoulder" technique to work alongside and train KMs and SMs as one of their "primary responsibilities" (Jimenez Tr. (Ex. 51): 118:4-24; 119:13-120-24; 157:10-19; Higgs Tr. (Ex. 49): 138:8-17; Gateley Tr. (Ex. 40): 48:24-49:22), while Medina did so only with Crew (Medina Tr. (Ex. 62): 87:10-14; 92:8-23). Jimenez, Higgs, and Ensor stated they regularly provided informal feedback to hourly employees throughout the day (Jimenez Tr. (Ex. 51): 119:13-120-24; Higgs Tr. (Ex. 49): 178:16-23; Ensor Tr. (Ex. 39): 219:10-18), while Scott testified he was "too busy" to do so (Scott Tr. (Ex. 84): 212:4-17; 213:6-12).

Some Named Plaintiffs testified that Development Journals were important training tools they utilized frequently to develop SMs, KMs and Crew. (Jimenez Tr. (Ex. 51): 118:4-24; 119:13-120-24; 194:8-195:6; Gateley Tr. (Ex. 40): 110:6-23; 112:17-113:2; 141:2-16; Medina Tr. (Ex. 62): 63:20-64:19; 93:5-94:10; Higgs Tr. (Ex. 49): 103:19-104:17; Ensor Tr. (Ex. 39): 140:6-25). Others testified that they wrote in Development Journals infrequently or "never." (Scott Tr. (Ex. 84): 100:11-18; Parker Tr. (Ex. 74): 68:15-21; 170:23-171:16).

The Opt-Ins also had divergent experiences with training. First, many Opt-Ins acknowledged providing "informal feedback" on a "constant" basis (Comp. ¶62), while others said they were "too busy" (*Id.* ¶63). Second, many Opt-Ins acknowledged they made frequent Development Journal entries and held regular meetings (*Id.* ¶¶71, 73), while others did not write in the Journals or did so infrequently (*Id.* ¶74). Third, most Opt-Ins acknowledged that they regularly developed employees through "shoulder-to-shoulder" training. (*Id.* ¶77). Others spent as little as 5% of their time training or conducted no training at all. (*Id.* ¶78).

**3. "Setting and Adjusting…Hours of Work"**

Chipotle considers "writing a great schedule" critical because it drives a "great customer experience." (*Id.* ¶82). The Named Plaintiffs had different responsibility for this task. Higgs independently created weekly schedules "half of the time," deciding who to staff and what position to assign them. (Higgs Tr. (Ex. 49): 64:13-14; 75:4-8; 132:16-133:3; 188:18-23). Ensor also exercised his authority to set weekly schedules without approval. (Ensor Tr. (Ex. 39): 129:22-24; 164:2-18). Jimenez and Gateley drafted weekly schedules, but were unable to post them without approval. (Jimenez Tr. (Ex. 51): 52:13-53:4; 134:3-19; Gateley Tr. (Ex. 40): 111:17-112:3; 123:5-11). Medina, Parker, and Scott, however, rarely if ever prepared schedules. (Medina Tr. (Ex. 62): 77:25-78:9; 301:19-302:4; Parker Tr. (Ex. 74): 11:21-12:20; 102:7-14; 145:15-146:6; Scott Tr. (Ex. 84): 141:4-142:2). Relatedly, Jimenez, Medina, Higgs, and Scott deviated from posted schedules by sending employees home if business was slow or by calling employees in if it was busy (Jimenez Tr. (Ex. 51): 140:14-141:2; Medina Tr. (Ex. 62): 83:8-15; Higgs Tr. (Ex. 49): 148:15-149:19; Scott Tr. (Ex. 84): 281:4-21), but Parker did not have this authority. (Parker Tr. (Ex. 74): 164:2-24).

The Opt-Ins also had an array of experiences with drafting schedules and determining hours of work. Some Opt-Ins prepared schedules and posted them without the approval of a GM or Restaurateur. (Comp. ¶84). Others prepared schedules which required approval, but with minimal

changes (*Id.* ¶85), while others had their drafts routinely rewritten (*Id.* ¶86). Others testified they had no authority for writing schedules. (*Id.* ¶87). The Opt-Ins also conceded differing authority for deviating from the schedule to send employees home or call employees in, with many Opt-Ins exercising this authority (*Id.* ¶88), and others believing they needed approval (*Id.* ¶89).

**4. "Directing the Work of Employees…Apportioning the Work"**

Three Named Plaintiffs regularly exercised their authority to assign tasks to SMs, KMs, and Crew. (Jimenez Tr. (Ex. 51): 214:20-215:6; 219:16-22; Ensor Tr. (Ex. 39): 300:24-301:3; 407:12-408:21; Higgs Tr. (Ex. 49): 76:20-77:13; 209:13-212:22). Gateley and Medina, however, only "sometimes" assigned work (Gateley Tr. (Ex. 40): 100:18-23; Medina Tr. (Ex. 62): 91:13-92:7; 100:20-101:11), while Scott did not "run a shift" or assign tasks. (Scott Tr. (Ex. 84): 136:11-20). Similarly, some Named Plaintiffs were always able to direct their own work. (Higgs Tr. (Ex. 49): 137:17-138:7; 147:11-148:14; Ensor Tr. (Ex. 39): 407:25-410:11). Others, such as Parker, testified that she "usually" could not determine where to work. (Parker Tr. (Ex. 74): 184:13-185:8).

The Named Plaintiffs relayed drastically different accounts of their supervisory authority. Medina, Parker, and Scott testified that supervision was either a "shared" responsibility or one exercised in narrow circumstances. (Medina Tr. (Ex. 62): 85:8-86:2; 87:5-9; Parker Tr. (Ex. 74): 185:11-20; Scott Tr. (Ex. 84): 136:11-20). Gateley, in contrast, acknowledged she "oversaw the daily operations of four managers and twenty staff members" and that she "ran" the store as an Apprentice. (Gateley Tr. (Ex. 40): 46:19-47:18; 48:8-14; 59:24-60:8; 61:15-18). Higgs testified to supervisory responsibility only while running "her" shift. (Higgs Tr. (Ex. 49): 133:19-21). Jimenez and Ensor, however, testified differently. Jimenez acknowledged she supervised all employees in the store constantly even when simultaneously working "on the line." (Jimenez Tr. (Ex. 51): 145:6-147:5; 148:6-20). Ensor likewise admitted to supervising all employees at all times (Ensor Tr. (Ex. 39): 162:16-163:3; 187:14-188:14), testifying:

Q. Your managerial authority as an Apprentice over Crew members, for example, existed at all times you were present in the restaurant, correct?
A. Yes.
Q. It didn't start at a certain part of your shift or end at a certain time during your shift, did it?
A. No, sir.
Q. In fact, 100 percent of the time you were present as the Apprentice manager, you had the authority to direct, supervise, and assign work to Crew members, correct?
A. Correct.
Q. In fact, you retained managerial authority over the restaurant and employees 100 percent of the time you were working, correct?
A. I believe so, yes. (*Id.* 407:25-410:11).

The Opt-Ins' experiences also differed markedly. Many Opt-Ins had total discretion to assign SMs, KMs, and Crew to any tasks in their discretion. (Comp. ¶90). However, other Opt-Ins had limited authority because they believed another manager had responsibility or the "deployment chart" eliminated discretion to assign tasks. (*Id.* ¶91). The disparity is also apparent in the Opt-Ins' ability to assign themselves tasks: most retained the discretion to choose what tasks to perform 100% of their time (*Id.* ¶92), while others only did what they were told (*Id.* ¶93). These differences exist with respect to supervisory responsibilities, too: most acknowledged their supervisory responsibilities "never ended" during 100% of their working time, even if they chose to work "on the line," (*Id.* ¶¶94-97), while others testified to the exact opposite (*Id.* ¶¶98-99).

**5. "Appraising…Productivity and Efficiency for the Purpose of Recommending Promotions" & "Adjusting Their Rates of Pay"**

The Named Plaintiffs had vastly different experiences in conducting Performance Reviews. Jimenez, Higgs, Gateley, Scott, and Ensor completed employee evaluations (Jimenez Tr. (Ex. 51): 158:14-160:10; Higgs Tr. (Ex. 49): 188:24-189:8; Gateley Tr. (Ex. 40): 30:9-31:7; Scott Tr. (Ex. 84): 134:15-25; Ensor Tr. (Ex. 39): 140:6-13; 270:8-24), while Medina testified he did so only as training (Medina Tr. (Ex. 62): 78:15-79:25; 213:18-23), and Parker stated she did not participate at all. (Parker Tr. (Ex. 74): 169:22-170:18). The experiences of those that participated differed further. Medina and Scott drafted Reviews using language dictated to them by a GM (Medina Tr.

