UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MAXCIMO SCOTT, JAY ENSOR, MATTHEW MEDINA, EUFEMIA JIMENEZ, KRYSTAL PARKER, STACY HIGGS, and CHRISTINE GATELEY, on behalf of themselves all others similarly situated<br><br>Plaintiff,<br><br>-against-<br><br>CHIPOTLE MEXICAN GRILL, INC. and CHIPOTLE SERVICES, LLC,<br><br>Defendants. | MEMORANDUM AND ORDER<br><br>12-CV-8333 (ALC)(SN) |

ANDREW L. CARTER, JR., District Judge:

Plaintiffs Maxcimo Scott ("Scott"), Jay Ensor ("Ensor"), Matthew Medina ("Medina"), Eufemia Jimenez ("Jimenez"), Krystal Parker ("Parker"), Stacy Higgs ("Higgs"), and Christine Gately ("Gateley") allege Fair Labor Standards Act (FLSA) violations, and claims under the New York Minimum Wage Act, N.Y. Lab. Law, art. 6 §190; art. 19 § 650 (NYLL), as well as parallel state laws in Missouri, Colorado, Washington, Illinois, and North Carolina against Defendants Chipotle Mexican Grill Inc ("Chipotle").

On June 20, 2013, the Court granted Plaintiffs' motion for conditional certification of a collective action after limited discovery, and 516 plaintiffs opted in to the FLSA collective action. ECF No. 68. Plaintiffs now seek to certify the following classes: all persons who worked for Chipotle as apprentices (1) in Colorado, between April 25, 2012 and the date of final judgment in this matter; (2) in Illinois, between April 25, 2011 and the date of final judgment in this matter; (3) in Missouri, between February 13, 2011 and the date of final judgment in this matter; (4) in New York, between November 15, 2006 and the date of final judgment in this

matter; (5) in North Carolina, between April 25, 2012 and the date of final judgment in this matter; and (6) in Washington, between April 25, 2011 and the date of final judgment in this matter. Chipotle seeks to decertify the collective action and opposes Plaintiffs' class certification motion.

## BACKGROUND

Chipotle operates more than 2,000 restaurants throughout the United States. Defendants' Memorandum of Law in Support of Motion to Decertify ("Defs.' Mem.") at 3, ECF. No. 1099. Chipotle management positions include General Managers ("GM"), Apprentices, Service Managers ("SM"), hourly Kitchen Managers ("KM") and hourly Crew Members ("CM"). *Id.* Apprentices are employed in a temporary position and train to be general managers of new stores. Memorandum of Law in Support of Motion for Class Certification ("Pls.' Mem.") at 3, ECF No. 1095. Chipotle's singular job description for Apprentices nationwide charges Apprentices with:

> (i) leading the restaurant's team in successful day-to-day operations; (ii) acting as GM when GM is not present; (iii) training and developing the team, especially KMs and SMs; (iv) ensuring that employees are properly paid, receive appropriate benefits, and are prepared for additional career opportunities; (v) identifying talent, interviewing, and hiring new Crew; (vi) participating in personnel decisions regarding the restaurant team; (vii) writing schedules that meet the needs of the business so that a great customer experience is delivered while maintaining financial responsibility; (viii) assisting the GM in performing administrative duties including payroll, inventory, food ordering, proper cash handling; (ix) building sales and managing the restaurant's budget; (x) assisting with local restaurant marketing opportunities; (xi) handling employee or customer complaint; and (xii) ensuring that safety and security standards within the restaurant are adhered to

Schwartz Decl., Ex. 84 ("Apprentice Job Description") at 1, ECF No. 1106. In 2011, Chipotle hired an expert to evaluate the classification of Apprentices as exempt or non-exempt employees

2

in accordance with labor laws. Pls.' Mem. at 6. To that end, Chipotle's consultant conducted an assessment of Apprentices' primary duties by gathering testimony from four Apprentices. *Id.* at 7. After assessing only four Apprentices, the consultant concluded that the employment position "as a whole" should be exempt, due in part to the fact that Apprentices have the "same responsibility" nationwide. *Id.* Indeed, Chipotle transfers Apprentices without providing additional job training. *Id.* at 8. Chipotle then classified all Apprentices outside of California as exempt employees not eligible of earning overtime pay. Murphy Decl., Ex. 1 ("Compendium") ¶¶20–21, ECF No. 1106. Chipotle Apprentices are guaranteed an annial salary of $38,000 to $51,000 to train as managers and supervise SMs, KMs, and CMs. *Id.* Apprentices may also earn an annual bonuses based on eligibility criteria. *Id.* ¶22.

