## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MAXCIMO SCOTT, JAY ENSOR, MATTHEW MEDINA, EUFEMIA JIMENEZ, KRYSTAL PARKER, STACY HIGGS, and CHRISTINA JEWEL GATELEY, on behalf of themselves and all others similarly situated,<br><br>               Plaintiffs,<br><br>    v.<br><br>CHIPOTLE MEXICAN GRILL, INC., and CHIPOTLE SERVICES, LLC,<br><br>               Defendants. | **No. 12 Civ. 8333 (ALC) (SN)** |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
UNOPPOSED MOTION FOR APPROVAL OF SETTLEMENT,
<u>SERVICE AWARDS, AND ATTORNEYS' FEES AND COSTS</u>**

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ................................................................... 2

    I.       Overview of Claims ................................................................................................ 2

    II.      Phase 1: Investigation, Complaints, and Initial Litigation ..................................... 2

    III.    Phase 2: Conditional Certification and Notice Period ........................................... 3

    IV.    Phase 3: Fact Discovery ......................................................................................... 4

    V.      Phase 4: Expert Discovery ..................................................................................... 6

    VI.    Phase 5: Certification Motion Practice .................................................................. 7

    VII.   Phase 6: Decertification and Requests for Interlocutory Review .......................... 8

    VIII.  Phase 7: Second Circuit Appeals ........................................................................... 9

    IX.    Phase 8: Supreme Court Filings ........................................................................... 10

    X.      Phase 9: Settlement Discussions .......................................................................... 10

SUMMARY OF SETTLEMENT TERMS .................................................................................. 11

    I.       The Settlement Fund and Eligible Employees ..................................................... 11

    II.      Notice and Distribution Process ........................................................................... 11

    III.    Allocation Formula .............................................................................................. 13

    IV.    Releases ................................................................................................................. 14

    V.      Service Awards ..................................................................................................... 14

    VI.    Claims Administration .......................................................................................... 15

    VII.   Attorneys' Fees and Costs .................................................................................... 15

ARGUMENT .............................................................................................................................. 15

    I.       A One-Step Approval Process Is Standard for FLSA Settlements ....................... 15

    II.      The Settlement Is Fair and Reasonable and Should Be Approved ....................... 16

    III.    The Proposed Notice of Calculation Should Be Approved .................................. 19

IV.    The Service Awards Should Be Approved as Fair and Reasonable .................... 20

    A.    The Named Plaintiffs Made Significant Contributions and Undertook Substantial Risk…………………………………...…………………….. 21

    B.    Collective Members Who Participated in Discovery and Were Deposed Assisted the Litigation and Benefited the Collective…………………….25

V.    The Court Should Approve Plaintiffs' Attorneys' Fees and Costs as Fair and Reasonable ........................................................................................................ 26

    A.    Time Expended by Plaintiffs' Counsel During Each Phase Was Reasonable……………………………………………………………26

    B.    Plaintiffs' Counsel Lodestar Far Exceeds Their Request………………31

    C.    Plaintiffs' Counsel's Hourly Rates Are Reasonable…………..............32

    D.    Plaintiffs' Fee Request Is Reasonable...........…………………….....35

    E.    Plaintiffs' Counsel Spent Substantial Out-of-Pocket Costs……..........37

CONCLUSION........................................................................................................... 38

## TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*Allende Unitech Design, Inc.*,
   783 F. Supp. 2d 509 (S.D.N.Y. 2011)...................................................................37

*Alli v. Bos. Mkt. Corp.*,
   No. 10 Civ. 4, 2011 WL 6156938 (D. Conn. Dec. 9, 2011) ....................................18

*Andrews v. Blick Art Materials, LLC*,
   286 F. Supp. 3d 365 (E.D.N.Y. 2017) ....................................................................32

*Aponte v. Comprehensive Health Mgmt., Inc.*,
   No. 10 Civ. 4825, 2013 WL 1364147 (S.D.N.Y. Apr. 2, 2013)..............................25

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany
Cty. Bd. of Elections*,
   522 F.3d 182 (2d Cir. 2008).....................................................................................33

*Aros v. United Rentals Inc.*,
   Nos. 10 Civ. 73, 11 Civ. 1281, 11 Civ. 1282, 11 Civ. 1283, 11 Civ. 1284, 11
   Civ. 1285, 2012 WL 3060470 (D. Conn. July 26, 2012)..................................15, 20

*Banford v. Entergy Nuclear Operations, Inc.*,
   649 F. App'x 89 (2d Cir. 2016) ...............................................................................18

*Barbour v. City of White Plains*,
   788 F. Supp. 2d 216 (S.D.N.Y. 2011).......................................................................27

*Beckman v. KeyBank, N.A.*,
   293 F.R.D. 467 (S.D.N.Y. 2013) .................................................................16, 32, 36

*Berrios v. Nicholas Zito Racing Stable, Inc.*,
   No. 04 Civ. 22, 2014 WL 12838562 (E.D.N.Y. Jan. 28, 2014)..............................36

*Blum v. Stenson*,
   465 U.S. 886 (1984).................................................................................................32

*Bozak v. FedEx Ground Package Sys., Inc.*,
   No. 11 Civ. 738, 2014 WL 3778211 (D. Conn. July 31, 2014)........................15, 20

*Briggs v. PNC Fin. Servs. Grp., Inc.*,
   No. 15 Civ. 10447, 2016 WL 7018566 (N.D. Ill. Nov. 29, 2016).........................15

*Campos v. Goode*,
   No. 10 Civ. 224, 2011 WL 9530385 (S.D.N.Y. Mar. 4, 2011) ..............................19

*Ceka v. PBM/CMSI Inc.*,
    No. 12 Civ. 1711, 2014 WL 6812127 (S.D.N.Y. Dec. 2, 2014)............................................24

*Cheeks v. Freeport Pancake House, Inc.*,
    796 F.3d 199 (2d Cir. 2015)...................................................................................19, 36

*Chevalier v. Staffpro, Inc.*,
    No. 20 Civ. 7006, 2021 WL 949749 (S.D.N.Y. Mar. 12, 2021) ............................................17

*Contreras v. Rosann Landscape Corp.*,
    No. 17 Civ. 6453, 2021 WL 1051646 (S.D.N.Y. Mar. 19, 2021) ...........................................24

*Deas v. Alba Carting & Demolition Inc.*,
    No. 17 Civ. 3947, 2021 U.S. Dist. LEXIS 38803 (S.D.N.Y. Mar. 2, 2021) ..........................24

*DeLeon v. Wells Fargo Bank, N.A.*,
    No. 12 Civ. 4494, 2015 WL 2255394 (S.D.N.Y. May 7, 2015).......................................23, 24

*Douglas v. Spartan Demolition Co. LLC*,
    No. 15 Civ. 5126, 2018 WL 4521212 (S.D.N.Y. Sept. 21, 2018) ...........................................37

*Espenscheid v. DirectSat USA, LLC*,
    688 F.3d 872 (7th Cir. 2012) .................................................................................................22

*Estrella v. P.R. Painting Corp.*,
    596 F. Supp. 2d 723 (E.D.N.Y. 2009) ..................................................................................36

*Fisher v. SD Prot. Inc.*,
    948 F.3d 593 (2d Cir. 2020).................................................................................................37

*Flores v. Mamma Lombardi's of Holbrook, Inc.*,
    104 F. Supp. 3d 290 (E.D.N.Y. 2015) ..................................................................................16

*Frank v. Eastman Kodak Co.*,
    228 F.R.D. 174 (W.D.N.Y. 2005)............................................................................... *passim*

*Fujiwara v. Sushi Yasuda Ltd.*,
    58 F. Supp. 3d 424 (S.D.N.Y. 2014)....................................................................................20

*Gaston v. Valley Nat'l Bancorp*,
    No. 17 Civ. 1886 (E.D.N.Y. Feb. 22, 2019) .......................................................................15

*Gay v. Tri-Wire Eng'g Sols., Inc.*,
    No. 12 Civ. 2231, 2014 WL 28640 (E.D.N.Y. Jan. 2, 2014)................................................36

*Genesis Healthcare Corp. v. Symczyk*,
    569 U.S. 66 (2013)................................................................................................................16

*Gonzalez v. Scalinatella, Inc.*,
   112 F. Supp. 3d 5 (S.D.N.Y. 2015) ........................................................36

*Guippone v. BH S & B Holdings, LLC*,
   No. 09 Civ. 1029, 2011 WL 5148650 (S.D.N.Y. Oct. 28, 2011) ...........................22

*Gusman v. Unisys Corp.*,
   986 F.2d 1146 (7th Cir. 1993) ........................................................33

*Halleen v. Belk, Inc.*,
   No. 16 Civ. 55, 2018 WL 6701278 (E.D. Tex. Dec. 20, 2018) ...........................35

*Henry v. Little Mint, Inc.*,
   No. 12 Civ. 3996, 2014 WL 2199427 (S.D.N.Y. May 23, 2014)....................17, 18

*Hnot v. Willis Grp. Holdings Ltd.*,
   No. 01 Civ. 6558 GEL, 2008 WL 1166309 (S.D.N.Y. Apr. 7, 2008) ...................34

*Jibowu v. Target Corp.*,
   492 F. Supp. 3d 87 (E.D.N.Y. 2020) ........................................................18

*Johnson v. Georgia Highway Express, Inc.*,
   488 F.2d 714 (5th Cir. 1974) ........................................................32

*Johnson v. Univ. Coll. of Univ. of Ala. in Birmingham*,
   706 F.2d 1205 (11th Cir. 1983) ........................................................33

*Kahlil v. Original Old Homestead Rest., Inc.*,
   657 F. Supp. 2d 470 (S.D.N.Y. 2009)........................................................27

*Kassman v. KPMG LLP*,
   No. 11 Civ. 3743, 2021 WL 1393296 (S.D.N.Y. Apr. 12, 2021) ...........................15

*Knox v. Jones Grp.*,
   No. 15 Civ. 1738, 2017 WL 3834929 (S.D. Ind. Aug. 31, 2017)...........................15

*Kudo v. Panda Rest. Grp., Inc.*,
   No. 09 Civ. 712, 2015 WL 13879800 (S.D.N.Y. June 26, 2015)...........................25

*Lauture v. A.C. Moore Arts & Crafts, Inc.*,
   No. 17 Civ. 10219, 2017 WL 6460244 (D. Mass. June 8, 2017) ...........................15

*Lawson v. Love's Travel Stops & Country Stores, Inc.*,
   No. 17 Civ. 1266, 2021 WL 720359 (M.D. Pa. Feb. 24, 2021) ........................31, 35

*LeBlanc-Sternberg v. Fletcher*,
   143 F.3d 748 (2d Cir. 1998)........................................................33

*Lilly v. City of New York*,
    934 F.3d 222 (2d Cir. 2019)............................................................................................33

*Lovaglio v. W & E Hosp. Inc.*,
    No. 10 Civ. 7351, 2012 WL 2775019 (S.D.N.Y. July 6, 2012) ...................................24

*Millea v. Metro-North R.R. Co.*,
    658 F.3d 154 (2d Cir. 2011)..........................................................................................31

*Paganas v. Total Maint. Sol., LLC*,
    726 F. App'x 851 (2d Cir. 2018) ...................................................................................18

*Parker v. Jekyll & Hyde Entm't Holdings, L.L.C.*,
    No. 08 Civ. 7670, 2010 WL 532960 (S.D.N.Y. Feb. 9, 2010) ....................................21, 22, 26

*Perdue v. Kenny A. ex rel. Winn*,
    559 U.S. 542 (2010)......................................................................................................31