(Ex. 62): 97:7-98:4; Scott Tr. (Ex. 84): 217:2-218:11), while Ensor and Jimenez used their personal observations to craft language. (Ensor Tr. (Ex. 39): 283:23-285:13; 289:22-292:17; Jimenez Tr. (Ex. 51): 158:14-160:10; 166:13-167:24). With regard to an Overall Rating, Scott was free to assign any rating he believed appropriate (Scott Tr. (Ex. 84): 235:25-237:13), while Jimenez, Medina and Ensor did not have such discretion (Jimenez Tr. (Ex. 51): 168:15-170:10; Medina Tr. (Ex. 62): 218:4-20; 294:11-295:9; Ensor Tr. (Ex. 39): 288:7-289:5; 314:18-316:2; 393:23-394:3). This is an important distinction because an "Above Expectations" Overall Rating results in a pay increase allowing some Named Plaintiffs to directly impact compensation. (Comp. ¶60).

The Named Plaintiffs also had different experiences regarding promotions. Jimenez, Higgs, Gateley, and Ensor developed employees for promotion. (Jimenez Tr. (Ex. 51): 42:7-10; Higgs Tr. (Ex. 49): 122:21-123:8; Gateley Tr. (Ex. 40): 48:24-49:22; Ensor Tr. (Ex. 39): 128:10-129:21; 161:16-24; 170:22-171:13). Ensor and Higgs made effective recommendations. (Ensor Tr. (Ex. 39): 353:4-354:15; Higgs Tr. (Ex. 49): 122:21-123:8). Medina prepared employees for promotion, but only together with KMs and SMs, and described his recommendations as receiving little weight. (Medina Tr. (Ex. 62): 77:22-24; 150:11-151:5; 203:21-204:11). Scott disavowed any responsibility for promoting or recommending promotions. (Scott Tr. (Ex. 84): 134:3-8; 323:10-24).

The Opt-Ins also had different experiences with respect to these exempt activities. Some Opt-Ins completed Reviews based on their own observations and used language they chose (Comp. ¶65), whereas others participated only superficially, copying language from other materials or typing language dictated by a GM or Restaurateur (*Id.* ¶66), and whereas others did not participate at all. (*Id.* ¶67). Some Opt-Ins directly awarded pay increases to hourly employees by issuing an "Above Expectations" rating (*Id.* ¶68), whereas others could not or, at most, provided only a recommendation. (*Id.* ¶69). Most Opt-Ins could promote or effectively recommend promotions of

Crew, KMs, and SMs (*Id.* ¶57), while others deferred to the GM or Restaurateur or believed their opinions were not accorded any weight.  (*Id.* ¶¶58-59).

**6.   "Disciplining" & "Firing"**

The authority of the Named Plaintiffs to discipline differed.  Jimenez, Ensor and Scott issued verbal/written discipline in their discretion, including to SMs and KMs.  (Jimenez Tr. (Ex. 51): 131:2-25; Ensor Tr. (Ex. 39): 229:4-230:20; 322:8-10; 326:13-23; 406:24-407:11; Scott Tr. (Ex. 84): 298:21-300:14).  Medina, Parker, and Gateley, in contrast, either could not discipline or could only do so at the direction of a GM.  (Medina Tr. (Ex. 62): 102:4-15; Parker Tr. (Ex. 74): 155:17-156:24; Gateley Tr. (Ex. 40): 119:22-120:7).

The ability of the Named Plaintiffs to terminate employees also differed.  Jimenez and Higgs made effective recommendations to terminate.   (Jimenez Tr. (Ex. 51): 55:12-58:11; 62:19-22; 129:14-17; Higgs Tr. (Ex. 49): 65:21-25; 104:18-105:3; 141:2-11; 173:5-19).  Ensor could not only make recommendations, but at times, terminated others by himself.  (Ensor Tr. (Ex. 39): 167:4-169:8; 364:6-365:3).  Medina and Scott, in contrast, testified they rarely made recommendations to terminate and they were given little weight.  (Medina Tr. (Ex. 62): 77:6-21; 300:10-21; Scott Tr. (Ex. 84): 326:24-327:5).  Gateley had no role in the termination process.  (Gateley Decl. ¶16).

These differences are apparent among the Opt-Ins as well.  Most had the authority to discipline to SMs, KMs and Crew (Comp. ¶52), but some stated they did not have the authority or could only do so at the direction of a GM or Restaurateur.  (*Id.* ¶53).  Similarly, some Opt-Ins had the authority to either terminate employees without approval or make effective recommendations (*Id.* ¶¶54-55), whereas others provided recommendations that were not necessarily followed or did not participate in the process (*Id.* ¶56).

### 7.  "Planning and Controlling the Budget"

The Named Plaintiffs had distinct responsibilities concerning their store's budget.  Jimenez, Gateley, and Ensor acknowledged that managing the store's budget was an important part of their duties.  (Jimenez Tr. (Ex. 51): 143:2-5; Gateley Tr. (Ex. 40): 60:15-61:10; Ensor Tr. (Ex. 39): 161:16-24; 163:16-19).  Medina and Higgs, however, stated they did not have any authority over the budget.  (Medina Tr. (Ex. 62): 87:15-19; 90:2-6; 135:13-136:15; Higgs Tr. (Ex. 49): 73:20-74:4).  Among the Opt-Ins, there is also a split as to those who had authority to manage the store budget (Comp. ¶115), and those who did not (*Id.* ¶¶116-117).

### 8.  Conflicting Versions of Responsibilities

The Named Plaintiffs also offered completely divergent descriptions of their roles as Apprentices.  Jimenez testified she performed as a GM because she "ran the store," adding:

> Q.  What made you feel you were ready to be the GM in the store?
> A.  I ran the store without Allan.
> Q.  During the period of time between when you were an Apprentice?
> A.  Yes.
> Q.  Did you believe at the time of your promotion to GM that you understood what all the duties and responsibilities of the [GM] position were?
> A.  Yes.
> Q.  Did you believe you were able to perform those duties immediately prior to your promotion into the [GM] role?
> A.  Yes.
> Q.  Is that because you had been performing those responsibilities immediately prior to your promotion?
> A.  Yes.  (Jimenez Tr. (Ex. 51): 89:3-21).

Jimenez further described her "primary responsibilities" as:

> Writing schedules, assisting with local store marketing opportunities, ensuring safety and security standards, maintaining a clean restaurant with excellent quality food, identifying talent, interviewing, inventory, food ordering, cash handling, role model of the standards and behaviors.  (*Id.* 102:23-103:12).

Ensor similarly testified he "acted as a GM," he was the "boss," and his management responsibilities never ended.  (Ensor Tr. (Ex. 39): 148:15-22; 149:3-10; 179:13-20; 374:10-23).

Gateley also acknowledged she "acted as the GM" when the GM was not present for two months. (Gateley Tr. (Ex. 40): 66:22-67:16; 145:10-146:11).

Medina, Parker, and Scott offered a wholly contradictory summary of their roles. Medina testified he spent 90% of his time on hourly duties:

> working tortillas, rolling burritos, working on the grill, cutting chicken, steak, making rice, cleaning bathrooms, throwing trash, doing dishes, working as a cashier, expo, linebacker, I mean, cleaning the dining room, the patio…

(Medina Tr. (Ex. 62): 301:6-18). Parker testified that her exempt activities accounted for less than 5% of her time and that she primarily worked "on the line" (Parker Tr. (Ex. 74): 17:2-19; 97:11-15; 98:25-99:7; 139:2-20), summarizing her responsibilities as:

> I was making burritos, rolling burritos, frying chips, prepping onions, lettuce, cutting up everything, but I'm not actually managing anybody. I can't manage the front of the house and the back of the house if I'm rolling someone's burritos.

(*Id.* 180:3-8). Scott testified he performed Crew tasks, he "was never considered the boss," and he would "go through the general manager all the time [and] wouldn't really make no decisions." (Scott Tr. (Ex. 84): 151:20-152:5; 180:20-24; 183:3-10). Yet, Scott confirmed the Apprentice who supervised him when he was hourly, Jessenia Aragon, actually ran his entire store, demonstrating a clear intra-store difference based on style. (*Id.* 78:4-79:2).

Like the Named Plaintiffs, the Opt-Ins' experiences fell across the spectrum, perhaps most evident by reference to testimony concerning the Job Description: there was a roughly equal split among Opt-Ins who agreed that the Job Description accurately reflected their primary duties versus those who disagreed. (*Id.* ¶¶102-103). Thus, about half acknowledged they were responsible for "leading the successful day-to-day operations of their store," and about half testified they had no such responsibility. (*Id.* ¶¶104-105). Likewise, many acknowledged they had responsibility for "inventory, food ordering and cash handling," while a competing group confirmed the opposite. (*Id.* ¶¶112-114). Similarly, many testified they had responsibility for "local store marketing" but

others said they did not.  (*Id.* ¶¶118-119).  Most pointedly, many acknowledged spending at least 50% (if not 100%) of their time performing management and supervisory duties (*Id.* ¶¶121-124), while others testified they spent as little as 10% of their time performing these tasks, and primarily chopped vegetables, grilled meats, and provided customer service.  (*Id.* ¶125-126).