In keeping with its practice of categorizing Apprentices as exempt employees, Chipotle reviews Apprentices' performance on a form entitled "Restaurant Management Performance Review." *Id.* ¶12. The form assesses whether an Apprentice successfully hires, develops, and promotes "their people," "train[s] and develop[s] Crew into successful KMs and SMs," creates a "culture that rewards constant improvement," and "lead[s] with enthusiasm and optimism." *Id.* ¶¶13–14. Other areas of performance review evaluates an Apprentice's ability to "setting clear direction" in the store, "maintaining high standards," and creating new ways to "run their restaurant." *Id.* ¶15.

While Chipotle has several corporate policies that uniformly categorize an Apprentice, the record evidence shows that a number of factors impact Apprentices' daily activities. *Id.* ¶¶26–27. For example, the management structure at locations are varied. *Id.* ¶¶28–30. Some Chipotle locations have a GM, some locations have a Restaurateurs who rotate among locations, and other locations have no GM or Restaurateur and are managed solely by Apprentices. *Id.*

The sales volume of a particular Chipotle location also impacts the daily activities of an Apprentice. *Id.* ¶¶38–39. Stores vary in daily sales ranging from $4,000 to $13,000 which fluctuate based on hours of operation and location. *Id.* Increased sales results in an increase in the number of staff. *Id.* Additional staff requires a change in daily activities such interviewing, hiring, disciplining, training, evaluating, and supervising. *Id.*

## DISCUSSION

A. **Rule 23 Motion For Certification Of State Law Classes**

In *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, the Second Circuit set forth the following standard regarding class certification:

> (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; and (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement.

546 F.3d 196, 202 (2d Cir. 2008) (citations and alterations omitted). "The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements have been met." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015). "Federal Rule of Civil Procedure 23(a) permits a case to be litigated as a class action only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will

fairly and adequately protect the interests of the class." *Id.* (citation and internal quotation marks omitted).

### B. Rule 23(a) Commonality and Typicality

Chipotle argues that Plaintiffs failed to meet the commonality requirement of Rule 23(a)(2). *See* Memorandum of Law in Opposition To Class Certification ("Defs.' Oppo. Mem."), at 27-30, ECF No. 1107. "A question of law or fact is common to the class, if the question is capable of classwide resolution—which means that its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Johnson*, 780 F.3d at 137 (citations, alterations, and internal quotation marks omitted). This burden "may be satisfied if plaintiffs demonstrate that the class members have suffered the same injury." *Id.* (citations, alterations, and internal quotation marks omitted). However, Rule 23(a)(2) does not demand that all classwide claims be identical, commonality is met when the resolution of issues "will affect all or a significant number of the putative class members." *Id.* "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Id.* (citations, alterations, and internal quotation marks omitted).

Here, the question of whether Apprentices were misclassified as exempt employees is common to all class members because it can be answered with common proof. *See Youngblood v. Family Dollar Stores, Inc.*, No. 09-CIV-3176 (RMB), 2011 WL 4597555, at *2 (S.D.N.Y. Oct. 4, 2011). First, the record evidence shows that Chipotle uniformly classified all Apprentices as exempt, and made that business decision after only assessing four employees work duties. Schwartz Decl., Ex. 168 ("Daggett Tr.") at 80-84, ECF No. 1106. Also convincing is the fact that Chipotle has an "expectation [] that the core duties of the apprentice is the same" regardless of the market in which an Apprentice works. Schwartz Decl., Ex. 111 ("Moore Tr.")

at 91, ECF No. 1106. As a result, Chipotle does not even gather individualized evidence from an Apprentice upon relocation to determine whether the Apprentice should remain exempt. *Id.* Further, Chipotle uses a single job description for all Apprentices that lists "principal accountabilities". Apprentice Job Description at 1. Such a uniform description "is unquestionably probative" of whether an employee is properly classified as exempt. *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 156 (S.D.N.Y. 2008).