*Puglisi v. TD Bank, N.A.*,
    No. 13 Civ. 637, 2015 WL 4608655 (E.D.N.Y. July 30, 2015) ...................................24

*Quaratino v. Tiffany & Co.*,
    166 F.3d 422 (2d Cir. 1999)..........................................................................................34

*Reyes v. Altamarea Grp.*,
    No. 10 Civ. 6451, 2011 WL 4599822 (S.D.N.Y. Aug. 16, 2011) ...............................16, 21, 26

*Roberts v. Texaco, Inc.*,
    979 F. Supp. 185 (S.D.N.Y. 1997) ...............................................................................21, 22

*Rozell v. Ross-Holst*,
    576 F. Supp. 2d 527 (S.D.N.Y. 2008)...........................................................................33

*Scott v. Chipotle Mexican Grill, Inc.*,
    67 F. Supp. 3d 607 (S.D.N.Y. 2014).............................................................................6

*Scott v. Chipotle Mexican Grill, Inc.*,
    No. 12 Civ. 8333, 2015 WL 868320 (S.D.N.Y. Feb. 27, 2015) ..................................5

*Seaport Glob. Holdings LLC v. Petaquilla Minerals Ltd.*,
    No. 19 Civ. 9347, 2020 WL 3428151 (S.D.N.Y. June 23, 2020)..................................32

*Sewell v. Bovis Lend Lease, Inc.*,
    No. 09 Civ. 6548, 2012 WL 1320124 (S.D.N.Y. Apr. 16, 2012)..................................22, 24

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*,
    659 F.3d 234 (2d Cir. 2011)..........................................................................................22

*Siegel v. Bloomberg L.P.*,
   No. 13 Civ. 1351, 2016 WL 1211849 (S.D.N.Y. Mar. 22, 2016) ..........................................35

*Siler v. Landry's Seafood House – N.C., Inc.*,
   No. 13 Civ. 587, 2014 WL 2945796 (S.D.N.Y. June 30, 2014)..............................................16

*Slaughter v. Sykes Enters. Inc.*,
   No. 17 Civ. 2038, 2019 WL 529512 (D. Colo. Feb. 11, 2019) ...............................................35

*Stevens v. HMSHost Corp.*,
   No. 10 Civ. 3571, 2015 WL 4645734 (E.D.N.Y. Aug. 5, 2015) ..............................................18

*Stock v. Xerox Corp.*,
   516 F. Supp. 3d 308 (W.D.N.Y. 2021) ..................................................................................15

*Sukhnandan v. Royal Health Care of Long Island, LLC*,
   No. 12 Civ. 4216, 2014 WL 3778173 (S.D.N.Y. July 31, 2014) ...........................................24

*Torres v. Gristede's Operating Corp.*,
   No. 04 Civ. 3316, 2010 WL 5507892 (S.D.N.Y. Dec. 21, 2010)...........................................19

*Torres v. Gristede's Operating Corp.*,
   No. 04 Civ. 3316, 2012 WL 3878144 (S.D.N.Y. Aug. 6, 2012) ...........................................27

*Toure v. Amerigroup Corp.*,
   No. 10 Civ. 5391, 2012 WL 3240461 (E.D.N.Y. Aug. 6, 2012)...........................................23

*Weston v. TechSol, LLC*,
   No. 17 Civ. 141, 2018 WL 4693527 (E.D.N.Y. Sept. 26, 2018).....................................15, 20

*In re Whirlpool Corp. Front-loading Washer Prod. Liab. Litig.*,
   No. 08 WP 65000, 2016 WL 5338012 (N.D. Ohio Sept. 23, 2016).......................................36

*Zorrilla v. Carlson Rests. Inc.*,
   No. 14 Civ. 2740, 2018 WL 1737139 (S.D.N.Y. Apr. 9, 2018).............................................25

**Other Authorities**

Nantiya Ruan, *Bringing Sense to Incentives: An Examination of Incentive
   Payments to Named Plaintiffs in Employment Discrimination Class Actions*,
   10 Emp. Rts. & Emp. Pol'y J. 395 (2006) .............................................................................21

## INTRODUCTION

Plaintiffs Maxcimo Scott, Jay Ensor, Matthew Medina, Eufemia Jimenez, Krystal Parker, Stacy Higgs, and Christina Jewel Gately, along with 500+ opt-in plaintiffs (collectively "Collective Members"),[1] and Defendants Chipotle Mexican Grill, Inc. and Chipotle Services, LLC (collectively, "Defendants" or "Chipotle"), have agreed, subject to Court approval, to resolve this wage and hour lawsuit on a collective-wide basis.  The Settlement followed a thorough pre-suit investigation and eight years of hotly contested litigation, which included substantial discovery (including 100 depositions) and significant motion practice, not only at the district court level but also in the form of two consolidated appeals to the U.S. Court of Appeals for the Second Circuit and briefing on a petition for writ of certiorari before the U.S. Supreme Court.  The Settlement satisfies the criteria for approval of a Fair Labor Standards Act ("FLSA") collective action settlement because it resolves a bona fide dispute, was reached after in-depth investigation and extensive discovery, was the result of arm's-length settlement negotiations between experienced counsel assisted by a private mediator, and provides good value to the workers it will benefit.

Accordingly, Plaintiffs respectfully request that the Court issue an Order: (1) approving the $8,000,000.00 settlement set forth in the Joint Stipulation of Settlement and Release ("Settlement Agreement"), attached as Exhibit 1 to the Declaration of Melissa L. Stewart in Support of Plaintiffs' Motion for Approval of Settlement, Service Awards, and Attorneys' Fees and Costs ("Stewart Decl.");[2] (2) approving the proposed Notice of Calculation (attached as Exhibit A to the

---

[1]      Collective Members are the individuals who opted into this case, worked as an Apprentice for Defendants, and have not been dismissed by the Court, as determined by the Claims Administrator.

[2]      Unless otherwise indicated, all exhibits are attached to the Stewart Declaration, and all capitalized terms have the definitions set forth in the Settlement Agreement.

Settlement Agreement) and directing its distribution; (3) approving Service Awards totaling $137,000.00 to the Service Award Plaintiffs; (4) approving Plaintiffs' request for attorneys' fees plus reimbursement of costs and expenses, which were separately negotiated after the parties agreed upon the settlement amount to the Collective Members; and incorporating the terms of the Settlement Agreement.

**FACTUAL AND PROCEDURAL BACKGROUND**

I.      **Overview of Claims**

Chipotle operates "fast-casual" dining establishments across the country.  ECF No. 872 (Third Amended Complaint) ¶¶ 2-3.  Plaintiffs are former employees of Chipotle who worked as apprentices and/or assistant managers ("Apprentices") at Chipotle restaurants.  *See id.* ¶¶ 19-74. Plaintiffs allege that Chipotle violated the FLSA and state wage and hour laws by improperly classifying them and other Apprentices as exempt from federal overtime requirements and failing to pay them overtime wages.  *See id.* ¶¶ 11, 13.  Chipotle denies these allegations and maintains Apprentices were properly classified throughout their employment.  *See generally* ECF No. 874 (Defs.' Answer and Affirmative Defenses).

II.     **Phase 1: Investigation, Complaints, and Initial Litigation.**

In 2012, Plaintiffs' Counsel began investigating allegations that Chipotle had a uniform nationwide policy and practice of misclassifying Apprentices as exempt from overtime pay requirements.  Stewart Decl. ¶ 17.  Plaintiffs' Counsel conducted a thorough investigation into the merits of the potential claims and defenses and conducted in-depth interviews of multiple Apprentices.  *Id.* ¶ 18.  Plaintiffs' Counsel focused their investigation and legal research on the merits of potential class and collective action members' claims, their damages, and the propriety of class and collective action.  *Id.* ¶ 19.

After evaluating Plaintiffs' claims, Plaintiffs' Counsel wrote to Chipotle to propose that the parties engage in pre-suit settlement discussions. *Id.* ¶ 20. Chipotle did not accept this overture. *Id.*

Plaintiff Maxcimo Scott filed the initial Complaint on November 15, 2012, asserting nationwide collective and class action claims that Chipotle willfully misclassified himself and other Apprentices as exempt from the protections of the FLSA and the New York Labor Law. ECF No. 1. Plaintiffs' Counsel then continued their investigation, researching state law claims, conducting intakes with potential class representatives, and reviewing client documents. Stewart Decl. ¶ 21. Plaintiff Scott subsequently amended the Complaint on February 13, 2013 (adding Plaintiff Jay Ensor and Missouri state law class claims) and on July 7, 2014 (adding class claims under Colorado, Illinois, North Carolina, and Washington state laws on behalf of four new named plaintiffs) after obtaining leave from the Court. ECF Nos. 17, 751; *see* ECF No. 750. Plaintiffs later filed a Third Amended Complaint, on February 10, 2015, which added Chipotle Services, LLC as a Defendant and included an additional class representative for Plaintiffs' Illinois state law claims. ECF No. 872.

III. **Phase 2: Conditional Certification and Notice Period**

On March 4, 2013, shortly after Plaintiffs filed the First Amended Complaint and six Apprentices joined the action as opt-in plaintiffs, Plaintiffs moved for conditional certification and collective action notice. ECF No. 29. Chipotle opposed conditional certification, filed a sur-reply, and submitted multiple notices of supplemental authority. ECF Nos. 45, 58, 64, 67. The Court granted Plaintiffs' motion for collective action notice on June 20, 2013. ECF No. 68. Chipotle then requested reconsideration, leave to file an interlocutory appeal, and a stay pending appeal, ECF No. 73, necessitating additional rounds of briefing, ECF Nos. 85, 87. The Court declined to reconsider and denied an interlocutory appeal. ECF No. 98.

On November 21, 2013, notice issued to approximately 3,750 putative collective members.[3]  Stewart Decl. ¶ 25.  During the notice period, Plaintiffs' Counsel worked to correct and track myriad issues that arose in the process of the Clerk's receipt of consent forms, *see* ECF No. 410, and fielded numerous inquiries from potential collective members.  Stewart Decl. ¶ 26.

Following the close of the notice period on January 20, 2014, additional prospective collective members filed consents to join.  *See* ECF Nos. 562-565, 569-581, 584-590, 592, 596-604, 606-608, 610-615, 623-632, 634-640, 642-649, 653-674, 677-682, 685-695, 697-707, 710, 713-715, 721-723, 731, 747-748, 762, 998.  The parties engaged in letter briefing regarding the rights of these late opt-in plaintiffs and whether good cause existed for their late submissions. ECF Nos. 833, 1002, 1003.  In total, approximately 582 individuals joined the case as opt-in plaintiffs.  Stewart Decl. ¶ 27.

## IV.   **Phase 3: Fact Discovery**

The parties engaged in over two years of extensive discovery, beginning in May 2013 with limited discovery regarding Plaintiffs and initial disclosures and continuing through the official conclusion of discovery on April 14, 2015.  *Id.* ¶ 30.  The breadth of fact discovery in this case is notable, stretching far beyond routine written discovery requests and responses and the negotiation of discovery parameters and search terms for electronically-stored information.