### C.   Testimony From An Opt-In Reveals How Drastically Activities Vary

The differences in duties performed among Plaintiffs is well-illustrated by the testimony of an Opt-In, who described her inconsistent experiences working in different stores.  Lauren Kelsch was an Apprentice in Nyberg Woods, OR from June 2011 until May 2012, and in Burlington, KY from May through October 2012.  (Kelsch Tr. (Ex. 54): 11:17-24; 13:11-25; 14:22-15:6; 22:21-24).  In Oregon, she worked with a GM, whereas in Kentucky she did not.  (*Id.* 25:4-27:5).

In Oregon, she did not "feel like [she] was doing much leadership per the printed definition of an Apprentice" (*Id.* 35:15-24), nor did she believe she "le[d] the successful day-to-day operations of the restaurant" (*Id.* 43:11-15).  Her GM was "very specific about how she wanted the store to run" and always told her "how things were to be done."  (*Id.* 36:19-37:5; 44:23-45:5).  In Oregon:

> I didn't really feel like the general manager was ever not present.  There may have been physical days off, but she was the kind of manager who left a bunch of notes for, like, literally I'm not here for two days but I want this person to clean this drain and organize this shelf and there – it might be broken down that it was, Hey, Lauren, I want you to find a bunch of people to do this stuff and I might further delegate her plans.  But everything was always Marra's way of doing so.  (*Id.* 72:12-22).

In Kentucky, in contrast, she was able to "impact the workforce" and had more of an opportunity to "lead" because she was "running the restaurant" and "made all the decisions for the restaurant."  (*Id.* 37:21-38:10; 44:19-22).  She had "overall responsibility" for the store and agreed her promotion to GM was simply a "salary change" since she "did everything the whole time [she] was there."  (*Id*. 51:8-15; 76:8-77:6; 78:9-79:12).  She contrasted her experience in Kentucky as:

> Setting the tone for the restaurant and ensuring that its as best staffed as possible and that the staff understands their role, has knowledge…keeping an eye on usages and

> making sure that we don't waste product. Making sure that we have enough and aren't wasting too much labor. (*Id.* 43:21-44:12).

Kelsch also detailed the differences in her day-to-day responsibilities. For example, in Oregon, she participated in group interviews and made hiring recommendations which were followed only 50% of the time (*Id.* 48:9-50:8), whereas in Kentucky she had the final say on all hires and implemented practices for hourly employees to "create a team" for her store. (*Id.* 50:9-51:15; 128:2-13). In Oregon, her GM developed all training plans and told her who to train, a duty which comprised no more than 5% of her time (*Id.* 51:23-52:15; 55:2-6), while in Kentucky:

> I decided whom I thought was in a position to grow. I found people came to me a little bit more, too, like, "Hey, I want to learn how to do this, I want to learn how to do that. I'd like to move up. What can you have me do today so that I grow." So I was completely in charge of coordinating all of that. I did – I was in the position then to delegate to some of my kitchen managers could you please oversee that this person does this when I'm off tomorrow. But it was all up to me.

(*Id.* 52:23-53:11; 132:17-23) (emphasis added). She also estimated the time she spent training in Kentucky increased to "maybe 70, 80 percent of the time…I definitely was much, much, much more involved." (*Id.* 55:7-17; 58:3-7).

Kelsch testified to similarly disparate experiences between the two work settings with regard to: (i) the budget (*Id.* 64:3-65:3); (ii) payroll and wages (*Id.* 65:10-18; 66:2-23); (iii) responsibility over inventory which became "a much more…active role" (*Id.* 67:6-68:17) (iv) termination decisions, which grew from no authority to complete authority (*Id.* 82:16-84:15); (v) promotions, which grew from none to providing the main recommendation (*Id.* 88:4-89:20); (vi) her role in the "financial success of the restaurant" (*Id.* 136:10-23); and (vii) the amount of time she spent performing tasks Crew could perform, which decreased from 85-90% of her time to only 30% (*Id.* 148:3-149:4). In short, Kelsch acknowledged: "I just had such differing experiences as an Apprentice from one restaurant to the next." (*Id.* 145:12-16). Plainly, the disparate work settings resulted in the performance of completely different duties.

## IV. PROCEDURAL HISTORY RELEVANT TO THIS MOTION

Scott filed a Complaint alleging putative collective and class misclassification claims under the FLSA and New York law on November 15, 2012. (Docket No. 1). The Complaint was amended on February 13, 2013 to add Ensor and Missouri claims, and again on July 2, 2014 to add Jimenez, Medina, Parker, Gateley and Higgs, and claims under North Carolina, Illinois, Washington, and Colorado law. (*Id.* Nos. 17, 751). The Court granted Plaintiffs' Motion for Court-Authorized Notice on June 20, 2013. (*Id.* No. 68). 3,740 current and former Apprentices received notice and 516 (including the seven Named Plaintiffs) opted into the collective. The parties took over 100 depositions consisting of Named Plaintiffs, Opt-Ins, declarants, and Chipotle executives.

# ARGUMENT

## I. APPLICABLE STANDARD

An FLSA collective action can be maintained only on behalf of named plaintiffs and those employees who are "similarly situated" to them. *See* 29 U.S.C. § 216(b); *Griffith v. Fordham Fin. Mgmt., Inc.*, No. 12-CIV-1117 (PAC), 2016 WL 354895, at *2 (S.D.N.Y. Jan. 28, 2016); *Hinterberger v. Catholic Health System*, 299 F.R.D. 22, 54 (W.D.N.Y. 2014). At the decertification stage, the Court applies a "more stringent standard of proof" than at conditional certification to determine "whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs." *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010); *Stevens v. HMSHost Corp.*, No. 10-CV-3571 (ILG)(VVP), 2014 WL 4261410, at *4-5 (E.D.N.Y. Aug. 27, 2014) (decertifying conditionally certified collective of Assistant Managers); *Hernandez v. Fresh Diet, Inc.*, No. 12-CV-4339, 2014 WL 5039431, at *3 (S.D.N.Y. Sept. 29, 2014) (Carter, J.). The analysis is akin to Rule 23 "commonality," such that it provides the Court "with discretion to deny certification for trial management reasons." *Griffith*, 2016 WL 354895, at *3. The burden rests with Plaintiffs to demonstrate that § 216(b)'s requirements are met by a preponderance of the evidence. *Id.* at *2.

Although the FLSA does not define "similarly situated," Courts consider three criteria: (i) disparate factual and employment settings; (ii) the various defenses available to the defendant which may be individual to each plaintiff; and (iii) fairness and procedural considerations. *See, e.g.*, *Griffith*, 2016 WL 354895, at *3. If Plaintiffs have not met their burden with respect to each of these considerations, the action must be decertified and the claims of the Opt-Ins dismissed without prejudice. *See, e.g.*, *Myers*, 624 F.3d at 555; *Harper*, 2015 WL 9673810, at *3.

## II. DISPARATE FACTUAL & EMPLOYMENT SETTINGS COMPEL DECERTIFICATION

### A. Relevant Standards

In actions alleging overtime violations premised on misclassification, "[b]lanket misclassification arguments are insufficient at [the decertification] stage." *Hernandez*, 2014 WL 5039431, at *4; *Gardner v. Western Beef Props., Inc.*, No. 07-CV-2345 (NGG)(JMA), 2013 WL 1629299, at *7 (E.D.N.Y. Mar. 25, 2013) (collecting cases and noting that "blanket classification decisions do not…eliminate the need to make a factual determination as to whether class members are actually performing similar duties."). Rather, Plaintiffs must demonstrate they are similar in "relevant respects." *See Hernandez*, 2014 WL 5039431, at *4. Here, the "relevant respects" are whether Plaintiffs "are employed in a bona fide executive [or] administrative…capacity," or a combination of the two. 29 U.S.C. § 213(a)(1); *Stevens*, 2014 WL 4261410, at *5; 29 C.F.R. § 541.708 (describing the administrative/executive combination exemption).

An exempt "executive" employee is one who:

> (i) is compensated on a salary basis of not less than $455/week; (ii) whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (iii) customarily and regularly directs the work of two or more other employees; and (iv) has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. 29 C.F.R. § 541.100(a).