There is no evidence that the opt-in plaintiffs would raise questions of law that differ from the representatives of the six state law classes. Defendants are adamant that Chipotle's blanket classification, singular job description, and nationwide policies are irrelevant. Defs.' Oppo. Mem. at 27. Defendants contend that the Court should instead focus on the individual testimony of the class members, which shows Apprentices are given discretion to deviate from corporate policies and guidelines which results in varying duties actually performed by Apprentices. *See id.* at 28-30. However, the differences in the actual job duties of Apprentices are "better suited to the predominancy inquiry discussed infra, together with an analysis of the Rule 23(b)(3) factors." *Jacob v. Duane Reade, Inc.*, 289 F.R.D. 408, 415 (S.D.N.Y.), on reconsideration in part, 293 F.R.D. 578 (S.D.N.Y. 2013). Plaintiffs have shown that commonality exists among the class members by a preponderance of evidence.

Chipotle also argues that Plaintiffs failed to establish the typicality requirement in Rule 23(a)(3). Defs.' Oppo. Mem. at 30-32. Rule 23(a)(3) "requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir.1997) (citations and internal quotation marks omitted). As discussed, Plaintiffs' claims are based on

the same legal theory and factual predicates—that Chipotle misclassified Apprentices which deprived those employees of overtime wages guaranteed by law. Therefore, typicality is satisfied.

### C. Rule 23(b)(3)

*1. Predominance Inquiry*

Chipotle argues that Plaintiffs' motion for certification does not satisfy the Rule 23(b)(3) predominance requirement. Defs.' Oppo. Mem. at 32-40. Plaintiffs have the burden to show that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Like the commonality inquiry, a court examining predominance must assess (1) the elements of the claims and defenses to be litigated; and (2) whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's entitlement to relief. Predominance requires a further inquiry, however, into whether the common issues can profitably be tried on a classwide basis, or whether they will be overwhelmed by individual issues." *Johnson*, 780 F.3d 128 at 138 (citations and internal quotation marks omitted).

Regarding the first step, litigating the claim of employment misclassification under FLSA requires application of Labor Department guidelines which exempts "executive" employees who are:

> (1) Compensated on a salary basis pursuant to § 541.600 at a rate per week of not less than the 40th percentile of weekly earnings of full-time nonhourly workers in the lowest-wage Census Region (or 84 percent of that amount per week, if employed in American Samoa by employers other than the Federal government), exclusive of board,

7

> lodging or other facilities. Beginning January 1, 2020, and every three years thereafter, the Secretary shall update the required salary amount pursuant to § 541.607;
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
> (3) Who customarily and regularly directs the work of two or more other employees; and
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a)(1)–(4).[1] Thus, the question of whether Chipotle Apprentices were misclassified is a "mixed question of law and fact" that can only be resolved "by examining the employees' actual job characteristics and duties." *Myers v. Hertz Corp.*, 624 F.3d 537, 548 (2d Cir. 2010) (citations omitted).

The evidence before the Court does not show that "primary job duties are the same everywhere" as Plaintiffs claim, Pls.' Mem. at 8, and many citations to record evidence were misleading or incorrect. It is true that Apprentices' range of managerial tasks such as employment decisions, scheduling, inventory, performance evaluations were similar. It is also true that Apprentices' range of manual labor tasks such as working the line, serving customers, prepping, grilling, and running the register were similar. However, "individualized proof will be needed to establish each class member's entitlement to relief . . . ." *Johnson*, 780 F.3d 128 at

---

[1] 29 C.F.R. § 541.102 describes management duties as: "activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

138. The named Plaintiffs' testimony, which were internally inconsistent and distinguishable from one another, shows this defect in Plaintiffs' motion. *See Ruiz v. Citibank, N.A.*, 93 F. Supp. 3d 279, 291 (S.D.N.Y. 2015).

**Scott** asserted that he did not have "any say" in hiring, Murphy Decl., Ex. 84 ("Scott Tr.") 30:8-31:7, ECF No. 1101, claimed he had no role in developing employees, *id.* 133:16-134:8, and rarely prepared work schedules, *id.* 141:4-142:2; 281:4-1. Scott testified he performed mostly Crew responsibilities and "was never considered the boss." *Id.* 180:20-24. However, at other times Scott admitted that his duties included hiring, performance evaluations, and scheduling. *Id.* 100:11-18; 134: 25; 281: 14.