Chipotle employed an aggressive discovery strategy.  Chipotle served subpoenas on the named plaintiffs' post-Chipotle employers to which Plaintiffs objected, resulting in court conferences, orders, and several rounds of letters and formal briefing.  ECF Nos. 708, 711, 712, 716, 717, 718, 719, 720, 752, 753, 754, 755, 757, 758, 759, 760, 763, 764.  Chipotle also sought discovery from each opt-in plaintiff (well over 500 individuals), which the Court denied after

---

[3]     Prior to issuance of the notice, the parties stipulated to the collection of unknown email addresses by a third-party administrator at Plaintiffs' expense.  ECF No. 88

extensive briefing.  ECF Nos. 729, 730, 732, 736, 741, 744, 749.  Chipotle eventually took all the

opt-in plaintiff discovery it was allotted by the Court, for a total of 71 Apprentice depositions (64

Collective Members, plus the seven named plaintiffs).  Ultimately, Plaintiffs produced written

discovery for over 90 Collective Members. ECF No. 1096. Plaintiffs also reviewed and produced

over 5,000 pages of client documents in response to Chipotle's requests.[4]  Stewart Decl. ¶ 31.

Chipotle also collected more than 200 declarations from current employees through a hotly

contested declaration gathering campaign, which necessitated numerous additional depositions

and document review, as well as additional briefing and court conferences regarding Chipotle's

*ex parte* interview of a Collective Member. ECF No. 766, 768, 769, 770, 785, 841.

Plaintiffs spent significant time, effort, and resources during this phase, even though they

repeatedly sought to avoid duplicative work.  For example, to save resources, Plaintiffs took only

12 of the 21 depositions they were permitted of Chipotle's 200+ current employee witnesses

after seeing that the testimony was repetitive and duplicative.  *See* ECF No. 841.  In response to

Plaintiffs' discovery requests, Chipotle produced over 335,500 pages, including email discovery

from 174 custodians, which Plaintiffs sorted through to prepare clients for depositions, and to

locate evidence in support of merits and certification issues.  Stewart Decl. ¶ 33.  Over Chipotle's

objection and after significant briefing, Plaintiffs deposed numerous Chipotle corporate

witnesses, ECF No. 826, including Chipotle's Co-CEO, Monty Moran, *Scott v. Chipotle Mexican

Grill, Inc.*, No. 12 Civ. 8333, 2015 WL 868320, at *1 (S.D.N.Y. Feb. 27, 2015); obtained a job-

duties study that Chipotle claimed to be privileged, ECF No. 942; persuaded the Court that

---

[4]       During this time and through the close of discovery, Plaintiffs' Counsel performed
extensive outreach to unresponsive collective members regarding their duties to participate in
discovery or face dismissal from the case.  Stewart Decl. ¶ 31.  On August 13, 2015, Plaintiffs
requested the reinstatement of 11 opt-in plaintiffs who became responsive after their dismissal.
*Id.* ¶ 32.

Chipotle must waive the attorney-client privilege with respect to withheld documents if it wanted to maintain its good faith defense, *Scott v. Chipotle Mexican Grill, Inc.*, 67 F. Supp. 3d 607, 618-19 (S.D.N.Y. 2014); and obtained company-wide personnel, compensation and point-of-sale data, ECF No. 946. Plaintiffs also served document and deposition subpoenas on a third-party consultant Chipotle had retained in its classification decision, which resulted in motion practice, as well.[5]

Throughout the discovery period, Chipotle filed motions for reconsideration and appeals. *See, e.g.*, ECF No. 985 (order denying Chipotle's Rule 72(a) objections to a discovery ruling); ECF No. 854 (same regarding another discovery ruling); ECF No. 978 (order denying motion to set aside discovery ruling under Rule 60(b)); ECF No. 936 (order denying Chipotle's motion for reconsideration of the Court's order authorizing a deposition).

Plaintiffs worked diligently on additional tasks to develop evidence following the official close of discovery, including by continuing outreach to Collective Members, reviewing and producing documents and written discovery, and taking and defending additional depositions. Stewart Decl. ¶ 35.

## V.    **Phase 4: Expert Discovery**

Fact discovery was followed by nearly a year of expert discovery. *Id.* ¶ 39. In order to be ready for trial, which looked increasingly likely, Plaintiffs' Counsel worked with John A. Gordon and Dr. Phillip M. Johnson, Ph.D., a restaurant analyst and an economist, respectively, each of whom provided extensive analysis of the employment practices at issue. *Id.* On July 28,

---

[5]     The consultant moved to quash the subpoena, claiming status as an unretained expert under Rule 45(d)(3) of the Federal Rules of Civil Procedure. (D. Co. 1:15-mc-00065, ECF No. 1.) Plaintiffs engaged local counsel in Colorado to transfer the motions to quash the subpoena to S.D.N.Y. The District of Colorado granted Plaintiffs' motion in part to depose the consultant about her factual investigation of Chipotle's classification. (D. Co. 1:15-mc-00065, ECF No. 23.)

2015, Plaintiffs served their Rule 26(a)(2) disclosures.  *Id.*  Chipotle served the report of its

rebuttal witness, Robert W. Crandall, on September 11, 2015, and shortly thereafter produced

1,649 files as backup data.  *Id.* ¶ 40.  Chipotle deposed Plaintiffs' experts in October 2015, and

Plaintiffs deposed Chipotle's rebuttal witness in November 2015, after having reviewed

Chipotle's post-report production and testing the rebuttal analyses.  *Id.* ¶ 41; *see* ECF No. 1022.

The parties also served additional reports with leave of the Court in early October 2015.  Stewart

Decl. ¶ 42.

The expert discovery phase also involved motion practice.  On November 25, 2015,

Plaintiffs moved to strike portions of Crandall's report, ECF No. 1039, and Defendants moved to

partially strike the testimony of Plaintiffs' experts, ECF No. 1036.  On April 15, 2016, following

oral argument, the Court granted and denied in part the parties' motions to strike.  ECF No.

1065.

## VI.     **Phase 5: Certification Motion Practice**

Plaintiffs moved for class certification pursuant to Rule 23 on May 9, 2016, attaching 173

exhibits to their well-supported motion.  ECF Nos. 1073, 1096.  On the same date, Chipotle filed

both its motion to decertify the FLSA collective and an affirmative motion requesting that the

Court deny class certification. ECF Nos. 1071-72.  The record evidence compiled in support of

the motions regarding class and collective certification largely overlapped; the motions

concerned the same set of facts regarding the Apprentice position, including corporate policies,

testimony of Apprentices, and testimony of Chipotle's corporate officials.  *See* ECF No. 1135, at

2-4.

Chipotle opposed and the Court denied Plaintiffs' request to consolidate briefing on these

motions, ECF Nos. 1076-78, and the resulting certification and decertification briefing before the

Court involved some 300 pages of argument (40 pages for opening and opposition memoranda

and 20 pages for reply memoranda), ECF Nos. 1095, 1099-1100, 1104-05, 1107, 1109, 1111-12;

100+ additional pages of legal arguments in the form of Chipotle's "compendium" and "chart" of

consolidated class and collective member testimony, *see* ECF Nos. 1079, 1086; Plaintiffs'

evidentiary compendium in opposition to Chipotle's motions (for which it obtained leave of the

Court), *see* ECF Nos. 1079-80; and Chipotle's notice of supplemental authority and Plaintiffs'

response to the notice, ECF Nos. 1131, 1133.

On March 29, 2017, the Court granted Chipotle's motions for decertification and denial

of Rule 23 class certification (and likewise denied Plaintiffs' motion for Rule 23 class

certification), relying largely on the class analysis for the collective decision.  *See* ECF No. 1135.

**VII.**   **Phase 6: Decertification and Requests for Interlocutory Review.**

On the heels of the Court's March 29, 2017 Order, Plaintiffs obtained tolling for the

claims of Collective Members over Chipotle's objection and began to pursue individual litigation

on their behalf.  *See* ECF Nos. 1138, 1139, 1142, 1148, 1161.  Plaintiffs worked diligently to

contact opt-in plaintiffs to advise them of their legal rights and negotiate the scope of

representation for those who wished to pursue their claims against Chipotle.  Stewart Decl. ¶ 48.

Communicating with hundreds of individuals to prepare to present their claims individually was

a time-consuming and complex process.  *Id.* ¶ 49.  Plaintiffs' Counsel also worked with 11

potential local counsel firms to prepare for prosecution of individual cases nationwide and

protect their clients' interests.  *Id.* They also began researching venues and drafting complaints

and other litigation documents to prepare for the individual filings.  *Id.*

In parallel, Plaintiffs sought to appeal the March 29, 2017 Order.  At the district court,

Plaintiffs moved to certify the Court's decertification order for interlocutory review pursuant to

28 U.S.C. § 1292(b).  ECF No. 1144.  On September 25, 2017, the Court granted Plaintiffs'

motion and stayed the action.  ECF No. 1158.

## VIII.   **Phase 7: Second Circuit Appeals**

Plaintiffs had a two-fold appellate strategy.  Around the same time they sought permission for interlocutory review from the Court, Plaintiffs also petitioned the Second Circuit for permission to appeal the Court's class certification decision under Rule 23(f).  *See* Case No. 17-1047.  The Second Circuit granted Plaintiffs' request, and Plaintiffs filed their Rule 23(f) appeal on October 31, 2017.  Case No. 17-2208, Dkt. Nos. 47, 49.  In parallel, earlier in October 2017, Plaintiffs had petitioned the Second Circuit for permission to appeal the Court's collective decertification order pursuant to 28 U.S.C. § 1292(b), after obtaining the requisite permission from this Court.  *See* Case No. 17-3200.  Plaintiffs' request for leave to appeal the decertification order was bolstered by the fact that the Second Circuit had already granted Plaintiffs' Rule 23(f) petition, in that permitting a § 1292(b) appeal would allow the Second Circuit to review the Court's order in its entirety.  *See* ECF No. 1158.

In February 2018, the Second Circuit granted Plaintiffs leave to appeal the decertification order and consolidated the appeals.  Case No. 17-3200, Dkt. No. 49.  Plaintiffs filed their decertification appeal on May 14, 2018. Case No. 18-359, Dkt. Nos. 43-49, 51.

The Second Circuit held oral argument on the fully briefed appeals in February 2019. *See* Case No. 17-2208, Dkt. No. 161; Case No. 18-359, Dkt. No. 86.  In April 2020, the Second Circuit affirmed the Court's order denying Rule 23 class certification but reversed the FLSA decertification order.  *See* Case No. 17-2208, Dkt. No. 162.  The Second Circuit instructed the Court to take its class commonality findings into account in reevaluating the collective "similarly situated" question on remand.  *Id*. at 42.

The Second Circuit denied Chipotle's subsequent motion for rehearing en banc.  *See* Case No. 17-2208, Dkt. No. 180.  Defendants then requested stay of the mandate while Chipotle

pursued Supreme Court review.  Case No. 17-2208, Dkt. No. 181.  The Second Circuit granted

the stay on August 26, 2020 over Plaintiffs' objection.  Case No. 17-2208, Dkt. Nos. 184, 195.

## IX.      **Phase 8: Supreme Court Filings**

In August 2020, Chipotle filed a petition for writ of certiorari to the Supreme Court, to

which Plaintiffs responded on November 2, 2020.  Case No. 20-257.  Plaintiffs' Counsel

engaged Supreme Court counsel to advise Plaintiffs on the writ of certiorari and prepare a

strategy for the Supreme Court appeal in the event the writ were granted.  Stewart Decl. ¶ 54.

After fully briefing the certiorari petition, the Parties agreed to request that the Supreme Court

defer consideration of the petition on December 31, 2020, in light of settlement discussions.  *Id.*

¶ 55; *see* Case No. 20-257.

## X.      **Phase 9: Settlement Discussions**

The parties began to discuss the possibility of a mediation in earnest after the Second

Circuit's April 2020 opinion.[6]  *Id.* ¶ 58.  In November 2020, the parties agreed to mediate before

Steven Rottman, a highly regarded and experienced wage-and-hour mediator.  *Id.* ¶ 61.  In

advance of mediation, Chipotle produced supplemental collective data to allow Plaintiffs to

calculate damages, including data showing weeks worked and detailed pay data.  *Id.* ¶ 62.