For purposes of this exemption, "management" includes:

> activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of…supplies…or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures. 29 C.F.R. § 541.102; *Gardner*, 2013 WL 1629299, at *7 (decertifying collective in exemption case and analyzing disparate employment settings by reference to these criteria).

An exempt "administrative" employee is one who:

> (i) is compensated on a salary basis of not less than $455/week; (ii) whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer ot the employer's customers; or (iii) whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200(a).

Examples of exempt "administrative" activities include:

> work in functional areas such as…budgeting, auditing…quality control, purchasing, procurement…marketing…safety and health, personnel management, human resources…[and] legal and regulatory compliance. *Id.* § 541.201(b).

The applicability of both exemptions turns on the employee's "primary duty." *See id.* § 541.700.

The factors informing the "primary duty" analysis include:

> the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee. *Id.*

Examining the percentage of time an employee devotes to exempt duties is useful, but not determinative, when deciding an employee's primary duty. *See id.* An employee may also perform exempt and non-exempt work concurrently without losing the exemption. Thus:

> an assistant manager in a retail establishment may perform work such as serving customers, cooking food, stocking shelves, and cleaning the establishment, but performance of such nonexempt work does not preclude the exemption if the assistant manager's primary duty is management. *An assistant manager can*

> *supervise employees and serve customers at the same time without losing the exemption. Id.* § 541.106(b) (emphasis added).

Notably, the Second Circuit has previously found Assistant Managers ("AMs") in the restaurant industry to be exempt in its seminal decision in *Donovan v. Burger King Corp.*, 675 F.2d 516 (2d Cir. 1982).[4] Although the Court found that the AMs spent 50% of their time performing non-exempt work, the Court held that it was not dispositive given other the performance of management duties. *See id*. 521. For example, the Court found that "the restaurants could not operate successfully unless the managerial functions of [AMs], such as determining amounts of food to be prepared…scheduling employees, keeping track of inventory, and assigning employees to particular jobs, were performed." *Id.* The Court also found that the AMs exercised discretionary powers, evident in their scheduling work time for employees, assigning employees tasks, monitoring their performance, and ordering supplies based on their judgments as to sales. *See id*. 522. Finally, the Court found that "for the great bulk of their working time," the AMs were solely in charge of their restaurant indicating a lack of supervision. *See id*. It was immaterial that Burger King used a blanket exemption and maintained company-wide policies on numerous topics. *See id.*

### B. The Named And Opt-In Plaintiffs Are Not Similarly Situated With Respect To Their Factual And Employment Settings

As set forth above, the Named Plaintiffs and Opt-Ins testified to striking differences in duties, authority and amount of time spent on the activities that guide the exemption inquiry. Critically, these differences exist not just between Named Plaintiffs and Opt-Ins, but among the Named Plaintiffs themselves. Upon such a record, decertification of the collective is necessary.

For example, the evidence here is akin to that in *Stevens v. HMSHost Corp.*, where the Court granted a motion for decertification. *See* 2014 WL 4261410, at *3. There, the plaintiffs were AMs at stores, including Burger King, Chili's, Quizno's, KFC, and Pizza Hut. *See id*. *1. The AMs

[4] Although decided prior to the 2004 revisions to the exemption tests, *Burger King* is nevertheless controlling because the current test does not differ from the short-test. *See* 29 C.F.R. § 541.1(f) (1981).

were governed by a uniform job description, which described their duties as supervision, assignment of work, and offering recommendations for hiring, firing, advancement, promotion and other status changes. *Id*. *1-2. Despite the managerial focus of the job description, many AMs testified to performing non-exempt work up to 95% of their time. *See id*. *2. Many, however, acknowledged performing exempt work for some of their time. *See id*.

The Court focused on the testimony of the opt-ins concerning "their particular job duties and level of managerial authority" as it intersected with the managerial tasks listed in 29 C.F.R. 541.102. *Id*. *6. The Court found disparities in the testimony: some AMs had the authority to set schedules, others could do so only with the approval of a Store Manager, and still others had no such authority. *See id*. Some AMs could discipline hourly employees, some could do so only with approval, and some could not under any circumstances. *See id*. The Court found similar variations with respect to hiring/firing, interviewing, evaluating others, and the level of discretion each AM could exercise. *See id*. *6-7. Thus, the Court held: these "wide differences in employment settings and job duties 'greatly complicate the use of representative proof either to prove the correctness of the executive classification or to rebut such a showing'" and decertified the action. *Id.* *7 (citing *Johnson v. Big Lots Stores, Inc.*, 561 F.Supp.2d 567, 582 (E.D. La. 2008)). The similarities between *Stevens* and this case are striking and compel the same result.

The record here is also analogous to *Aquilino v. Home Depot, U.S.A., Inc.*, where the Court decertified a collective of Assistant Store Managers ("ASMs"). No. 04-4100 (PGS), 2011 WL 564039 (D.N.J. Feb. 15, 2011). The plaintiffs contended that a uniform classification and job description, a centralized hierarchy, and a uniform goal to provide customer service supported collective treatment. *See id.* The Court disagreed, citing the testimony of ASMs, which illustrated "wide variation" concerning how they directed and supervised employees, with some testifying to it being a daily responsibility, while others testified they "never really watched associates." *Id*. *2.

The Court found similar variation in the authority of the ASMs to delegate tasks, address employee grievances, and their ability to hire, promote, evaluate, discipline, and terminate. *See id*. *4. The Court credited this testimony over plaintiffs' broad theoretical arguments:

> Quite simply, the deposition testimony of the Opt-Ins does not bear out that Home Depot's centralized corporate structure resulted in [ASMs] performing identical duties. To the contrary, the [ASM] testimony clearly evidences that [ASM] duties and responsibilities significantly varied from [ASM] to [ASM].

*Id*. *8. Accordingly, the Court decertified the collective. *See id*. *10-11.

*Stevens* and *Aquilino* are representative of a wealth of cases decertifying collective actions advanced by AMs based upon similarly varying testimony from opt-ins. *See Till v. Saks Inc.*, No. C 11-0504, 2013 WL 5755671, at *9 (N.D. Cal. Sept. 30, 2013) (denying collective certification of AMs where "for each instance of 'common proof'…there is conflicting evidence regarding the actual experiences of [AMs]; some claim their duties were affected by Defendants' policies, while others state the precise opposite."); *Gardner*, 2013 WL 1629299, at *7 (same); *Green v. Harbor Freight Tools USA, Inc.*, 888 F.Supp.2d 1088 (D. Kan. 2012) (decertifying collective of AMs where testimony diverged on amount of time free from direct supervision and ability to hire/fire); *Big Lots*, 561 F.Supp.2d at 579-86) (decertifying collective of AMs); *Reyes v. Texas EzPawn, L.P.*, No. V-03-128, 2007 WL 101808, at *2-4 (S.D. Tex. Jan. 8, 2007) (decertifying collective of ASMs"); *Holt v. Rite Aid Corp.*, 333 F.Supp.2d 1265, 1275 (M.D. Ala. 2004) (same).[5]

The above decisions are also representative of many others where courts have decertified collective actions in different, albeit analogous, settings in light of testimony demonstrating dissimilarities within the collective. *See Fresh Diet*, 2014 WL 5039431, at *4-5 (Carter, J.) (decertifying collective where record illustrated variation as to the degree of control exercised over drivers); *Griffith*, 2016 WL 354895, at *3-4 (same); *Harper v. GEICO, Inc.*, No. 09-CV-2254

[5] These decisions echo the reasoning of courts opining on the impropriety of even conditional certification. *See, e.g., Ahmed v. T.J. Maxx Corp.*, No. 10-CV-3609 (ADS)(ETB), 2013 WL 2649544, at *8-10 (E.D.N.Y. June 8, 2013); *Khan v. Airport Mgmt. Servs.*, LLC, No. 10-CIV-7735 (NRB), 2011 WL 5597371, at *4 (S.D.N.Y. July 11, 2011).

(LDW)(GRB), 2015 WL 9673810, at *4 (E.D.N.Y. Nov. 16, 2015) (decertifying collective where testimony conflicted as to supervision); *Ruiz v. Citibank, N.A.*, 93 F.Supp.3d 279, 299-301 (S.D.N.Y. 2015) (decertifying collective where plaintiffs could not identify "shared experiences" beyond the anecdotal); *Tracy v. NVR, Inc.*, 293 F.R.D. 395, 398-99 (W.D.N.Y. 2013) (decertifying collective where testimony indicated plaintiffs each had broad discretion regarding how to allocate their time); *Zivali v. AT&T Mobility*, 784 F.Supp.2d 456, 459-60 (S.D.N.Y. 2011) (decertifying collective alleging timekeeping violations); *Santiago v. Amdocs, Inc.*, No. 1 10-4317 SI, 2013 WL 5444324, at * (N.D. Cal. Sept. 30, 2013) (decertifying collective under executive exemption).