**Jimenez** spent a majority of time "on the floor" serving customers which included prepping, grilling, and making salsa. Schwartz Decl., Ex. 155 ("Jimenez Tr.") 233:20-24, ECF No. 1106. However, Jimenez also stated she was promoted from Apprentice to GM because she was "running a good store" and spent "three or four days out of the week" marketing her store to local businesses. *Id.* 108:19-25; 109: 1-6.. In addition, Jimenez admitted that she made hiring recommendations, Murphy Decl., Ex. 51 ("Jimenez Tr.2") 51:3-10; 62:23; 63:21; 125:12-17, ECF No. 1101; drafted employee schedules, *id.* 52:13-53:4; 134:3-19; and helped with overall store budgeting. *Id.* 143:2-5.

**Higgs** made effective hiring and termination recommendations, Murphy Decl., Ex. 49 ("Higgs Tr.") 104:18-105:18, ECF No. 1101 ; trained employees, *id.* 65:7-13; provided feedback to employees, *id.* 177:6-15; created weekly schedules, *id.* 64:13-14; controlled the labor budget by sending employees home early, *id.* 148:15-149:19; made task assignments, *id.* 76:20-77:13; 209:13-212:22; and completed performance evaluations, *id.* 189:2-8. Yet, Higgs maintained that she spent seventy to eighty percent of her time "working on the line, making burritos, running

the register and preparing food." Schwartz Decl., Ex. 153 ("Higgs Tr.2") 202:11-25, ECF No. 1106.

**Ensor** also performed many managerial tasks including: conducting independent interviews, making hiring recommendations, supervising employees, training subordinates, writing schedules, and completing performance evaluations. Murphy Decl., Ex. 39 ("Ensor Tr.") 60:3-14; 129:22-24; 163:4-9; 219:10-18; 353:4-354:15; 140:6-25; 161:6-15; 164:2-18; 270:8-24, ECF No. 1101. In fact, Ensor had managerial authority over restaurant employees at all times as an Apprentice. *Id.* 407:25-410:11. However, Ensor's duties also included daily food preparation and "on the line helping customers" which he characterized as a "substantial part of [his] day." Schwartz Decl., Ex. 147 ("Ensor Tr.2") 407:25-410:11, ECF No. 1106.

**Gateley** only assumed a leadership role when her GM was absent, relied on her GM to discipline subordinates, and had no role in terminations. Murphy Decl., Ex. 40 ("Gateley Tr.") 67:10, ECF No. 1101. Yet Gately interviewed candidates and made hiring recommendations, *id.* 84:23-85:23; drafted schedules, *id.* 123:5-11; and maintained her stores budget, *id.* 60:15-61:10.

**Medina** interviewed new employees, made termination recommendations, drafted schedules, completed evaluations of subordinates, and coached employees. Schwartz Decl., Ex. 160 ("Medina Tr.") 76:8-80:10, ECF No. 1106. Yet, Medina maintained that "maybe like 90% of the time" he performed duties that fell outside the Apprentice job description such as "working tortillas, rolling burritos, working on the grill, cutting chicken, steak, making rice, cleaning bathrooms, throwing trash, doing dishes, working as a cashier, expo, linebacker." *Id.* 301:7-19.

**Parker** (i) had no role in training, Murphy Decl., ECF No. 1101 Ex. 74 ("Parker Tr.") 68:15-25; 138:13-20; (ii) rarely, if ever, prepared schedules, *id.* 11:21-12:20; 102:7-14;

10

145:15-146:6; (iv) had no authority to deviate from the posted schedule, *id.* 164:2-24; (v) never participated in the evaluation process, *id.* 169:22-170:18; and (vi) could not issue discipline, *id.* 155:17-156:24. Parker spent less than 5% of her time as an Apprentice engaged in exempt activities, *id.* 17:2-19; 97:11-15; 98:25-99:7; 139:2-20, summarizing her duties as "rolling burritos, frying chips, prepping onions, lettuce, cutting up everything, but I'm not actually managing anybody. I can't manage the front of the house and the back of the house if I'm rolling someone's burritos." *Id.* 180:3-8.

Notwithstanding the internally inconsistent testimony among the named Plaintiffs, the opt-in Plaintiffs are not similarly situated to their representatives. To compare the groups, the Court assumed arguendo, that the named plaintiffs' testimony regarding managerial tasks was harmonious, and still, the opt-in plaintiffs' testimony rang dissonantly from the record.