Plaintiffs' Counsel analyzed this data and constructed a damages model.  *Id.* ¶ 63.  The parties

submitted mediation statements setting forth their respective positions as to liability and

damages.  *Id.* ¶ 64.

---

[6]      Plaintiffs first broached the topic in a November 2012 pre-suit demand letter, but
Chipotle did not accept their overture then, *see supra* Factual and Procedural Background, § 2,
and also did not accept Plaintiffs' invitations to mediate at other significant inflection points
during litigation.  Stewart Decl. ¶ 59.  While the parties did participate in a September 11, 2015
Court-ordered settlement conference with Judge Netburn, Chipotle stated that at that time it
would not "settle for a monetary amount."  ECF No. 1016.  The 2015 settlement conference did
not result in a resolution.  Stewart Decl. ¶ 60.

Following a full-day mediation session on November 30, 2020, the parties were unable to reach a resolution. *Id.* ¶ 65. However, the mediator continued working with both sides, and made a mediator's proposal to resolve the matter on December 1, 2020, which both sides ultimately accepted on December 2, 2020, resolving the settlement amount. *Id.* ¶ 66. The parties spent the next several months discussing the material non-monetary terms, subsequently memorialized in a term sheet fully executed on March 18, 2021. *Id.* ¶ 67. The parties spent another six months negotiating and finalizing the terms of the full Settlement Agreement, which they executed on September 21, 2021. Stewart Decl. ¶ 68; *see also* Ex. 1 (Settlement Agreement).

## SUMMARY OF SETTLEMENT TERMS

### I.      The Settlement Fund and Eligible Employees

The Settlement Agreement establishes a Total Settlement Amount of up to $8,000,000.00 to settle claims against Defendants. Ex. 1 (Settlement Agreement) § 1.24. The Total Settlement Amount covers payments to the Collective Members, payroll taxes, any Court-approved Service Awards, the Claims Administrator's fees and costs, and Plaintiffs' Counsel's Court-approved attorneys' fees and costs. *Id*. The Collective Fund of $1,900,000 is the portion of the Total Settlement Fund that will cover payments to the Collective Members, payroll taxes, any Court-approved Service Awards, and Settlement Administration Expenses. *Id.* § 1.7.

Collective Members – that is, all persons who joined this action by filing consent to join forms, who worked as an Apprentice for Defendants, and who have not been dismissed by the Court are Collective Members – are eligible to receive settlement payments. *Id.* § 1.11.

### II.      Notice and Distribution Process

Within 14 days of the Court's approval, Chipotle will provide the Claims Administrator and Plaintiffs' Counsel with a list containing (if available) Collective Members' last known

addresses, telephone numbers, email addresses, and Social Security numbers.  *Id.* § 2.3(A).  On the same date, Plaintiffs' Counsel will transmit to the Claims Administrator employment data previously produced by Defendants.  *Id*.  The Claims Administrator will update the addresses on the Notice List through available resources and request additional data from Defendants if deemed necessary.  *Id.* § 2.3(A), (B).

The parties negotiated a robust process to ensure that Collective Members receive their portion of the settlement.  The Claims Administrator will send Notices of Calculation to each Collective Member, informing them of the terms of the settlement, the estimated amount of their individual settlement amount, the employment dates and opt-in dates on which that calculation is based, how to dispute their respective workweeks, and the scope of the release, by mail, email, and text message.  *Id.* § 2.3(C); *see id.* at Ex. B (Notice of Calculation).  The Claims Administrator will take all reasonable steps to obtain the correct address of any Eligible Settlement Participant for whom the Notice of Calculation is returned as undeliverable and will attempt re-mailings in the event updated contact information is obtained.  *See id.* § 2.3(F).

Collective Members will have the longer of 45 days after the initial mailing or 30 days from the subsequent re-mailing of their Notice of Calculation to update contact information and/or dispute workweeks used to determine their Individual Settlement Amount.[7]  *Id.* § 2.3(G).  If any Collective Member has not updated their contact information and/or disputed their respective workweeks within 30 days from the mailing of the Notice of Calculation, the Claims Administrator will send a reminder to those individuals by mail, text message, and email.  *Id.* § 2.3(F).

---

[7]     Collective Members will be able to submit workweek disputes and contact information updates through a website created by the Claims Administrator.  Ex. 1 (Settlement Agreement) § 2.3(C).

Seven days after the close of the period to respond to the Notice of Calculation, the Claims Administrator will calculate the final individual settlement amounts and mail the payments to Collective Members.[8]  *Id.* § 2.3(I).  Collective Members will have 180 days from check date to sign and cash their check.  *Id.* § 3.4(D).  During this 180-day check cashing period, Collective Members may still submit disputes or self-identify as Collective members to seek a settlement payment from a $100,000 Reserve Fund based on the same pro-rata workweek amount as other Collective Members.  *Id.* § 3.4(J).  Sixty days from the mailing of settlement checks, the Claims Administrator will provide a list of individuals who have not yet cashed their checks to Plaintiffs' Counsel, who are free to encourage those individuals to cash their checks. *See id.* § 3.4(E).

Unclaimed funds, including any amounts remaining in the Reserve Fund, will be distributed on a pro rata basis to Collective Members who previously cashed their settlement checks.  *Id.* § 3.4(f).  Any further unclaimed funds (including accrued interest) will be returned to Defendants six months after the later of the first or second mailing of settlement checks.  *Id.*

## III.   **Allocation Formula**

The individual settlement awards will be based on weeks worked for Chipotle as an exempt-classified Apprentice during the Collective Period.  *Id.* §§ 1.2, 3.4(A).  To determine the proportionate shares, each Collective Members will be assigned one point for each workweek of employment during the Collective Period.  *Id.* § 3.4(A).  The Claims Administrator will then add all points for all Collective Members together and divide the Net Collective Fund by this total to obtain the Collective Fund Point Value.[9]  *Id.*  To determine each Individual Settlement Amount,

---

[8]      Chipotle will remit the settlement funds into the Qualified Settlement Fund within 73 days of the Approval Order.  *Id.* § 2.3(D).

[9]      The Net Collective Fund is the Collective Fund less Court-approved service awards and Settlement Administration Expenses.  *Id.* § 1.16.

the Claims Administrator will multiply each Collective Member's total points by the Collective

Fund Point Value, and Collective Members will receive a minimum payment of $500 unless they

at no point worked as an Apprentice.  *Id.*

For tax purposes, 50% of each Collective Member's payment will be treated as unpaid

wages and 50% will be treated as non-wage relief to compensate for liquidated damages and/or

interest.  *Id.* § 3.5(B).  The payments will also be adjusted on a pro rata basis to account for

payment of Employer Payroll Taxes from the Net Collective Fund.  *Id.* § 3.4(A).

**IV.** **Releases**

Although all Collective Members will be offered settlement checks, only Collective

Members who cash their settlement checks will release any claims.  *See id.* § 3.6(A).

Participating Collective Members will release "all claims contained in the Complaint and any

amendments thereto, and any additional wage and hour claims that could have been brought

based on the facts alleged in the Complaint and any amendments thereto . . . that accrued during

their employment as Apprentices" relating back to the applicable statute of limitations through

the date of settlement approval.  *Id.*  A description of the release of claims will be included in the

Notice of Calculation.  *See id.* at Ex. B (Notice of Calculation).  Additionally, in exchange for

receiving and accepting any Court-approved Service Award, Service Award Plaintiffs will also

agree to a general release of claims.  *See id.* § 3.6(B).

**V.** **Service Awards**

The Settlement Agreement provides that, subject to Court approval, certain Collective

Members will receive service awards in recognition of assistance they rendered in obtaining the

benefits of the Settlement for the Collective and the risks they took to do so.  *See id.* § 3.3.  The

Settlement Agreement provides for, and Plaintiffs seek approval of, service awards in the amount

of $15,000 to each of the Plaintiffs (Maximo Scott, Jay Ensor, Matthew Medina, Eufemia

Jimenez, Krystal Parker, Stacy Higgs, and Christina Jewel) and service awards of $500 to the 64

Collective Members who appeared for a deposition.  *Id.*  The Service Award Plaintiffs aside

from the named Plaintiffs can elect to receive a service award in exchange for a general release

by executing and return the service award Claim Form and General Release that they will receive

with their Notice of Calculation.  *Id.* § 3.6(D).

## VI.   <u>Claims Administration</u>

The Parties have selected Rust Consulting, Inc., an experienced settlement claims

administrator, as the Claims Administrator.  *Id.* § 1.5.  Rust Consulting's fees and costs, not to

exceed $24,000, will be paid from the Collective Fund.  *See id.* § 2.1; Stewart Decl. ¶ 79.

## VII.   <u>Attorneys' Fees and Costs</u>

Under the Agreement, subject to Court approval, Defendants will pay a separate amount

of up to $6,100,000, as attorneys' fees and costs.  Ex. 1 (Settlement Agreement) § 3.2(A).

## <u>ARGUMENT</u>

## I.   <u>A One-Step Approval Process Is Standard for FLSA Settlements.</u>

Courts routinely employ a one-step approval process, rather than the two-step process for

settlement approval of class actions, for FLSA settlements that do not include classes under Rule

23.  *See, e.g.*, *Kassman v. KPMG LLP*, No. 11 Civ. 3743, 2021 WL 1393296 (S.D.N.Y. Apr. 12,

2021); *Stock v. Xerox Corp.*, 516 F. Supp. 3d 308, 312-13 (W.D.N.Y. 2021); Order at 1-2,

*Gaston v. Valley Nat'l Bancorp*, No. 17 Civ. 1886 (E.D.N.Y. Feb. 22, 2019), ECF No. 74;

*Weston v. TechSol, LLC*, No. 17 Civ. 141, 2018 WL 4693527, at *1 (E.D.N.Y. Sept. 26, 2018).[10]

---

[10]      *See also Knox v. Jones Grp.*, No. 15 Civ. 1738, 2017 WL 3834929, at *2 (S.D. Ind. Aug.
31, 2017); *Lauture v. A.C. Moore Arts & Crafts, Inc.*, No. 17 Civ. 10219, 2017 WL 6460244, at
*1 (D. Mass. June 8, 2017); *Briggs v. PNC Fin. Servs. Grp., Inc.*, No. 15 Civ. 10447, 2016 WL
7018566, at *1 (N.D. Ill. Nov. 29, 2016); *Bozak v. FedEx Ground Package Sys., Inc.*, No. 11
Civ. 738, 2014 WL 3778211, at *2 (D. Conn. July 31, 2014); *Aros v. United Rentals Inc.*, Nos.

This is because collective actions under Section 216(b) do not implicate the same due process concerns as Rule 23 class actions; unlike in class actions, "under the FLSA, parties may elect to opt in but a failure to do so does not prevent them from bringing their own suits at a later date." *Flores v. Mamma Lombardi's of Holbrook, Inc*., 104 F. Supp. 3d 290, 304 (E.D.N.Y. 2015) (quoting *Viafara v. MCIZ Corp.*, No. 12 Civ. 7452, 2014 WL 1777438, at *7 (S.D.N.Y. May 1, 2014)); *see also Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 74 (2013) ("Rule 23 actions are fundamentally different from collective actions under the FLSA . . . ."). Accordingly, courts do not apply the exacting standards for approval of a class action settlement under Rule 23 to FLSA settlements. *See, e.g.*, *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 476 (S.D.N.Y. 2013) ("[T]he standard for approval of an FLSA settlement is lower than for a class action under Rule 23.").