The record here falls squarely within the logic of these decisions insofar as the testimony and other available evidence precludes a finding of "similarity." These differences exist with respect to the very duties identified in 29 C.F.R. § 541.102, and not only in degree of performance, but whether one Plaintiff versus another performed the duty at all. The differences proliferate as between the Named Plaintiffs, as between the Named Plaintiffs and Opt-Ins, and even among individual Plaintiffs who worked in multiple stores. For example:

**Hiring:** Scott did not have "any say" in hiring decisions, while Ensor, Jimenez, and Gateley provided "effective recommendations." *See* Point III.B.1., *supra*. Opt-Ins testified to a similar spread of authority, but a sizeable group, unlike any Named Plaintiff, was vested with the authority to make hiring decisions without any approval at all. *See id.*; *Stevens*, 2014 WL 4261410, at *7 ("Using representative proof is problematic if for every instance in which an opt-in plaintiff reported that she hired subordinates, there is an alternative response to the contrary.").

**Training:** Jimenez, Medina, Higgs, and Gateley provided regular training to SMs, KMs, and Crew, while Scott and Parker provided minimal or no training. *See* Point III.B.2., *supra*. Some Named Plaintiffs made frequent management entries in Development Journals and some did infrequently or not at all. *See id.* These divergent experiences with regard to training and

Development Journals are apparent among the Opt-Ins as well, where the testimony ranged from providing training "constantly" to not providing any form of training whatsoever.  *See id.*

      **Setting/Adjusting Hours of Work:** Higgs and Ensor independently set schedules without approval, whereas Jimenez and Gateley prepared schedules but required approval from a GM, and Medina, Parker, and Scott rarely, if ever, prepared schedules.  *See* Point III.B.3., *supra*.  Similarly, among the Named Plaintiffs, Jimenez, Medina, Higgs, and Scott had the authority to deviate from the schedule, while Parker could not.  *See id.*  Opt-In testimony likewise fell across the spectrum from total autonomy to prepare (and deviate from) schedules to no authority whatsoever.  *See id.*

      **Directing Work and Supervision:** Among the Named Plaintiffs, Jimenez, Ensor, Higgs, and Gateley acknowledged their ability to assign tasks to employees, confirmed their discretion to assign duties to themselves, and verified they exercised supervisory authority for the bulk of their working time.  *See* Point III.B.4., *supra*.  In contrast, Parker, Scott and Medina, testified their experiences were the exact opposite: they could not assign tasks to others, determine what duties to perform themselves, or exercise supervisory authority over the store's employees.  *See id.*  Opt-Ins relayed similarly inconsistent experiences of supervisory authority, with roughly equal numbers falling into the "could" and "could not" categories.  *See id.*

      **Appraising Work/Performance Reviews:** Jimenez, Higgs, Gateley, Scott and Ensor completed Performance Reviews, while Medina did for training, and Parker did at all.  *See* Point III.B.5., *supra*.  Ensor and Jimenez used their discretion to determine the content of Reviews, while Scott and Medina simply mimicked language dictated to them by a GM.  *See id.*  The experiences of the Opt-Ins varied along these lines as well.  *See id.*

      **Promotions:** Jimenez, Higgs, Gateley, Ensor and Medina prepared employees for promotion, Ensor and Higgs provided "effective recommendations," Medina provided ineffective recommendations, and Scott did not participate in the promotion process at all.  *See id.*  Opt-In

testimony reflects varying degrees of participation, from those who made promotion decisions themselves, to those who provided effective recommendations, to those who provided ineffective recommendations, to those who did not have authority to participate in the process at all. *See id.*

**Discipline:** Jimenez, Ensor and Scott issued discipline in their discretion, while Medina, Parker, and Gateley did not or only acted at the direction of a GM. *See* Point III.B.6., *supra*. Opt-In testimony similarly varied. *See id.*

**Terminations:** Jimenez, Ensor and Higgs provided "effective recommendations" concerning terminations, Ensor made termination decisions himself, while Medina provided ineffective recommendations. *See id.* The Opt-Ins' authority likewise varied. *See id.*

**Budgeting:** Jimenez, Gateley and Ensor acknowledged that managing their store's budget was an important part of their responsibilities, while Medina and Higgs testified that they did not have any responsibility in this regard. *See* Point III.B.7., *supra*. The testimony of Opt-Ins revealed roughly equal numbers of Apprentices on either side of the issue. *See id.*

**Summaries of Responsibilities:** Jimenez, Ensor, and Gateley agreed they effectively performed the duties of a GM while working as an Apprentice. *See* Point III.B.8., *supra*. Medina, Parker, and Scott, in contrast, described their daily tasks as rolling burritos and chopping vegetables. *See id.* These conflicts are apparent among the Opt-Ins as well, with roughly equal numbers agreeing and disagreeing that the Job Description accurately reflected their daily duties. *See id.* Likewise, roughly half confirmed they spent at least 50% of their time performing managerial duties (with many estimating they supervised 100% of their time), while roughly half testified to spending as little as 10% of their time on such tasks. *See id.* This wholly irreconcilable testimony would, if visually depicted, result in a scatterplot with no discernable pattern.

These distinctions in duties informing exemption status render this matter wholly distinguishable from cases like *Indergit v. Rite Aid Corp.*, where the Court denied a motion to

decertify a collective of Store Managers ("SMs"). *See* 293 F.R.D. 632 (S.D.N.Y. 2013). The Court generally observed the "vast majority of deposed SMs" expressed they spent "most of their time on a mix of non-exempt work," but "nevertheless felt an ultimate responsibility for their store and its profitability." *Id.* 641. The Court also found the amount of time SMs testified to spending on non-exempt tasks was "consistent across-the-board." *Id.* Finally, the Court found the "vast majority" of SMs agreed "their role is to be 'in charge of' the store" and they largely agreed as to certain limitations as to their ability to perform supervisory functions. *See id.* 642.

Against this homogenous testimony, the Court found the minor deviations to be "marginal and expected, rather than hyper-individualized and unpredictable." *Id.* 643. For example, the Court discounted the differences in the amount of time spent by one SM versus another providing training, finding that all SMs nevertheless provided training (unlike here). *See id.* 643-44. Likewise, the Court noted that while one SM might have spoken with a District Manager more often than another, it did not result in a change in the responsibilities performed (unlike here). *See id.* 644. With regard to supervision, the Court noted that while there were some minor deviations, "all SMs regularly supervise the hourly associates in their stores" (unlike here). *Id.* 645-646. Finally, the Court found the ability of SMs to make hiring and firing decisions was "remarkably" consistent (unlike here). *Id*. 645. Based on this record, the Court held there were not sufficient "disparate factual and employment settings" to support decertification, *id*. 649, illustratively stating, "it is not as if 'the deposition testimony of members of the Manager Class shows that for every manager who says one thing about his or her job responsibilities, another says the opposite." *Id.* 650. Rather, they mostly described their jobs in precisely the same terms – unlike here.

Here, there is remarkable inconsistency. The Named Plaintiffs and Opt-Ins are either "haves" or "have nots." That is, some do and some do not perform the salient responsibilities including each of those referenced in *Indergit.* This divergent testimony cannot be described as the

product of "outliers," since there are roughly equal numbers of Named Plaintiffs and Opt-Ins on either side of virtually every responsibility set forth in 29 C.F.R. § 541.102. *Indergit's* reasoning thus supports decertification in this matter because, as *Indergit* counseled, opposing deposition testimony necessitates decertification. *See id*. 650; *see also Big Lots*, 561 F.Supp.2d at 587. It is difficult to imagine more striking inconsistencies. This Court should decertify the collective.

### C. The Named Plaintiffs And Opt-Ins Did Not Share A Primary Duty

The exemptions are determined by reference to an employee's "primary duty." In making this determination, Courts consider the "character of the job as a whole" as well as:

> the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee. 29 C.F.R. § 541.700(a).

#### 1. The "Character Of The Job As A Whole" Does Not Render The Named Plaintiffs And Opt-Ins "Similarly Situated"

Plaintiffs will likely contend that the Named Plaintiffs and Opt-Ins are "similarly situated" with respect to the "character of their job as a whole" since, in Plaintiffs' view, they can be characterized as "trainees," even though this position does not exist.[6] True enough, some Opt-Ins described themselves as trainees without authority to manage a store. (Comp. ¶80). However, many testified they received little to no training at the hands of a GM or Restaurateur and, thus, were anything but GMs in training. (*Id.* ¶81). Indeed, many Apprentices worked without a GM or Restaurateur at all precluding this designation. (*Id.* ¶30). Chipotle itself expects that, by the time an individual is promoted to Apprentice, the individual is already performing the duties of a GM as the second manager for the entire store. (Elder Tr. (Ex. 37): 169:10-19). The "character of the [Apprentice] job as a whole" therefore cannot be uniformly described as a training position.