### a) Personnel Decisions

DOL regulations categorize several personnel tasks as managerial such as interviewing, hiring, and disciplining subordinates. *See* 29 C.F.R. § 541.102. Many Apprentices played a significant role in personnel decisions by meeting with applicants and making hiring recommendations to higher management. Murphy Decl., Ex. 8 ("Anthony Tr.") 67:2-68:12; Ex. 55 ("Larson Tr." ) 35:25-36:4; Ex. 53 ("Kaise Tr."): 33:2-3; Ex. 32 ("Doran Tr.") 43:11-44:15; Ex. 15 ("Betancourt Tr."): 30:2-7; Ex. 25 ("Connor Tr.") 70:12-21, ECF No. 1101. Some Apprentices conducted interviews and made hiring decisions without the need for approval by higher management. *Id.* Ex. 61 ("Masdin Tr.") 85:2-22; Ex. 87 ("Simoes Tr.") 46:17-22; Ex. 43 ("Gomula Tr.") 99:9-100:12; Ex. 76 ("Perez Tr.") 66:23-67:20, 150:7-19; Ex. 14 ("Berry Tr.") 51:25-52:23. In contrast, other Apprentices testified that they had no involvement Chipotle's hiring process. *Id.* Ex. 72 ("Ortega, V. Tr.") 33:8-16; Ex. 30 ("Diaz-Vega Tr.") 66:14-67:7; Ex.

93 ("Winfrey Tr.") 70:15 -22; Ex. 21 ("Chan Tr.") 59:12-25; Ex. 15 ("Betancourt Tr.") 106:25-107:9, 126:8-1.

Many Apprentices testified they disciplined or recommend discipline hourly employees, for improper behavior, performance problems, or failure to comply with directives. *Id.* Anthony Tr. 69:16-71:3; Chan Tr. 64:5-13; Larson Tr. 45:4-17; Masdin Tr. 105:25-107:2; Perez Tr. 187:18-188:11; Ex. 57 ("Link Tr.") 60:6-61:10; Ex. 73 ("Ortiz Tr.") 82:2-10; Ex. 36 ("Eich Tr.") 113:4; Ex. 32 ("Doran Tr.") 46:18-47:9; Ex. 59 ("Lovato Tr.) 122:5-14; Ex. 77 ("Ramirez Tr.") 81:17-83:19; Ex. 82 ("Rosario Tr.") 130:15-22, 134:10-135:8. Several other Apprentices did not discipline subordinates or did so only after approval from higher management. *Id.* Berry Tr. 90:11-14; Betancourt Tr. 118:9-15; Diaz-Vega Tr. 76:23-77:22; Eich Tr. 89:16-23; V. Ortega Tr. 72:16-73:8; Winfrey Tr. 83:16-84:9; Ex. 16 ("Breenden Tr. ) 146:19-148:18; Ex. 28 ("Curtis Tr.") 101:10-23; Ex. 19 ("Casillas Tr. ) 86:13-15; Ex. 35 ("Durkin Tr. ) 115:21-24; Ex. 67 ("Morgan Tr. ) 82:5-15; Ex. 71 ("A. Ortega Tr.") 88:17-23; Ex. 91 ("Villanueva Tr. ) 70:16-71:1; Ex. 48 ("Herrera Tr.") 112:12-20.

### b) *Scheduling Authority*

DOL regulations provide that "setting and adjusting [employees] rates of pay and hours of work" constitutes a managerial duty. 29 C.F.R. § 541.102. Some Apprentices prepared and disbursed schedules without even needing approval from higher management. Murphy Decl., Ex. 78 ("Rivera Tr.") 65:12-66:10; Ex. 87 ("Simoes Tr. ) 67:13-18; Ex. 75 ("Penaranda Tr. ) 70:7-19; Ex. 63 ("Milligan Tr. ) 52:11-19, 55:11-56:1, ECF No. 1101. Other Apprentices prepared schedules that were rewritten by higher management. *Id.* Berry Tr. 14:25-15:11; Betancourt 30:18-22, 111:12-15, 129:5-12; Breenden Tr. 131:13-132:9, 207:23-208:11; Diaz-Vega Tr. 74:25-75:15; V. Ortega Tr. 53:3-54:11, 55:6-56:4; Ex. 43 ("Gomula Tr.)