## II.      The Settlement Is Fair and Reasonable and Should Be Approved.

"Courts approve FLSA settlements when they are reached as a result of contested litigation to resolve bona fide disputes, and regard the adversarial nature of a litigated FLSA case to be an adequate indicator of the fairness of the settlement." *Flores*, 104 F. Supp. 3d at 304-05 (quoting *Siler v. Landry's Seafood House – N.C., Inc.*, No. 13 Civ. 587, 2014 WL 2945796, at *6 (S.D.N.Y. June 30, 2014)). "If the proposed FLSA settlement reflects a reasonable compromise over contested issues, it should be approved." *Siler*, 2014 WL 2945796, at *7 (citing *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1353 (11th Cir. 1982), and *Reyes v. Altamarea Grp.*, No. 10 Civ. 6451, 2011 WL 4599822, at *6 (S.D.N.Y. Aug. 16, 2011)); *see also* 4 William B. Rubenstein, Newberg on Class Actions § 13.44 (5th ed. 2018) ("The law favors settlement, particularly in class actions and other complex cases where substantial resources can be

---

10 Civ. 73, 11 Civ. 1281, 11 Civ. 1282, 11 Civ. 1283, 11 Civ. 1284, 11 Civ. 1285, 2012 WL 3060470, at *2 (D. Conn. July 26, 2012).

conserved by avoiding lengthy trials and appeals.").  To determine whether a settlement is "fair and reasonable," courts consider "the totality of the circumstances," including "(1) the plaintiff's range of possible recovery; (2) the extent to which 'the settlement will enable the parties to avoid anticipated burdens and expenses in establishing their respective claims and defenses'; (3) the seriousness of the litigation risks faced by the parties; (4) whether 'the settlement agreement is the product of arm's-length bargaining between experienced counsel'; and (5) the possibility of fraud or collusion."  *Chevalier v. Staffpro, Inc.*, No. 20 Civ. 7006, 2021 WL 949749, at *1 (S.D.N.Y. Mar. 12, 2021) (quoting *Wolinsky v. Scholastic Inc.*, 900 F. Supp. 2d 332, 335 (S.D.N.Y. 2012)).

The Settlement in this case easily meets the standard for approval.  First, the Collective Fund of $1,900,000 is substantial, especially in light of the considerable risks Plaintiffs and Collective Members faced.  Stewart Decl. ¶ 75.  In comparison, Plaintiffs' Counsel estimates that the Collective Members' lost overtime wages are $4,145,018 calculated at time-and-a-half assuming they worked 10 overtime hours per week in 85% of workweeks (to account for weeks in which overtime may not have been worked due to holidays, sick days, paid time off, etc.), so the net recovery (after deductions for service awards, claims administration, and estimated taxes) amounts to 39% of lost overtime wages using time-and-a-half calculation.  *Id.*  Calculated using the fluctuating workweek method, Plaintiffs' Counsel estimates that the lost wages amount to $1,105,338, so the net recovery represents 100% of unpaid overtime wages plus 48% of liquidated damages using the fluctuating workweek method.  *Id.*

The proposed allocation of the Settlement is also reasonable.  It reflects a proportion of damages owed to Collective Members based on the number of exempt-classified weeks they worked for Chipotle, which is a reasonable approximation of each Collective Member's potential recovery.  Ex. 1 (Settlement Agreement) §§ 1.2, 3.4; *see, e.g.*, *Henry v. Little Mint, Inc.*, No. 12

Civ. 3996, 2014 WL 2199427, at *3, *17 (S.D.N.Y. May 23, 2014) (approving an allocation formula based in part on number of workweeks class members were employed during the class period); *Alli v. Bos. Mkt. Corp.*, No. 10 Civ. 4, 2011 WL 6156938, at *3 (D. Conn. Dec. 9, 2011) ("The Parties have agreed to a settlement that compensates individuals based on weeks worked during the relevant time periods.  This is a fair and reasonable provision . . . .").

Second, Plaintiffs faced risks as to maintaining the collective through trial, and at trial establishing liability and damages.  Although the Second Circuit reversed the Court's decertification order and remanded to this Court for further proceedings, Chipotle's certiorari petition challenging that ruling remains pending at the Supreme Court.  If the Supreme Court chose to consider the matter, there is a risk that it could adopt an interpretation of "similarly situated" that might lead to the reinstatement of the decertification order.

Even if Plaintiffs could maintain collective treatment through trial, Plaintiffs would have to defeat Chipotle's argument that the fluctuating workweek applies to any damages calculations, *see Banford v. Entergy Nuclear Operations, Inc.*, 649 F. App'x 89, 90-93 (2d Cir. 2016), and that Collective Members were subject to the administrative and executive exemption to the FLSA and the corresponding exemptions under applicable state laws.  While Plaintiffs maintain that Apprentices' primary duties are non-exempt and overtime-eligible duties like serving customers and preparing food, Chipotle has argued that Collective Members perform sufficient managerial and administrative tasks to justify their exempt status.  Determining the legal status of manager positions under the FLSA is highly contextual and fact-dependent.  *See, e.g.*, *Paganas v. Total Maint. Sol., LLC*, 726 F. App'x 851, 853-55 (2d Cir. 2018) (vacating grant of summary judgment regarding executive exemption); *Jibowu v. Target Corp.*, 492 F. Supp. 3d 87, 98-113 (E.D.N.Y. 2020) (same); *Stevens v. HMSHost Corp.*, No. 10 Civ. 3571, 2015 WL 4645734, at *3-6 (E.D.N.Y. Aug. 5, 2015) (same as to administrative and executive exemptions).

Third, the Settlement was the result of eight years of robust litigation before the district court, the Second Circuit, and the Supreme Court, and substantial arm's-length negotiations between experienced counsel assisted by a private mediator.  Stewart Decl. ¶ 73; *see id.* ¶¶ 16-69; *see also, e.g.*, *Torres v. Gristede's Operating Corp.*, No. 04 Civ. 3316, 2010 WL 5507892, at *7 (S.D.N.Y. Dec. 21, 2010) (settlement is result of "contested litigation and arm's length negotiation . . . [after] the parties engaged in a 19-hour mediation session with an experienced mediator"); *Campos v. Goode*, No. 10 Civ. 224, 2011 WL 9530385, at *6 (S.D.N.Y. Mar. 4, 2011) (FLSA settlement approved after "the parties engaged in mediation with an experienced mediator in an effort to reach a resolution").  Recognizing the uncertain legal and factual issues involved, the parties reached the Settlement pending before the Court only after attending a mediation session with experienced mediator Steven Rottman.  Stewart Decl. ¶ 74.

Fourth, in addition to the aforementioned reasons for approval, the settlement complies with the Second Circuit's guidance in *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199 (2d Cir. 2015).  The Settlement has been subject to this Court's judicial review and approval, and it does not contain any of the types of provisions that the Second Circuit found objectionable in *Cheeks*, such as overly restrictive confidentiality provisions, overbroad releases, or excessive attorneys' fees.  *See id.* at 206-07.  The confidentiality paragraph, Ex. 1 (Settlement Agreement) § 4(A), applied only until this motion was filed, and the non-publicity paragraph, *id.* § 4(B), does not implicate the concerns underlying *Cheeks* where the news media has extensively followed the case through its life cycle.  *See* Stewart Decl. ¶ 15 (collecting news articles).

## III.   **The Proposed Notice of Calculation Should Be Approved.**

The Court should also approve the proposed Notice of Calculation.  *See* Ex. 1 (Settlement Agreement) at Ex. B (Notice of Calculation).  The proposed Notice of Calculation sufficiently informs Collective Members of: the allocation formula; the estimated monetary amount to which

they are entitled under the Settlement; the scope and mechanism of the release of claims; the

Court-approved attorneys' fees, costs, and Service Awards; the Claims' Administrator's

expenses; and other pertinent information. *See, e.g.*, *Weston*, 2018 WL 4693527, at *9

(approving FLSA notice that informed recipients of the FLSA allegations; the total settlement

amount, including "the amount being paid for attorneys' fees and expenses, the cost of

administration, and the service awards to the named plaintiffs"; the allocation fee; and other

relevant terms); *Bozak*, 2014 WL 3778211, at *3 (approving FLSA notice providing notice of

settlement terms and options facing collective).

## IV.     The Service Awards Should Be Approved as Fair and Reasonable.

Plaintiffs request approval of Service Awards totaling $137,000, allocated as $15,000 to

each of the named Plaintiffs and $500 to the 64 opt-in plaintiffs who were deposed by Chipotle

during the litigation ("Opt-In Deponents") (collectively, "Service Award Recipients").  These

Service Awards are reasonable given the significant contributions they made to advance the

prosecution and resolution of the lawsuit.[11]

Service awards are appropriate because "plaintiffs in class and collective actions play a

crucial role in bringing justice to those who would otherwise be hidden from judicial scrutiny."

*Aros*, 2012 WL 3060470, at *3.  This is especially true in employment litigation.  *See Frank v.

Eastman Kodak Co.*, 228 F.R.D. 174, 187 (W.D.N.Y. 2005) ("In employment litigation, the

plaintiff is often a former or current employee of the defendant, and thus . . . he has, for the

---

[11]     This case is distinguishable from *Fujiwara v. Sushi Yasuda Ltd.*, 58 F. Supp. 3d 424
(S.D.N.Y. 2014).  In *Fujiwara*, the Court acknowledged the named plaintiffs' efforts and risks on
behalf of the class but denied their application for service awards because the settlement
allocation formula favored the named plaintiffs over other class members, providing them with a
"backdoor service award." *Id.* at 434.  Here, the settlement allocation formula gives no
preference to Service Award Recipients and treats them the same as other collective members.
Therefore, the concerns raised in *Fujiwara* about paying named plaintiffs a "backdoor service
award" do not apply here to the Service Award Recipients.

benefit of the class as a whole, undertaken the risk of adverse actions by the employer or co-workers."); *see generally* Nantiya Ruan, *Bringing Sense to Incentives: An Examination of Incentive Payments to Named Plaintiffs in Employment Discrimination Class Actions*, 10 Emp. Rts. & Emp. Pol'y J. 395 (2006).

Service awards serve the important purpose of compensating plaintiffs for the "time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiffs." *Reyes*, No. 10 Civ. 6451, 2011 WL 4599822, at *9; *see also Parker v. Jekyll & Hyde Entm't Holdings, L.L.C.*, No. 08 Civ. 7670, 2010 WL 532960, at *1 (S.D.N.Y. Feb. 9, 2010) ("Enhancement awards for class representatives serve the dual functions of recognizing the risks incurred by named plaintiffs and compensating them for their additional efforts.").  Service awards are commonly awarded to those who serve a class or collective's interests. *See Reyes*, 2011 WL 4599822, at *9; *Frank*, 228 F.R.D. at 187.

In examining the reasonableness of a requested incentive award, courts consider: (1) the "existence of special circumstances," including any personal risk incurred by the plaintiffs; (2) the "time and effort expended by [the plaintiffs] in assisting in the prosecution of the litigation or in bringing to bear added value (e.g., factual expertise)"; (3) "any other burdens" carried by the plaintiffs; and (4) "the ultimate recovery" in vindicating statutory rights. *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 200 (S.D.N.Y. 1997).  A consideration of these factors under the circumstances of this case supports approval of the requested service awards.