---

[6] Plaintiffs' expert, John Gordon, attempted to inject this argument into the factual record. By Order dated April 15, 2016, however, the Court struck those portions of Mr. Gordon's declaration where he claimed Apprentices served a "trainee" function. *See* Docket No. 1065 at 18.

**2. Relative Importance Of Exempt Duties Versus Other Duties**

Chipotle believes the management functions performed by Apprentices are their most important responsibilities. (Comp. ¶8). Indeed, Apprentices often spend more than 50% of their time as the highest-ranking manager on duty, highlighting the primary expectation of their role. (*Id.* ¶¶29-30). Many Opt-Ins agreed, describing management and supervision as their "main," "primary," or "most important" responsibilities. (*Id.* ¶95). However, a number of Opt-Ins testified differently, discounting their management responsibilities (if any), and contending that their manual duties, such as grilling meat and cutting vegetables, were their most important functions. (*Id.* ¶¶125-126). Thus, in spite of Chipotle's expectations, the evidence does not demonstrate that Apprentices uniformly performed either management or non-management tasks as their primary function. Under these circumstances, only individual inquiries will suffice.

**3. The Amount Of Time Spent Performing Exempt Work**

Plaintiffs also testified to widely varying experiences concerning the amount of time they spent performing exempt activities. Some Opt-Ins spent as little as 10% of their working time performing the tasks identified in 29 C.F.R. § 541.102 (Comp. ¶126), or like Named Plaintiff Parker, only 5% of her time (Parker Tr. (Ex. 74): 17:2-19). In contrast, many others testified to spending well over 50% of their time performing management duties. (*Id.* ¶¶95-97). With respect to supervision – the most important indicator of exempt status –the testimony likewise fell across the spectrum from no supervisory responsibility whatsoever, to those actively supervising 100% of their time. (*Id.* ¶94-99). These differences are expected, given that some Opt-Ins acknowledged they were able to perform whatever task they believed necessary to ensure the success of the store for 100% of their time, while others stated they did not have such authority. (*Id.* ¶92). This inconsistency in the amount of time spent performing exempt activities precludes a uniform determination as to an Opt-In's primary duty. *See Tracy*, 293 F.R.D. at 399 (decertifying collective

because "it appears undisputed that SMRs had broad discretion to decide how to allocate their time.").

**4. Freedom From Direct Supervision**

Opt-Ins testified to significant differences in the amount of time spent as the "highest manager on duty" free from direct supervision. Some testified that a GM or Restaurateur worked with them often, such that they had direct supervision more than 50% of their time (*Id.* ¶¶28, 111), while others estimated it to be less than 50% of the time (*Id.* ¶¶29, 109), and still others testified that they worked in a store without a GM or Restaurateur and were never directly supervised. (*Id.* ¶¶30, 110).[7] These variations are only compounded by the divergent testimony of Opt-Ins concerning their authority while the highest manager on duty: some acknowledged they "acted like the GM" making all relevant managerial decisions without interference (*Id.* ¶¶106-107), while others testified they stayed in telephone contact with the GM to obtain approval for any "real" decisions (*Id.* ¶108). This aspect of the "primary duty" analysis is therefore subject to starkly competing evidence.

**5. Apprentices' Salary Versus Wages Paid To Non-Exempt Employees**

The weekly earnings of Apprentices greatly exceed those of the hourly employees they supervise. Apprentices' guaranteed salaries range from approximately $38,000 to $51,000/year ($730-$980/week). (*Id.* ¶20). Apprentices are also eligible for management bonuses based on how well they manage their restaurant, and enhanced vacation, insurance, retirement and tuition benefits not available to hourly employees. (*Id.* ¶23). Crew, in contrast, earn an average of $9.03/hour, which over a 40-hour week, approximates $361.20, and KMs and SMS earn an average of $11.19/hour and $13.60/hour, which over a 40-hour week, approximates $447.60 and $544.00, respectively. (Crandall Decl. (Ex. 6): ¶49). The earnings of Named Plaintiff Scott emphasizes the

---

[7] The expert testimony of Mr. Crandall highlights the disparity among Opt-Ins with respect to the amount of time they spent as the highest manager on duty, with the data revealing it to be approximately 20% for some Opt-Ins and up to 100% for others. (Crandall Decl. (Ex. 6): Ex. 4(a)).

disparity. He earned $13,807 in 2008, $15,553.71 in 2009, and $27,997.45 in 2010 while working in Crew, KM and SM positions, but $45,132.88 in 2011 as an Apprentice, which included a $2,970.28 half-year bonus. (Comp. ¶25). To the extent Plaintiffs ask the Court to ignore actual earnings in favor of their expert's hypothetical hourly earnings, their attempt should be rejected because: (i) courts will not engage in "mathematical gymnastics" by crediting non-existent hourly rates, *Amash v. Home Depot U.S.A., Inc.*, No. 12-CV-837, 2014 WL 4119409, at *7 (N.D.N.Y. Aug. 21, 2014); and (ii) an examination of the relationship between the salary paid to a plaintiff and the wages paid to other subordinate employees is inappropriate at the decertification stage, *Aquilino*, 2011 WL 564039, at *8-9.

In sum, because each of the "primary duty" considerations under 29 C.F.R. § 541.700(a) is subject to conflicting evidence, a collective-wide determination cannot be made. As such, the Court should decertify the collective. *See Hernandez*, 2014 WL 5039431, at *6 ("These wide differences in employment settings…'greatly complicate the use of representative proof either to provide the correctness of [the decision] or to rebut such a showing").

**D. Various Chipotle Guides, Tools & Resources Do Not Render The Named <u>Plaintiffs And Opt-Ins Similarly Situated</u>**

Chipotle anticipates that Plaintiffs will argue that company-wide policies create uniform set procedures that direct the job duties of Apprentices and limit discretion. Plaintiffs' stock argument in this regard is not tethered to the record and has been found unavailing in the Second Circuit.

Plaintiffs will reference Chipotle's Labor Matrix and contend that it all but requires the performance of non-exempt work by all Apprentices. The Labor Matrix is merely a guide that estimates the amount of non-exempt hours that should be scheduled in a day to deliver an "extraordinary dining experience." (Comp. ¶127). The Matrix assumes that a store cannot afford the high cost of an Apprentice unless a minimum sales volume is exceeded. (*Id.*). Plaintiffs will argue that because the Matrix provides less hours when an Apprentice is present, there is an

expectation that Apprentices perform manual work that would otherwise be performed by non-exempt employees. Plaintiffs' argument is faulty: it shuns the undisputed fact that the "extra" hours provided when an Apprentice is not scheduled are not for Crew performing manual work; rather, they are for those hours spent by an hourly SM engaged in the exempt activity of "running the restaurant" that the Apprentice would otherwise perform. (Elder Tr. (Ex. 37): 55:11-56:2; 59:8-60:23; 104:2-23; Olds Tr. (Ex. 70): 54:11-55:4). Further, Plaintiffs' argument overlooks the fact that the Matrix serves as a guide which Apprentices are empowered to deviate from in their discretion. (30(b)(6) Tr. (Ex. 44): 243:11-25; 251:25-253:11; Duffy Tr. 122:5-123:23; Elder Tr. (Ex. 37): 176:22-177:8; Moran Tr. (Ex. 66): 45:17-46:12). Matthew Elder, Director of Field Support and the primary architect of the Matrix, testified:

> Yeah, and the reason why I say guideline is because it truly is a guideline. There's so many variables that go into each of our restaurants. Each of our restaurants are -- are so different as far as the way the sales patterns come in throughout the day.

(Elder Tr. (Ex. 37): 50:14-51:17). Thus, the Matrix does not imbue uniformity in duties performed.

Plaintiffs may similarly contend that there exists a company-wide aversion to overtime such that Apprentices serve as "free" labor to avoid overtime.[8] This argument suffers from two flaws. First, the record reveals a disparity in testimony, with some Opt-Ins testifying they were primarily charged with performing manual tasks in an effort to avoid overtime, but others testifying that their primary role was management. (*Id.* ¶¶95, 126). Second, Chipotle executives acknowledged that overtime was often a "good" thing.[9] (*Id.* ¶134). As Mr. Moran explained:

> [W]hat I believe is important is having a restaurant have a team of top performers who are empowered to achieve high standards and through that delivering a great

---

[8]     The Court struck the portions of Mr. Gordon's declaration where he purported to state that "Chipotle offsets hourly employee labor costs by assigning salaried Apprentices to work in manual labor roles, such as food production, customer services, and restaurant upkeep roles." *See* Docket No. 1065 at 26-27.