59:24-60:8; Ex. 68 ("Moschini Tr. ) 38:15-39:14; Ex. 81 ("Rommel Tr.") 60:13-61:22, 88:4-13. While many Apprentices did not perform this managerial task, because they did not believe they had the authority to do so. *Id.* Costello Tr. 43:17-44:19; Durkin Tr. 41:15-42:13; A. Ortega Tr. 62:15-64:11; Ramirez Tr. 50:18-52:2, 71:4-72:11; Ex. 55 ("Larson Tr. ) 37:10-24.

### *c) Employee Supervision and Training*

Training subordinates and supervising their tasks are considered management responsibilities. *See* 29 C.F.R. § 541.102. Many Apprentices acknowledged they supervised hourly employees at their Chipotle location. Murphy Decl., Breenden Tr. 59:17-21; Chan Tr. 31:19-23, 73:10-16, 89:3-21, 92:2-25, 166:16-20; Costello Tr. 53:22-57:19; Curtis Tr. 41:2-42:14; Eich Tr. 49:22-50:15, 69:19-72:16; Kaise Tr. 16:5-14, 72:9-18; Larson Tr. 93:1-4; Masdin Tr. 163:13-165:24; Milligan Tr. 84:11-25; A. Ortega 49:5-25, 50:21-51:11, 54:21-25, 67:14-25, 68:2-69:15, 91:18-92:6; Ortiz Tr.71:24-7, 73:20-74:24, 77:21-78:7; Rivera Tr. 39:7-12, 156:14-157:4; Simoes Tr. 49:19-50:15, 123:10-17, 175:21-178:8, 194:4-8; Ex. 75 Penaranda Tr.49:12-50:5, 60:3-10; Perez Tr. 16:4-20; Rosario Tr. 53:5-19, ECF No. 1101. Some Apprentices even described supervision as their "primary duty". *Id.* Curtis Tr. 69:25-70:8; Diaz-Vega Tr. 53:7-24; Eich Tr. 40:21-42:16, 69:19-72:16; Larson Tr. 52:1-7; Milligan Tr. 84:11-25; A. Ortega Tr. 49:5-25, 50:21-51:11, 70:4-17, 70:23-71:25, 84:18-85:3, 92:9-15, 103:3-9, 107:24-108:11, 108:18-109:7; Perez Tr. 163:9-13; Rivera Tr. 148:6-17; Rosario Tr. 187:21-190:12, 194:16-23, 195:6-196:197:3; Simoes Tr. 175:21-178:8.

Chipotle's "shoulder-to-shoulder" training required Apprentices to work on the food preparation line with hourly employees and perform non-managerial tasks. *Id.* Ex. 66 ("Moran Tr.) 194:20-195:22. However, several Apprentices acknowledged that they still supervised hourly employees while working on the food preparation line. *Id.* Anthony Tr. 38:16-39:23,

13

Curtis Tr. 41:2-42:14; Masdin Tr. 163:13-165:24; Casillas Tr. 97:12-98:11; Diaz-Vega Tr. 105:12-23; Eich Tr. 69:19-72:16, Kaise Tr. 72:9-18; Chan Tr. 31:19-23, 89:3-21; Connor Tr. 145:21-146:24, 173:20-175:22, 176:13-23; Rivera Tr. 128:14-129:2, 140:15-141:17, 156:14-157:4; Simoes Tr. 175:21-178:8; Costello Tr. 53:22-57:19, 67:15-21, 72:2-11; Doran Tr. (Ex. 32): 77:23-80:23, A. Ortega Tr. 68:2-69:15, 70:23-71:25; Penaranda Tr. 161:20-162:20, 163:9-164:3, 177:18-178:14; Perez Tr. 119:13-120:13, 189:12-191:5; Berry Tr. 126:15-127:11.

### e) Factors Affecting The Amount Of Time Spent On Managerial Tasks

The record evidence shows that the differences in the structures of Chipotle locations, sales volume, and managerial styles across the country affected the amount of time Apprentices' spend performing managerial tasks. The Chipotle Compliance Director testified that:

> Every single [restaurant] is different. When we open, when we close, how many hours we operate in any given day, whether there is inclement weather, whether it's a new store opening, whether we have a full slate of managers or we do not…whether we are closing for some reason because of a structural problem. All of those things contribute to what an apprentice might do in a given day . . . or any given week . . . .