### A.    <u>The Named Plaintiffs Made Significant Contributions and Undertook Substantial Risk.</u>

Plaintiffs' request for service awards of $15,000 to each of the named Plaintiffs should be approved.  <u>First</u>, the named Plaintiffs in this case undertook substantial direct and indirect risk.

In the workplace context, plaintiffs who sue their employers are particularly vulnerable to retaliation in that they face "potential risks of being blacklisted as 'problem' employees." *Sewell v. Bovis Lend Lease, Inc.*, No. 09 Civ. 6548, 2012 WL 1320124, at *14 (S.D.N.Y. Apr. 16, 2012); *see also Guippone v. BH S & B Holdings, LLC*, No. 09 Civ. 1029, 2011 WL 5148650, at *7 (S.D.N.Y. Oct. 28, 2011); *cf. Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 244 (2d Cir. 2011) ("[A]n employee fearful of retaliation or of being 'blackballed' in his or her industry may choose not to assert his or her FLSA rights.").

Even where, as here, there has been no threat or indication of retaliation, plaintiffs merit recognition for assuming potential risk of negative consequences or even financial liability in filing the suit. *See Espenscheid v. DirectSat USA, LLC*, 688 F.3d 872, 876 (7th Cir. 2012) ("[A] class action plaintiff assumes a risk; should the suit fail, he may find himself liable for the defendant's costs or even, if the suit is held to have been frivolous, for the defendant's attorneys' fees."); *Frank*, 228 F.R.D. at 187-88 ("Although this Court has no reason to believe that [defendant] has or will take retaliatory action towards . . . any of the plaintiffs in this case, the fear of adverse consequences or lost opportunities cannot be dismissed as insincere or unfounded."). Even former employees assume the risk of adverse consequences for their future employment. *See Roberts*, 979 F. Supp. at 201 (recognizing that where the named plaintiff is a "past employee whose . . . recommendation may be at risk by reason of having prosecuted the suit," the individual "lends his or her name and efforts to the prosecution of litigation at some personal peril"). Here, the risks are additionally noteworthy in light of the highly contested nature of the litigation, the media attention it garnered, and the length of the case, with submissions filed all the way up to the Supreme Court. *See supra* Factual and Procedural Background. Service awards "provide an incentive to seek enforcement of the law despite these dangers." *Parker*, 2010 WL 532960, at *1.

Second, named Plaintiffs spent a significant amount of time and effort in pursuing this litigation on behalf of the Collective Members.  They provided extensive assistance to Plaintiffs' Counsel in investigating the claims, responding to discovery, producing documents, sitting for depositions, having subpoenas sent to then-current employers without notice, submitting declarations in support of the case, providing information to Plaintiffs' Counsel throughout the life of the case, attending a Court-ordered mediation before Judge Netburn by phone, assisting Plaintiffs' Counsel in preparing for the Court-ordered and private mediations, and reviewing the terms of the Settlement reached following the mediation.  Stewart Decl. ¶ 82; *see DeLeon v. Wells Fargo Bank, N.A.*, No. 12 Civ. 4494, 2015 WL 2255394, at *7 (S.D.N.Y. May 7, 2015) (approving a service award in light of the "efforts [the plaintiff] made on behalf of the class, including producing documents, continuously speaking with Class Counsel, and actively participating in the mediation"); *Frank*, 228 F.R.D. at 187 (recognizing the important role that the plaintiff played in "serv[ing] as plaintiff counsel's primary source of information concerning the claims," reviewing documents, and "respond[ing] to his counsel's questions").

Third, and similarly, Plaintiffs took substantial actions to protect the interests of potential collective action members, and those actions resulted in a substantial benefit.  *See* Stewart Decl. ¶ 83.  Named Plaintiffs participated in an extensive investigation in addition to providing information, documents, and testimony crucial to establishing their claims and those of the Collective.  *Id.*  These actions have resulted in substantial benefit to the Collective, leading to a Collective Fund of $1,900,000, which results in an estimated net average award (after deduction of administration costs, service awards, and estimated taxes) of approximately $2,800.  *Id.* ¶¶ 75-76.

Courts in this circuit have approved service awards for similar activities in employment cases.  *See, e.g., Toure v. Amerigroup Corp.*, No. 10 Civ. 5391, 2012 WL 3240461, at *6

- 23 -

(E.D.N.Y. Aug. 6, 2012) (granting service awards in recognition of "the risks that the named Plaintiffs and opt-ins faced by participating in a lawsuit . . . and the efforts they made on behalf of the class, including producing documents, responding to interrogatories, and preparing for and having their depositions taken"); *DeLeon*, 2015 WL 2255394, at *7; *Ceka v. PBM/CMSI Inc.*, No. 12 Civ. 1711, 2014 WL 6812127, at *1 (S.D.N.Y. Dec. 2, 2014) (approving service award of $10,000 to class representative who assisted investigation and prosecution of claims by providing detailed factual information regarding the class members' job duties, the hours that they worked, the wages paid, and other information relevant to their claims, and who was closely involved in settlement negotiations); *Sukhnandan v. Royal Health Care of Long Island, LLC*, No. 12 Civ. 4216, 2014 WL 3778173, at *16 (S.D.N.Y. July 31, 2014) (approving $10,000 service awards to four named plaintiffs based on their time spent and risks taken in bringing, litigating and settling the lawsuit).

Moreover, the $15,000 payments to the named Plaintiffs are reasonable and within the range of additional payments that courts in this circuit routinely approve. *See, e.g.*, *Contreras v. Rosann Landscape Corp.*, No. 17 Civ. 6453, 2021 WL 1051646, at *2 (S.D.N.Y. Mar. 19, 2021) (approving service awards of $15,000 each for class representatives); *Deas v. Alba Carting & Demolition Inc.*, No. 17 Civ. 3947, 2021 U.S. Dist. LEXIS 38803, at *9-10 (S.D.N.Y. Mar. 2, 2021) (approving service award of $15,000 to the named plaintiff); *Puglisi v. TD Bank, N.A.*, No. 13 Civ. 637, 2015 WL 4608655, at *1 (E.D.N.Y. July 30, 2015) (granting service awards of $15,000 each to two named plaintiffs and between $7,000 and $12,000 to other named plaintiffs and opt-in plaintiffs); *Lovaglio v. W & E Hosp. Inc.*, No. 10 Civ. 7351, 2012 WL 2775019, at *4 (S.D.N.Y. July 6, 2012) (approving service awards of $10,000 to class representatives); *Sewell*, 2012 WL 1320124, at *14-15 (granting service awards of $10,000 and $15,000 to named plaintiffs where they "provided detailed factual information to class counsel for the prosecution

of their claims and made themselves available regularly for any necessary communications with counsel").

**B.**  **Collective Members Who Participated in Discovery and Were Deposed Assisted the Litigation and Benefited the Collective.**

The remaining Service Award Recipients – i.e., the 64 Opt-In Deponents – also merit modest service awards of $500 each in recognition of their time and contributions.  First, Opt-In Deponents undertook reputational risk by actively participating in a highly contested litigation against their former employer.  Stewart Decl. ¶ 84.  Second, they faced these risks because, as representative discovery plaintiffs, they bore more burden than other opt-in plaintiffs – they responded to written discovery, produced documents, and prepared and sat for depositions.  *Id.* ¶ 85.  Third, like the named Plaintiffs, the actions of the Opt-In Deponents benefited the Collective and helped lead to the proposed Settlement.  *Id.* ¶ 86.

Courts have approved similar (or higher) service awards for similar activities in employment cases.  *See, e.g.*, *Zorrilla v. Carlson Rests. Inc.*, No. 14 Civ. 2740, 2018 WL 1737139, at *2 (S.D.N.Y. Apr. 9, 2018) (approving service awards of $2,500 to each deposed opt-in plaintiff); *Kudo v. Panda Rest. Grp., Inc.*, No. 09 Civ. 712, 2015 WL 13879800, at *4 (S.D.N.Y. June 26, 2015) (approving service awards of $5,000 each to certain opt-in plaintiffs for their time and effort "submitting to interviews, helping with discovery, and traveling to and sitting for depositions"); *Aponte v. Comprehensive Health Mgmt., Inc.*, No. 10 Civ. 4825, 2013 WL 1364147, at *7 (S.D.N.Y. Apr. 2, 2013) (approving service awards of $500 each to certain opt-in plaintiffs who faced risks by "by participating in a lawsuit against their current or former employer" and "produc[ed] documents, respond[ed] to interrogatories, and prepar[ed] for and [had] their depositions taken").

*     *     *

Collectively, the requested service awards amount to 1.7% of the Total Settlement Amount and 7.2% of the Collective Fund, which is a reasonable percentage. *See Reyes*, 2011 WL 4599822, at *9 (approving awards of $15,000 to three class representatives and $5,000 to a fourth class representative, totaling approximately 16.67% of the total recovery); *Parker*, 2010 WL 532960, at *2 (finding that awarding 11% of recovery as service awards is reasonable "given the value of the representatives' participation and the likelihood that class members who submit claims will still receive significant financial awards"); *Frank*, 228 F.R.D. at 187 (awarding service award of 8.4% of the total recovery).

## V.     The Court Should Approve Plaintiffs' Attorneys' Fees and Costs as Fair and Reasonable.

Plaintiffs' Counsel is entitled to recover fees and costs expended in litigating this FLSA collective action.  29 U.S.C. § 216(b).  Because Plaintiffs' Counsel's efforts have rendered a significant benefit to Collective Members, Plaintiffs request that the Court grant their request of $6,100,000 in attorneys' fees and costs, as provided in section 3.2 of the Agreement.  This amount was negotiated separately from the Collective Fund, Stewart Decl. ¶ 87, and is far less than the $14,273,427.55 in lodestar and actual out-of-pocket expenses Plaintiffs' Counsel expended during the prosecution of this suit.  *Id.* ¶ 88.

### A.     Time Expended by Plaintiffs' Counsel During Each Phase Was Reasonable.

This was a lengthy, hard fought, and complex case.  Plaintiffs' claims have been hotly contested every step of the way, and Defendants strongly disputed liability and asserted multiple defenses throughout the litigation.  The litigation therefore entailed extensive briefing over motions both large and small, from this Court up to the Supreme Court.  *See supra* Factual and Procedural Background.  Because of Chipotle's "vigorous approach to litigating this case" and decision not to accept earlier mediation invitations, Plaintiffs' Counsel committed significant

time to this matter.  *Torres v. Gristede's Operating Corp.*, No. 04 Civ. 3316, 2012 WL 3878144, at *4 (S.D.N.Y. Aug. 6, 2012) (concluding that "Plaintiffs' proposed hours are reasonable" where "much of the work performed by Plaintiffs was due to Defendants' choice of litigation tactics"), *aff'd*, 519 F. App'x 1 (2d Cir. 2013); *see* Stewart Decl. ¶¶ 59, 88; *supra* Factual and Procedural Background.  Courts have recognized that, in similar circumstances, plaintiffs' counsel's time should not be reduced when assessing a fee request.  *See Barbour v. City of White Plains*, 788 F. Supp. 2d 216, 224 (S.D.N.Y. 2011) (finding time expended by plaintiff's counsel reasonable where defendants declined to discuss settlement until late stage of the litigation); *Kahlil v. Original Old Homestead Rest., Inc.*, 657 F. Supp. 2d 470, 478 (S.D.N.Y. 2009) (refusing to reduce fees where "opposing counsel wage[d] a tenacious defense which expand[ed] the time required to pursue even straightforward claims").