[9]     The expert testimony of Mr. Crandall bears this out: across all weeks, 87.8% of stores had some overtime work. (Crandall Decl. (Ex. 6): ¶ 33, Ex. 9). Again, however, even in this regard there is remarkable variation, with some stores incurring overtime in fewer than 25% of the weeks and others doing so in more than 90% of the weeks, (*Id.*), and variation in total overtime hours per week from 11.7 hours to 32.7 hours (*Id.*. ¶ 35).

> restaurant experience. There are times when overtime might be good to have. I mean, as for instance when let's say a restaurant scheduled the right amount of people based on what they thought sales would be, but let's say that something unpredictable happened and the sales are much, much higher, and we were going into the night shift needing to prepare a lot more food than we thought we'd have to prepare, it would make more sense for me to hold some people over and incur overtime in order to deliver a great customer experience than it would to, you know, seek to lower overtime and give a bad customer experience…all of our leaders are supposed to use all the tools at their disposal to do a good job…So overtime [] is one tool that they have in their arsenal. (Moran Tr. (Ex. 66): 176:15-178:3).

Plaintiffs may attempt to identify other policies, like training materials, that are national in scope to avoid decertification. However, Plaintiffs' resort to policies as a "glue" for the collective must fail because, in this Circuit, the use of guidelines will not defeat exempt status if the employee remains empowered to exercise judgment and discretion. *See Burger King*, 675 F.2d at 521-22; *Pippins v. KPMG LLP*, 921 F.Supp.2d 26, 52-53 (S.D.N.Y. 2012). Here, as both Chipotle's executives and many Opt-Ins testified, these policies are simply resources from which Apprentices are empowered to depart as they deem necessary to run a great restaurant. Chipotle's Rule 30(b)(6) designee illustratively testified:

> [O]ur general managers and our apprentice managers run the restaurant. That's their job. That's the expectation. That's how we evaluate them in any given period of time to determine how well they are doing or not doing. And we ask them to do that. We do provide them guidelines. We do provide them guidance from time to time, ideas about how they might do it. But those decisions because they are the leaders and managers of those restaurants are at the manager level. (30(b)(6) Tr. (Ex. 44): 242:7-21).

Likewise, David Chrisman, Chipotle's Director of Training, echoed:

> So while we set these kind of national standards and guidelines, it's, you know, it's not the end all, be all. They certainly are empowered to run their restaurant to the best of their ability. (Chrisman Tr. (Ex. 22): 151:1-152:6).

Finally, Mr. Moran summarized:

> Another thing is that we recognize the individual abilities of leaders. And by -- and I think this is the most -- one of the most important ways is that we -- we make sure that our apprentices and general managers have the tools and training and coaching that they need to become excellent leaders. But once in that position, there's a lot of latitude at Chipotle for them to lead the way they think

best for the circumstances of their particular restaurant, for the sales volume of their restaurant, for the demographics that they live in, for the – whether it's mostly lunch, mostly dinner business, mostly to-go, mostly eat-in business. (Moran Tr. (Ex. 66): 148:21-149:15).

Finally, even putting aside the contextual testimony revealing Chipotle's empowerment of Apprentices to act like business-owners, Plaintiffs' argument must be rejected for an additional reason covered at length: the testimony reveals Plaintiffs to perform a wholly disparate spectrum of activities. *See* Point III.B., *supra*. Thus, the testimony reveals that, in practice, Chipotle policies do not result in Apprentices performing the same activities or doing so for the same amounts of time. This is the critical inquiry in an exemption case. *See* 29 C.F.R. § 541.2; *Aquilino*,, 2011 WL 564039, at *8. And it is not susceptible to common proof.

## III.   THE INDIVIDUALIZED DEFENSES AVAILABLE TO CHIPOTLE COMPEL DECERTIFICATION

The myriad of differences in activities performed among Named Plaintiffs and Opt-Ins warrant decertification under the "individualized defense" prong of the inquiry. *See, e.g., Stevens*, 2014 WL 4261410, at *7 (noting that where the employer's defenses are premised on differences in duties performed, the first and second prongs of the decertification inquiry merge); *Harper*, 2015 WL 9673810, at *6 (same). A defendant "cannot be expected to come up with representative proof when the plaintiffs cannot reasonably be said to be representative of each other.'" *Hernandez*, 2014 WL 5039431, at *6. This is particularly so where, as here Chipotle will argue that some Apprentices are exempt under the "executive" exemption and that others are exempt under a combination of the "executive" and "administrative" exemptions, as contemplated by 29 C.F.R. § 541.708.

### A.   Chipotle's Executive Exemption Defense Is Highly Individualized And Necessitates Decertification

The record is replete with conflicting evidence as to whether a Named Plaintiff or an Opt-In performed the very duties identified under 29 C.F.R. § 541.102. Named Plaintiff Scott cannot, for instance, be said to be representative of Krystl Beining, a Florida Opt-In, where he claimed he

functioned like a Crew member the majority of his time (Scott Tr. (Ex. 84): 88:5-89:13; 183:3-10; 192:14-194:7; 201:20-22; 280:3-9), but she – in contrast – spent virtually all her time on exempt managerial and administrative activities. She interviewed candidates and recommended hires (Beining Tr. (Ex. 12): 50:14-54:5), disciplined employees (*Id.* 57:15-58:16), recommended terminations (*Id.* 60:10-62:2; 98:2-24), recommended promotions (*Id.* 56:18-57:10), conducted Performance Reviews (*Id.* 89:4-91:22), wrote in Development Journals (*Id.* 92:3-93:2), wrote and instituted schedules (*Id.* 32:10-16; 62:15-63:2; 103:21-104:8), conducted regular shoulder-to-shoulder training (*Id.* 47:10-48:6), performed administrative tasks such as payroll and cash handling (*Id.* 49:8-23; 64:3-65:16), assigned hourly employees their tasks (*Id.* 99:24-100:8; 113:3-6), and supervised the store and all its employees during 100% of her working time (*Id.* 32:17-24; 40:15-41:12; 45:9-46:20; 68:10-14; 99:24-100:8; 113:3-6). Beining is the opposite of Scott. *See Indergit*, 293 F.R.D. at 650 (opposite testimony on exemption criteria warrants decertification).

Beining cannot be characterized as an outlier either, as a number of Opt-Ins provided similar testimony concerning their authority to supervise and run their restaurant that highlights the incongruity between the Named Plaintiffs and Opt-Ins, such as Chris Armstrong (IN), Kevin Callahan (MN), Kevin Chan (NC), Raul Cruz (TX), Andria Larson (IL), Ana Montalvo (SC), Zaida Ortiz (CO), and Edmar Simoes (NC).[10] The testimony of these Opt-Ins, in turn, stands in contrast to the testimony of various other Opt-Ins who vigorously disclaimed performing any exempt activities,

---

[10]    For space reasons, the testimony cited in this section concerns only supervisory responsibilities and the authority to assign and direct tasks of hourly employees. However, the Compendium provides citations to the testimony of each of these Opt-Ins setting forth their authority for performing other exempt executive and administrative activities identified in 29 C.F.R. § 541.102 and § 541.201. Armstrong Tr. (Ex. 10): 92:21-92:2; 95:11-96:14; 115:21-117:24; 123:8-125:11; 183:22-189:15; 209:3-18; 210:21-24; 217:3-25; 221:13-18; Callahan Tr. (Ex. 17): 147:5-148:24; 153:17-154:22; 244:9-22; 250:22-251:3; 254:2-8; 260:11-15; Chan Tr. (Ex. 21): 31:19-23; 73:5-16; 89:3-21; 92:2-25; 166:16-20; 170:15-23; Cruz Tr. (Ex. 27): 32:2-21; 65:7-10; 70:23-71:11; 122:16-123:13; Larson Tr. (Ex. 55): 23:6-17; 52:1-7; 86:3-24; 89:3-14; 93:1-4; Montalvo Tr. (Ex. 64): 48:14-17; 49:3-50:13; 52:19-54:10; 62:6-64:5; 75:22-78:3; Ortiz Tr. (Ex. 73): 60:10-16; 71:24-74:24; 77:21-78:7; 112:6-19; Simoes Tr. (Ex. 87): 49:19-50:21; 63:14-64:21; 123:16-125:21; 175:21-178:8.

such as Daniel Argo (OK), Erin Durkin (MO), Jorge Lopez (FL) Kristina Rodriguez (KS), and Matthew Rommel (WA).[11]