Gottlieb Tr., Ex. 44 84:6-18. Chipotle locations have different store structures nationwide. Some stores have a GM, some have a Restaurateur with responsibility for up to 4 stores (splitting time among them), while other stores have no GM or Restaurateur and are managed solely by one or two Apprentices. These structural differences impact the amount of time Apprentices serve as the highest-ranking manager on duty, their supervisory and management functions, the authority they exercise, and the time spent on tasks. Chipotle locations have varying sales volume nationwide. Daily revenue from Chipotle locations across the country ranges from $4,000 to $13, 000. Increased sales results in an increase in the number of staff. Plaintiffs

testified that additional staff required them to devote more time to activities such as interviewing, hiring, disciplining, training, evaluating, and supervising, than was necessary in a low-volume store. The individual Plaintiffs in Colorado, Illinois, Missouri New York, North Carolina, and Washington did not perform the same work, thus proof of their claims will not overlap. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352 (2011). The proposed classes in this case are unlike the class in *Jacob v. Duane Reade, Inc.*, where a sufficient degree of homogeneity existed among convenience stores in New York City and its surrounding metropolitan area. 289 F.R.D. at 422. The nationwide Chipotle Apprentices are also different than those in *Youngblood v. Family Dollar Stores, Inc.*, where convenience store managers in New York State adhered to corporate policies set forth in "minute detail" which removed any doubt that the class satisfied the predominance inquiry. 2011 WL 4597555, at *5.

The disparate accounts from Apprentices proves fatal to the predominancy inquiry. Accordingly, Plaintiffs have failed to meet their burden of showing that the question of whether all Apprentices were misclassified is subject to generalized proof as required by Rule 23(b)(3).

    *2. Superiority*

In determining whether to grant class certification, the Court should also consider "the difficulties likely to be encountered in the management of a class action." Rule 23(b)(3). Plaintiffs failed to address the difficulties likely to be encountered in this class action involving laws from six states, by merely asserting that "the claims of potential class members in all six states are identical." Pls.' Mem. at 39. However, the state law claims are not "identical." Indeed, Colorado and Washington have strict percentage limitations governing how much time an employee can spend on non-exempt activities. *See* COL. CODE REGS. 1103-1.5(b) (less than 50% under executive exemption); R.C.W. §§ 296-128-510(5), 520(4) (less than 40% for

executive and administrative exemptions). Meanwhile, Illinois allows for a special penalty if Chipotle is found liable. *See* 80 I.L.C.S. § 105/4a.

Further, due to the level of inconsistencies among the Plaintiffs' testimony, the need for individualized proof would require the Court to " conduct a series of mini-trials in order to determine, for each participant, whether the delay in the award of benefits was unreasonable." *Dunnigan v. Metro. Life Ins. Co.*, 214 F.R.D. 125, 142 (S.D.N.Y. 2003).

Therefore, the Court finds that a collective action consisting of nationwide Apprentices from six states is not a superior method for resolving Plaintiffs' claims.

### D. Motion For Decertification Of Collective Action

Chipotle filed a motion to decertify the FLSA collective action pursuant to § 216(b) of FLSA. Defs' Mem. at 20-39. Courts in this district employ a "two-step method" in determining whether to certify a FLSA collective action. *Myers*, 624 F.3d at 555. "The first step involves the court making an initial determination to send notice to potential opt-in plaintiffs who may be similarly situated to the named plaintiffs with respect to whether a FLSA violation has occurred." *Id.* (citations and internal quotation marks omitted). The second step, at issue here, requires the Court to review a fuller record, and determine "whether the plaintiffs who have opted in are in fact similarly situated to the named plaintiffs." *Id.* (citations and internal quotation marks omitted). To avoid conflating § 216(b) collective certification with Rule 23, courts in this district consider: "(1) disparate factual and employment settings of the individual plaintiffs; (2) defenses available to defendants which appear to be individual to each plaintiff; and (3) fairness and procedural considerations counseling for or against collective action treatment" to determine whether the opt-ins are similarly situated to the named plaintiffs.

*Hernandez v. Fresh Diet, Inc.*, No. 12-CV-4339 (ALC) (JLC), 2014 WL 5039431, at *3 (S.D.N.Y. Sept. 29, 2014).