In order to provide the Court with additional detail as to the work performed, Plaintiffs' Counsel have divided the case into eleven phases of litigation (described in additional detail in the Factual and Procedural Background section) and broken out Outten & Golden LLP's time, which makes up the majority of time on this case into these phases of litigation.  Stewart Decl. ¶ 14.  While the time and lodestar presented in this Part does not include that of Shavitz Law Group, P.A. or Fitapelli & Schaffer, LLP, the relative breakdown of time spent in each phase by Shavitz Law Group, P.A. and Fitapelli & Schaffer, LLP is comparable.  *See* Declaration of Gregg I. Shavitz ("Shavitz Decl.") ¶ 22; Declaration of Brian S. Schaffer ("Schaffer Decl.") ¶ 12.  Although some phases overlap in time periods, and work for some phases occurred outside of the identified time periods, no time was double counted.  Stewart Decl. ¶ 14.

| Phase | Approximate Time Period | O&G Lodestar |
|---|---|---|
| 1. Investigation, Complaints, and Initial Litigation | September 2012 – February 2013 | $133,647.50 |
| 2. Conditional Certification and Notice Period | February 2013 – March 2014 | $344,624.00 |
| 3. Fact Discovery | March 2014 – April 2015 | $5,448,397.00 |
| 4. Expert Discovery | April 2015 – March 2016 | $1,203,822.65 |
| 5. Certification Motion Practice | March 2016 – March 2017 | $2,297,875.00 |
| 6. Decertification and Seeking Interlocutory Review | March 2017 – February 2018 | $377,298.50 |
| 7. Second Circuit Appeals | April 2017 – August 2020 | $1,191,254.50 |
| 8. Supreme Court Filings | August 2020 – December 2020 | $84,163.00 |
| 9. Settlement Discussions | April 2020 – September 2021 | $167,679.00 |
| 10. Settlement Approval | December 2020 – present | $48,992.50 |
| 11. Settlement Administration | To come | - |

*Id.* ¶¶ 23, 28, 36, 44, 4650, 52, 56, 69, 71.

**Phase 1: Investigation, Complaints, and Initial Litigation**.  Phase 1 roughly extends from the initial investigation in September 2012 through the First Amended Complaint, filed on February 13, 2013, with additional investigation, interviews, and briefing for subsequent amended complaints.  *Id.* ¶ 16.  Plaintiffs' Counsel spent over 200 hours conducting research, interviewing witnesses, and drafting the complaints, as well as other tasks such as issuing retainer agreements.  *Id.* ¶ 23.

**Phase 2: Conditional Certification and Notice Period.**  Phase 2 extends from February 13, 2013, after Plaintiffs filed their Amended Complaint to March 2014, after issuance of the collective action notice and joinder of opt-in plaintiffs.  *Id.* ¶ 24.  Plaintiffs' Counsel spent more

than 700 hours preparing for conditional certification, attending to the logistics of notice administration, speaking with collective members, and ensuring proper docketing of the approximately 582 consent forms, among other tasks.  *Id.* ¶ 28.

**Phase 3: Fact Discovery.**  Phase 3 roughly spans the period between March 2014 and April 2015.  *Id.* ¶ 29.  Plaintiffs' Counsel spent the bulk of their time, over 11,000 hours, on extensive discovery tasks, including crafting discovery requests and responses, engaging in extensive and time-consuming motion practice about the scope of discovery, scheduling and traveling for depositions, preparing witnesses, reviewing over 300,000 pages of discovery, digesting transcripts, and performing extensive outreach to opt-in plaintiffs.  *Id.* ¶ 36.  During this phase, Plaintiffs sought to avoid duplicative motion practice and discovery in order to avoid unnecessary expenditure of fees.  *Id.* ¶ 37.

**Phase 4: Expert Discovery.**  Phase 4 extended from the conclusion of fact discovery in April 2015 through oral argument on the parties' motions to strike portions of the expert reports held on March 3, 2016.  *Id.* ¶ 38.  Plaintiffs' Counsel compiled case information such as document productions, deposition transcripts and digests, and declarations for the experts' review and analyses, before then engaging in motion practice.  *Id.* ¶ 43.  Plaintiffs' Counsel spent more than 2,000 hours during this phase.  *Id.* ¶ 44.

**Phase 5: Certification Motion Practice.**  Phase 5 picks up after oral argument on *Daubert* motions in March 2016 until March 2017 when the Court entered its order regarding Plaintiffs' Rule 23 class certification and Defendants' Section 216(b) decertification motions.  *Id.* ¶ 45.  Second to discovery, preparation and briefing on the certification and decertification motions occupied the greatest expenditure of Plaintiffs' time.  Plaintiff's Counsel spent over 5,000 hours interviewing witnesses, gathering declarations, reviewing evidence, and vigorously defending the putative class and collective claims.  *Id.* ¶ 46.

**Phase 6: Decertification and Seeking Interlocutory Review.**  Phase 6 extends from the entry of the March 29, 2017 decertification order through the Second Circuit's acceptance of Plaintiffs' interlocutory appeal under 28 U.S.C. § 1292(b) on February 7, 2018.  *Id.* ¶ 47. Plaintiffs' Counsel spent over 900 hours in this phase in their outreach to collective members and local counsel, and research and drafting to prepare to prosecute the claims of decertified collective members; and motion practice before the Court to obtain leave to appeal the March 29, 2017 Order.  *Id.* ¶ 50.

**Phase 7: Second Circuit Appeals.**  Phase 7 extends from Plaintiffs' appeal of the Court's certification decision pursuant to Rule 23(f) on April 12, 2017 until August 26, 2020 when the Second Circuit stayed its mandate pending Chipotle's writ of certiorari.  *Id.* ¶ 51. Plaintiffs' Counsel spent over 2,000 hours on tasks including performing legal research, drafting, and cite checking their appeal briefs, and determining strategy and preparing for oral argument of the appeals.  *Id.* ¶ 52.

**Phase 8: Supreme Court Filings.**  Phase 8 continues from Chipotle's filing for petition for a writ of certiorari in the Supreme Court on August 28, 2020 and extends through the parties' joint motion to defer consideration of the petition on December 31, 2020.  *Id.* ¶ 53.  Plaintiffs' Counsel spent over 100 hours on their Supreme Court work, which included: preparing their strategy, selecting specialized counsel, drafting and cite checking the opposition, and coordinating the logistics of filing their response and chamber copies.  *Id.* ¶ 56.

**Phase 9: Settlement Discussions.**  Phase 9 began in earnest after the Second Circuit's opinion entered on April 1, 2020 (though Plaintiffs had also invited Chipotle to mediate pre-suit and at each significant inflection point of the case) and continued through the execution of the settlement agreement on September 21, 2021.  *Id.* ¶ 57.  This phase includes more than 300

hours, which Plaintiffs' Counsel spent on damages calculations, negotiations with Chipotle, and preparing for and attending the mediation.  *Id.* ¶ 69.

**Phase 10: Settlement Approval.**  This phase of the case includes time drafting and preparing the settlement approval papers.  *Id.* ¶ 70.  Plaintiffs' Counsel have spent at least 100 hours on this phase.  *Id.* ¶ 71.

**Phase 11: Settlement Administration.**  Based on Plaintiffs' Counsel's experience, they expect to spend significant additional time fielding collective members' questions and interacting with the Claims Administrator and Defendants' counsel to resolve those questions.  *Id.* ¶¶ 72, 95.

### B.   <u>Plaintiffs' Counsel Lodestar Far Exceeds Their Request.</u>

When courts consider attorneys' fees requests, there is a "strong" presumption that the lodestar, which is calculated by multiplying the number of hours expended on the litigation by hourly rates, is reasonable.  *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552 (2010) (quoting *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992)); *see Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (lodestar calculation creates a "presumptively reasonable fee" (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany Cty. Bd. of Elections*, 522 F.3d 182, 183 (2d Cir. 2008))).

Here, Plaintiffs' request for attorneys' fees is only approximately 38% of Plaintiffs' Counsel's actual lodestar incurred in litigating and settling this matter, after deduction of actual out-of-pocket expenses, which supports the reasonableness of their request.  Stewart Decl. ¶ 101; *see Lawson v. Love's Travel Stops & Country Stores, Inc.*, No. 17 Civ. 1266, 2021 WL 720359, at *6 n.3 (M.D. Pa. Feb. 24, 2021) (approving an FLSA collective settlement in which the attorney's fee amount was separately negotiated and choosing to not independently assess "the hourly rates claimed by counsel because we deem it unnecessary given how low this multiplier is").  The total lodestar to date for the work performed by the law firms primarily representing

the Collective Members is $13,225,511.55, representing 26,761.64 hours of attorney, paralegal, and support staff hours prosecuting and negotiating the settlement of this case.[12]  *Id.* ¶ 88; *see id.* ¶ 93; Shavitz Decl. ¶ 21; Schaffer Decl. ¶ 12.

###        C.       Plaintiffs' Counsel's Hourly Rates Are Reasonable.

The hourly rates Plaintiffs' Counsel used in calculating their lodestar are reasonable and appropriate.  In assessing the reasonableness of an attorney's hourly rate, courts consider whether the claimed rate is "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."  *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984).  Other factors relating to the determination of reasonable hourly rates were enunciated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989):

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "'undesirability'" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

---

[12]       If the Court would like to review Plaintiffs' Counsel's detailed billing records, Plaintiffs' Counsel request permission to submit the underlying time entries by timekeeper under seal.  *See, e.g.*, *Seaport Glob. Holdings LLC v. Petaquilla Minerals Ltd.*, No. 19 Civ. 9347, 2020 WL 3428151, at *1 n.1 (S.D.N.Y. June 23, 2020) (granting motion to file under seal "attorney billing records submitted in support of this motion" for attorneys' fees and costs); *Andrews v. Blick Art Materials, LLC*, 286 F. Supp. 3d 365, 386 (E.D.N.Y. 2017) (keeping affidavit and information concerning attorneys' fees under seal).  Plaintiffs' Counsel also notes that this lodestar figure does not account for the additional time they will expend on this case going forward in connection with implementing and monitoring the settlement following approval.  *See Beckman*, 293 F.R.D. at 482.

*Arbor Hill Concerned Citizens Neighborhood Ass'n*, 522 F.3d at 186 n.3 (citing *Johnson*, 488 F.2d at 717-19).[13]

When considering counsel's rates, courts in the Second Circuit typically award rates charged by counsel at the time of the fee petition (as opposed to historic rates at the time the work was done) to account for the time value of money. *See LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998) ("current rates, rather than historical rates, should be applied in order to compensate for the delay in payment").  Using historical rates, by contrast, "may convert an otherwise reasonable fee into an unreasonably low one." *Johnson v. Univ. Coll. of Univ. of Ala. in Birmingham*, 706 F.2d 1205, 1210 (11th Cir. 1983), *modified by Gaines v. Dougherty Cty. Bd. of Educ.*, 775 F.2d 1565 (11th Cir. 1985).

These considerations all weigh in favor of adopting Plaintiffs' Counsel's (current) customary rates.  The rates that Plaintiffs' Counsel used to calculate their lodestar are the rates they typically charge and are consistent with prevailing rates.  Stewart Decl. ¶ 94; *see* Shavitz Decl. ¶¶ 20-21; Schaffer Decl. ¶ 15.  These customary rates are the best evidence of what the market will bear, as compared to a "rate devised by the court" because "[l]awyers do not come from cookie cutters"; rather, "[c]lients are willing to pay more, per hour, for . . . better lawyers." *Gusman v. Unisys Corp.*, 986 F.2d 1146, 1150 (7th Cir. 1993) (Easterbrook, J.); *see also Rozell v. Ross-Holst*, 576 F. Supp. 2d 527, 545 (S.D.N.Y. 2008) ("[T]he range of rates that plaintiff's counsel actually charge their clients . . . is obviously strong evidence of what the market will bear.").  Here, Plaintiffs' Counsel have extensive experience in employment law and litigating class and collective wage and hour actions, which was on display throughout this action, and

---

[13]    The Second Circuit has clarified that the *Johnson* factors "remain important tools for helping district courts calculate the lodestar," though only "in exceptional cases" may their application warrant "an enhancement or cut to the lodestar."  *Lilly v. City of New York*, 934 F.3d 222, 233 (2d Cir. 2019).

Plaintiffs' Counsel's hourly clients (including those in this district) regularly accept and pay these hourly rates, or higher.  Stewart Decl. ¶¶ 13, 94; Shavitz Decl. ¶ 16; Schaffer Decl. ¶¶ 4-5.

Relatedly, Plaintiffs' Counsel accepted significant risk by representing the Collective Members on a contingency basis over a lengthy period of time.  Stewart Decl. ¶ 91; Shavitz Decl. ¶¶ 17-18; Schaffer Decl. ¶ 16; *see supra* Factual and Procedural Background.  This representation precluded other endeavors (including hourly matters) and created significant risk of non-payment with any payment contingent upon achieving a good result.  Stewart Decl. ¶ 92; Shavitz Decl. ¶¶ 17-18; Schaffer Decl. ¶¶ 15.  In part due to their representation of the Collective on a contingent basis, the firms communicated regularly to avoid incurring unnecessary time or duplicating effort.  Stewart Decl. ¶ 92; Shavitz Decl. ¶ 25.

Plaintiffs' Counsel also achieved a high level of success in this case.  Plaintiffs prevailed on their motion for § 216(b) notice, multiple motions relating to discovery, and a Second Circuit appeal as to the Court's decertification order, and, ultimately, they obtained a substantial settlement for the Collective.  While Plaintiffs did not prevail on their motion for class certification, the motion practice in support of class and collective action (and the underlying work of interviewing witnesses, gathering declarations, and reviewing evidence) overlapped significantly, such that they "are inextricably intertwined and involve a common core of facts or are based on related legal theories."  *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999); *see Hnot v. Willis Grp. Holdings Ltd.*, No. 01 Civ. 6558 GEL, 2008 WL 1166309, at *1 (S.D.N.Y. Apr. 7, 2008) ("Even work on ultimately unsuccessful claims is compensable, so long as the 'plaintiff's unsuccessful claims are not "wholly unrelated" to the plaintiffs['] successful claims.'") (alteration added) (quoting *Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994))).  Moreover, the Second Circuit may not have permitted an appeal of the decertification order absent the coordinated Rule 23(f) petition, which could have significantly lengthened

proceedings.  *See supra* Factual and Procedural Background, § 8.  Even if the Court were to discount the time spent on the Rule 23 certification motion practice by 50%, *see, e.g.*, *Siegel v. Bloomberg L.P.*, No. 13 Civ. 1351, 2016 WL 1211849, at *11 (S.D.N.Y. Mar. 22, 2016), Plaintiffs' Counsel's remaining lodestar would still far exceed Plaintiffs' requested fee award.

Courts, meanwhile, regularly approve Plaintiffs' Counsel's rates in other cases.  Stewart Decl. ¶ 94; Shavitz Decl. ¶ 21.  And the effective blended hourly rate requested by Plaintiffs' Counsel is significantly below these rates.  The requested fee divided by the hours worked on the case yields an effective hourly rate of $228.  Stewart Decl. ¶ 90.

### D.    **Plaintiffs' Fee Request Is Reasonable.**

In addition to being supported in relation to Plaintiffs' Counsel's reasonable hours spent on this intensely litigated action, actual lodestar, and reasonable hourly rates, Plaintiffs' requested fee award is also supported by several other factors.

First, because the parties separately negotiated attorney's fees after they had negotiated the settlement amount for the Collective, Stewart Decl. ¶ 87, the amount of the Collective's recovery was not reduced to account for Plaintiffs' fees – and Plaintiffs' Counsel's loyalty to their clients was not undermined by a simultaneous negotiation.  *See, e.g.*, *Lawson*, 2021 WL 720359, at *5 (approving an FLSA collective settlement for a collective of operations managers that included $1,500,000 to the collective members and $1,450,000 in attorneys' fees and costs where Shavitz Law Group, P.A. was plaintiffs' counsel); *Slaughter v. Sykes Enters. Inc.*, No. 17 Civ. 2038, 2019 WL 529512, at *8-9 (D. Colo. Feb. 11, 2019) (approving an FLSA collective settlement for a collective of call center workers that included $500,000 to the collective members and $650,000 in attorneys' fees and costs where Outten & Golden, LLP and Shavitz Law Group, P.A. were plaintiffs' counsel); *Halleen v. Belk, Inc.*, No. 16 Civ. 55, 2018 WL 6701278, at * 7 (E.D. Tex. Dec. 20, 2018) (approving an FLSA collective settlement for a

- 35 -

collective of retail managers in which the amount to attorneys' fees and costs was separately negotiated from the amount to the collective where Shavitz Law Group, P.A. was plaintiffs' counsel); *In re Whirlpool Corp. Front-loading Washer Prod. Liab. Litig.*, No. 08 WP 65000, 2016 WL 5338012, at *10 (N.D. Ohio Sept. 23, 2016) ("no indicia . . . of fraud or collusion" where attorneys' fees were separately negotiated); *Berrios v. Nicholas Zito Racing Stable, Inc.*, No. 04 Civ. 22, 2014 WL 12838562, at *7 (E.D.N.Y. Jan. 28, 2014) (approving an FLSA and Rule 23 settlement and considering "the fact that the attorneys' fee award was negotiated separately from the Settlement award for class members" when granting fees and costs); *Gay v. Tri-Wire Eng'g Sols., Inc.*, No. 12 Civ. 2231, 2014 WL 28640, at *12 (E.D.N.Y. Jan. 2, 2014) ("the fact that the attorney's fee award was negotiated separately from the settlement award for class members" along with other factors such as the firms' lodestars, "together prompt the court to find that the requested amount of attorney's fees is fair and reasonable").

Second, public policy favors adequately compensating lawyers who take high-risk, contingent wage and hour cases like this one. The FLSA "is a uniquely protective statute" that relies on private enforcement. *Cheeks*, 796 F.3d at 207. The FLSA's fee provisions were designed "to secure legal representation for plaintiffs whose wage and hour grievances were too small, in terms of expected recovery, to create a financial incentive for qualified counsel to take such cases under conventional fee arrangements." *Estrella v. P.R. Painting Corp.*, 596 F. Supp. 2d 723, 727 (E.D.N.Y.), *aff'd*, 356 F. App'x 495 (2d Cir. 2009). Where the law relies on prosecution by "private attorneys general," attorneys who fill that role "must be adequately compensated for their efforts." *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 477 (S.D.N.Y. 2013). The FLSA's fee-shifting provisions serve that purpose "to encourage attorneys to represent rights victims even in small cases." *Gonzalez v. Scalinatella, Inc.*, 112 F. Supp. 3d 5, 11 (S.D.N.Y. 2015) (internal quotations omitted).

In this vein, it is "of no matter" that Plaintiffs' Counsel's requested award is large in comparison to Collective Members' recovery. *Allende v. Unitech Design, Inc.*, 783 F.Supp.2d 509, 511 (S.D.N.Y. 2011). The Second Circuit has expressly rejected the application of "a proportionality limit on attorneys' fees in FLSA actions," describing a proportionality rule as being grounded in "[n]either the text nor the purpose of the FLSA." *Fisher v. SD Prot. Inc.*, 948 F.3d 593, 602-03 (2d Cir. 2020). The *Fisher* court explained that because favorable outcomes in FLSA cases that "often involve ordinary, everyday workers who are paid hourly wages" commonly "result in limited recoveries," a proportionality rule would result in "no rational attorney . . . tak[ing] on these cases unless she were doing so essentially pro bono," leaving the ordinary worker "with little legal recourse." *Id.* at 603-04; *see also Allende*, 783 F. Supp. 2d at 511 ("[T]he attorneys' fees need not be proportional to the damages plaintiffs recover, because the award of attorneys' fees in [FLSA] cases encourages the vindication of Congressionally identified policies and rights."); *Douglas v. Spartan Demolition Co. LLC*, No. 15 Civ. 5126, 2018 WL 4521212, at *8 n.9 (S.D.N.Y. Sept. 21, 2018) ("The caselaw is clear, however, that a plaintiff's 'limited monetary recovery does not preclude a substantial attorneys' fee award, for there is no requirement of proportionality.'" (quoting *Baird v. Boies, Schiller & Flexner LLP*, 219 F. Supp. 2d 510, 519-20 (S.D.N.Y. 2002)).

**E.    Plaintiffs' Counsel Spent Substantial Out-of-Pocket Costs.**

While Plaintiffs' Counsel are not seeking costs in addition to the $6,100,000 award, Plaintiffs' Counsel have incurred $1,047,916 in out-of-pocket expenses, including court fees, process service, court reporter fees, court transcript fees, mediation fees, travel expenses, postage, photocopies, claims administration costs for the § 216(b) notice period, electronic research, e-discovery costs, consultant costs, mediation fees, and appellate printing fees. Stewart Decl. ¶ 98; *see* Stewart Decl. at Ex. 6; Shavitz Decl. at Ex. A; Schaffer Decl. at Ex. A. This

substantial out-of-pocket expenditure further supports the reasonableness of the $6,100,000 award of fees and costs which Plaintiffs' Counsel agreed to accept as part of the settlement; if the incurred costs are subtracted from the requested award, the remaining request of $5,052,084 represents only 38% of Plaintiffs' Counsel's lodestar.[14]  Stewart Decl. ¶ 102.

The expenses to date have not been reimbursed, and Plaintiffs' Counsel was aware such costs and expenses might not be recovered unless and until the litigation was successfully resolved.  Stewart Decl. ¶ 100.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court issue an order: (1) approving the $8,000,000 settlement set forth in the Settlement Agreement; (2) approving the proposed Notice of Calculation and directing its distribution; (3) approving Service Awards of $15,000 to each of the Plaintiffs and $500 to each of the remaining Service Award Plaintiffs; (4) approving Plaintiffs' request for $6,100,000 in attorneys' fees and costs and expenses; and (5) incorporating the terms of the Settlement Agreement.


Dated: October 1, 2021                        Respectfully submitted,

                                              */s/ Melissa L. Stewart*
                                              Justin M. Swartz
                                              Melissa L. Stewart
                                              **OUTTEN & GOLDEN LLP**
                                              685 Third Avenue, 25th Floor
                                              New York, New York 10017
                                              Telephone: (212) 245-1000

---

[14]     Plaintiffs have attached cost ledgers as Exhibit 6 to the Stewart Declaration, Exhibit A to the Shavitz Declaration, and Exhibit A to the Schaffer Declaration.  If the Court would like additional information about costs expended, Plaintiffs' Counsel would be glad to provide it. However, the $6,100,000.00 request would be reasonable even without taking these expenses into account, given that it represents just 46% of actual lodestar incurred by counsel.  Stewart Decl. ¶ 102.

Brian S. Schaffer
Frank J. Mazzaferro
**FITAPELLI & SCHAFFER, LLP**
28 Liberty Street, 25th Floor
New York, New York 10005
Telephone: (212) 300-0375

Gregg I. Shavitz (*pro hac vice*)
**SHAVITZ LAW GROUP, P.A.**
951 Yamato Road, Suite 285
Boca Raton, FL 33431
Telephone: (561) 447-8888