It should also not be overlooked that the Named Plaintiffs cannot be described as "similarly situated" even among themselves. Even the first two Named Plaintiffs, Scott and Ensor, described widely divergent work settings, managerial structures, and experiences with respect to: (i) acting as the highest-ranking manager (Scott Tr. (Ex. 84): 183:3-10; Ensor Tr. (Ex. 39): 179:13-20; 328:18-329:23); (ii) writing schedules (Scott Tr. (Ex. 84): 141:4-142:2; Ensor Tr. (Ex. 39): 129:22-24; 164:2-18); (iii) training KMs and SMs (Scott Tr. (Ex. 84): 175:19-23; Ensor Tr. (Ex. 39): 128:10-129:21; 226:20-227:14; 301:14-302:3; 354:23-355:3); (iv) the amount of time supervising hourly employees (Scott Tr. (Ex. 84): 88:5-89:13; Ensor Tr. (Ex. 39): 301:14-302:3; 407:25-410:11); (v) the ability to assign/direct the work of others (Scott Tr. (Ex. 84): 88:5-89:13; Ensor Tr. (Ex. 39): 300:24-301:3; 407:25-410:11); and (vi) their authority in evaluating subordinates (Scott Tr. (Ex. 84): 38:17-39:13; 217:2-218:11; Ensor Tr. (Ex. 39): 140:6-25; 211:2-24; 215:9-218:12-25; 221:10-18; 233:7-25; 290:15-291:6). Striking differences among Plaintiffs Gateley and Jimenez, who are both from Illinois, are likewise apparent with respect to their authority in running the store and their disciplinary and termination authority. (Jimenez Tr. (Ex. 51): 55:12-58:11; 62:19-22; 89:3-17; 102:23-103:12; 129:14-131:25; Gateley Tr. (Ex. 40): 66:22-67:16; 119:22-120:7; 145:10-146:11; 153:12-19; Gateley Decl. ¶16). These palpable disparities are telling and proliferate as comparators increase or as Opt-In Kelsch exemplified, even from a change in stores. *See* Point III.C., *supra*.

These differences cannot be glossed over. They do not exist at the "margins" of the exemption inquiry, but cut through the heart of the analysis. Chipotle is entitled as a matter of due process to explore these differences and receive rulings as to the merits of its exemption defenses

[11] Argo Tr. (Ex. 9): 88:3-90:13; 102:9-14; 105:5-106:11; Durkin Tr. (Ex. 35): 35:11-36:18; 37:25-38:15; 51:15-53:19; 65:15-66:8; 112:5-9; Lopez Tr. (Ex. 58): 63:19-66:6; 93:14-95:8; 128:9-17; Rodriguez Tr. (Ex. 79): 35:3-12; 37:24-38:8; 44:4-21; 53:6-16; 54:5-21; 132:6-19; Rommel Tr. (Ex. 81): 39:14-23; 74:13-16; 83:20-84:4; 103:15-104:11; 105:8-15.

with respect to each Plaintiff who wishes to pursue claims against it. *See, e.g.*, *Stevens*, 2014 WL 4261410, at *7. Decertification is necessary.

**B. The Combination Of The Executive And Administrative Exemptions Provides Further Grounds For Decertification**

The need for decertification is further apparent given the evidence that will allow Chipotle to assert an exemption defense based on a combination of the executive and administrative exemptions to some, but not all, Plaintiffs. *See* 29 C.F.R. § 541.708. For example, many Opt-Ins testified that they had responsibility for administrative tasks such as budgeting,[12] auditing,[13] purchasing materials,[14] local store marketing,[15] and legal and regulatory compliance.[16] These qualify as exempt activities. Together with the management activities these Opt-Ins acknowledged performing, these activities may render them exempt under the combination exemption. *See* 29 C.F.R. §§ 541.201(b), 708; *Scarpinato v. East Hampton Point Mgmt. Corp.*, No. 12-CV-3681 (JFB), 2013 WL 5202656, at *11-12 (E.D.N.Y. Sept. 13, 2013) (finding restaurant manager exempt under administrative exemption); *Mota v. Imperial Parking Sys.*, No. 08-CIV-9526, 2010 WL 3377497, at *3 (S.D.N.Y. Aug. 24, 2010). However, because these duties are performed by some but not other Opt-Ins, Chipotle is entitled to evaluate each Apprentice to determine whether the defense is available, further necessitating decertification.

---

12 Callahan Tr. (Ex. 17): 231:22-232:6; Kelsch Tr. (Ex. 54): 63:22-65:3; Tullis Tr. (Ex. 90): 112:14-18; Curtis Tr. (Ex. 28): 103:10-104:8; Ortiz Tr. (Ex. 73): 59:2-6; 62:6-15; Simoes Tr. (Ex. 87): 47:9-11; 51:11-52:24; 77:3-14.

13 Callahan Tr. (Ex. 17): 140:20-141:18; 197:22-198:14; Henriquez Tr. (Ex. 47): 108:16-109:10; Kelsch Tr. (Ex. 54): 98:9-101:13; Tullis Tr. (Ex. 90): 33:8-21; 171:22-172:9; Curtis Tr. (Ex. 28): 95:21-96:9; Ortiz Tr. (Ex. 73): 33:11-16; 108:5-9; Simoes Tr. (Ex. 87): 203:17-206:25.

14 Callahan Tr. (Ex. 17): 283:10-284:4; Henriquez Tr. (Ex. 47): 73:8-21; Kelsch Tr. (Ex. 54): 134:5-22; Simoes Tr. (Ex. 87): 71:22-72:9.

15 Callahan Tr. (Ex. 17): 193:24-194:24; Tullis Tr. (Ex. 90): 32:10-33:3; Curtis Tr. (Ex. 28): 37:6-10; Ortiz Tr. (Ex. 73): 69:18-70:17; Simoes Tr. (Ex. 87): 77:15-80:25.

16 Tullis Tr. (Ex. 90): 120:9-12; 122:9-18; 168:10-13; Ortiz Tr. (Ex. 73): 80:21-81:7; Simoes Tr. (Ex. 87): 252:21-253:4.

## IV.   FAIRNESS AND PROCEDURAL CONSIDERATIONS COMPEL DECERTIFICATION

Courts analyzing how fairness and procedural considerations impact decertification consider "whether a collective action would lower costs to the plaintiffs through the pooling of resources, efficiently resolve common issues of law and fact, and coherently manage the class in a manner that will not prejudice any party."  *DeSilva v. North Shore*, 27 F.Supp.3d 313, 326 (E.D.N.Y. 2014) (cost savings do not override fairness and manageability considerations).  Here, if the Court were to disregard the disparate employment settings and the individualized defenses available to Chipotle, it "inevitably lead[s] to 'one of two results – it would either prejudice defendants' ability to present their defenses, or require [516] mini-trials for each of the Opt-In Plaintiffs."  *Harper*, 2015 WL 9673810, at *6.  Because these are "equally undesirable results," the Court "must" decertify the collective action where the evidence demonstrates a wide variety of pertinent experiences among the collective.  *Hernandez*, 2014 WL 5039431, at *6; *Gardner*, 2013 WL 1629299, at *4 ("The benefits to the parties of a collective proceeding need to be balanced against any prejudice to [defendant] and any problems of judicial administration that may surface.").

Given the record before the Court, decertification is necessary here.  Under even the most permissive interpretation of the phrase "similarly situated," Plaintiffs cannot be found to have met it given their irreconcilable testimony concerning duties performed.  "To find otherwise would reduce Section 216(b)'s requirement that plaintiffs be 'similarly situated' to a mere requirement that plaintiffs share an employer, a job title, and a professed entitlement to additional wages."  *Ruiz v. Citibank, N.A.*, 93 F.Supp.3d 279, 300 (S.D.N.Y. 2015).  This is not the law.

## CONCLUSION

For each of the foregoing reasons, Chipotle respectfully submits that the Court should enter an Order:  (i) decertifying the collective action; (ii) dismissing the claims of any Opt-In Plaintiffs without prejudice; and (iii) for such other and further relief as the Court deems just and proper.

Dated:  May 9, 2016             Respectfully submitted,

**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**


By:   /s/ Brian D. Murphy
       Brian D. Murphy
       Richard J. Simmons (admitted *pro hac vice*)
       Lisa M. Lewis
       30 Rockefeller Plaza
       New York, NY 10112-0015
       Tel:  (212) 653-8700
       Fax:  (212) 653-8701

       Bruce A. Montoya (admitted *pro hac vice*)
       John Karl Shunk (admitted *pro hac vice*)
       Lou Grossman (admitted *pro hac vice*)
       MESSNER & REEVES LLC
       1430 Wynkoop St. No. 300
       Denver, CO 80202
       Telephone:  (303) 623-1800
       Facsimile:  (303) 623-0552

       *Attorneys for Chipotle Mexican Grill, Inc. and Chipotle Services, LLC*