### 1. Disparate Employment Settings

"[C]ourts have recognized that the "similarly situated" analysis for the purposes of FLSA certification can be viewed, in some respects, as a sliding scale. In other words, the more opt-ins there are in the class, the more the analysis under § 216(b) will mirror the analysis under Rule 23." *Indergit v. Rite Aid Corp.*, 293 F.R.D. 632, 651 (S.D.N.Y. 2013) (citations, alterations, and internal quotation marks omitted). A comparison of the named plaintiffs with the opt-ins, as noted above, shows that Apprentices had vastly different levels and amounts of authority in exercising managerial tasks.

The disparities in job duties in this case seems axiomatic considering that the 516 opt-in plaintiffs worked at 37 states across Chipotle's nine geographic regions. Murphy Decl. ¶2. Indeed, opt-in plaintiff, Lauren Kelsch ("Kelsch"), worked as an Apprentice in Oregon and Kentucky, and testified about the differences in locations. Murphy Decl., Ex. 54 ("Kelsch Tr.") 11:17-24; 13:11-25; 14:22-15:6; 22:21-24, ECF No. 1101. Kelsch worked under a GM in Oregon who limited her leadership responsibilities. *Id.* 72:12-22. In Kentucky, however, Kelsch had no GM and was able to "impact the workforce" and had more of an opportunity to "lead" because she was "running the restaurant" and "made all the decisions for the restaurant." *Id.* 37:21-38:10; 44:19-22. Kelsch had "overall responsibility" for the Kentucky location and agreed her promotion to GM was simply a "salary change" since she "did everything the whole time [she] was there." *Id.* 51:8-15; 76:8-77:6; 78:9-79:12. Kelsch also explained that the two work settings were also different with regard to: (i) the budget; (ii) payroll and wages; (iii) responsibility over inventory which became "a much more . . . active role"; (iv) termination

decisions, which grew from no authority to complete authority; (v) promotions, which grew from none to providing the main recommendation; (vi) her role in the "financial success of the restaurant"; and (vii) the amount of time she spent performing tasks Crew could perform, which decreased from 85-90% of her time to only 30%. *Id.* 64-68.

### 2. *Defenses and Procedural Fairness*

Chipotle anticipates arguing that some Apprentices are exempt under the "executive" exemption and that others are exempt under a combination of the "executive" and "administrative" exemptions, as contemplated by 29 C.F.R. § 541.708. Defs.' Mem. at 36. "Available defenses and procedural fairness go hand-in-hand, as the efficiency gained by holding one trial as opposed to many cannot be obtained at the expense of a defendant's due process rights." *Indergit*, 293 F.R.D. at 649 (citations, alterations, and internal quotation marks omitted). The myriad of accounts from opt-in plaintiffs and named plaintiffs weighs against certification of the collective action, because it would be difficult for Chipotle to rely on "representative proof" while asserting its defenses as noted above. *Stevens v. HMSHost Corp.*, No. 10-CV-3571 (ILG) (VVP), 2014 WL 4261410 at *7 (E.D.N.Y. Aug. 27, 2014). "To find otherwise would reduce Section 216(b)'s requirement that plaintiffs be 'similarly situated' to a mere requirement that plaintiffs share an employer, a job title, and a professed entitlement to additional wages." *Ruiz*, 93 F.Supp.3d at 300. Indeed, if a jury were to determine that one Apprentice is properly classified as exempt in Washington under the executive or administrative exemptions, it does not follow that all Apprentices would be exempt across the country. *See Indergit*, 293 F.R.D. at 650.

Accordingly, the Court decertifies the collective action and the claims of the opt-in plaintiffs are dismissed without prejudice.

## CONCLUSION

Plaintiffs' proposed classes do not have common questions of law or fact that predominate over individual questions, therefore Plaintiffs' motion to certify six classes under the state laws of New York, Missouri, Colorado, Washington, Illinois, and North Carolina is **DENIED**. Given that the opt-in plaintiffs are not similarly situated, Defendants' motion to decertify the collective action under FLSA is **GRANTED**. The claims of the opt-in plaintiffs are **DISMISSED** without prejudice. The clerk of the Court is directed to terminate ECF Nos. 1071, 1072, and 1073.

**SO ORDERED.**

Dated:   March 29, 2017
         New York, New York

　　　　　　　　　　　　　　　ANDREW L. CARTER, JR.
　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE